IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF  AMERICA,          Criminal Action
                                    No. 1:21-0537
                  Plaintiff,

       vs.
                                    November 2, 2023
RYAN SAMSEL - 1,                    11:00 a.m.
JAMES TATE GRANT - 2,
PAUL RUSSELL JOHNSON - 3,
STEPHEN CHASE RANDOLPH - 4,
JASON BENJAMIN BLYTHE - 5,

                  Defendants.    Washington, D.C.
_____

            TRANSCRIPT OF CLOSING ARGUMENTS DAY 7
            **BEFORE THE HONORABLE JIA M. COBB**
              UNITED STATES DISTRICT JUDGE

APPEARANCES:

**For Plaintiff:**                  **Kyle Mirabelli**
                                    **Joseph Hutton Marshall**
                                    United States Attorneys Office
                                    601 D Street NW, Suite 6-725
                                    Washington, DC  20001
                                    202-815-4028

                                    **Christopher Brunwin**
                                    U.S. Attorneys Office
                                    Federal Courthouse
                                    312 N. Spring Street, 13th Floor
                                    Los Angeles, CA 90012
                                    213-894-4242

                                    **Alexandra Foster**
                                    DOJ - U.S. Attorneys Office
                                    880 Front Street, Room 6293
                                    San Diego, CA  92101-8807
                                    619-546-6735

APPEARANCES CONTINUED:

For Deft. Samsel:          **Stanley Woodward**
                           BRAND WOODWARD LAW, LP
                           400 Fifth Street, Northwest
                           Washington, DC 20001
                           202-996-7447

For Deft. Grant:           **Robert A. Feitel**
                           LAW OFFICE OF ROBERT FEITEL
                           1300 Pennsylvania Avenue NW,
#1505
                           Washington, DC 20008
                           202-255-6637

For Deft. Johnson:         **Lauren Rosen**
                           **Todd M. Richman**
                           OFFICE OF FPD-EDVA
                           1650 King Street, Suite 500
                           Alexandria, VA 22314
                           703-600-0819

For Deft. Randolph:        **Angel Halim**
                           3580 Indian Queen Lane
                           Philadelphia, PA 19129
                           215-300-3229

For Deft. Blythe:          **Stephen Brennwald**
                           BRENNWALD & ROBERTSON, LLP
                           922 Pennsylvania Avenue, SE
                           Washington, DC 20003
                           301-928-7727

Reported By:               **Stacy H. Johns, RPR**
                           Official Court Reporter
                           U.S. District & Bankruptcy Cts.
                           333 Constitution Avenue, NW
                           Washington, DC 20001
                           Stacy_Johns@dcd.uscourts.gov

**\*\*\*** Proceedings recorded by stenotype shorthand.
**\*\*\*** Transcript produced by computer-aided transcription.

**INDEX**

|                                          | PAGE |
|------------------------------------------|------|
| Closing Argument By Ms. Foster           | 5    |
| Closing Argument By Mr. Woodward         | 48   |
| Closing Argument By Mr. Feitel           | 69   |
| Closing Argument By Ms. Rosen            | 97   |
| Closing Argument By Ms. Halim            | 113  |
| Closing Argument By Mr. Brennwald        | 128  |

**EXHIBITS**

| GOVERNMENT EXHIBITS | ADMIT |
|---------------------|-------|
| 338                 | 5     |

**P R O C E E D I N G S**

1

2          DEPUTY CLERK:  Good morning, again, Your Honor.  We

3    are on the record in criminal Case 21-537, United States of

4    America versus Ryan Samsel, et al.  All defendants and counsel

5    are present.

6          THE COURT:  Okay.  Good morning, everyone.  Just give

7    me one minute to log on here.

8          Okay.  Good morning.  Are we ready to proceed with

9    closings?

10         MR. MIRABELLI:  Yes, Your Honor.  If I could just

11   raise one matter before that.

12         THE COURT:  Sure.

13         MR. MIRABELLI:  So at the end of business the other

14   day when we were going over exhibits, I realized that we had

15   not offered Government's Exhibit 338.  Actually, Ms. Franklin

16   made it aware to me that we had not admitted that into

17   evidence.

18         THE COURT:  Okay.

19         MR. MIRABELLI:  We have laid a foundation for it.  We

20   checked in the transcript.  So I would move to reopen to admit

21   Government's Exhibit 338.

22         THE COURT:  Any objection?

23         MR. BRENNWALD:  What is 338?

24         MR. MIRABELLI:  It's an open-source video from the

25   West Plaza.  I believe it's only relevant to Mr. Samsel.

```
1              THE COURT:  Any objection other than the ones that

2    have already been stated with respect to the open-source

3    videos?

4              UNIDENTIFIED SPEAKER:  Same objection, Your Honor.

5              THE COURT:  Okay.  I will reopen the case, admit

6    Exhibit 338.

7              MR. MIRABELLI:  Thank you, Your Honor.

8              THE COURT:  Now evidence is closed.

9        (Government Exhibit 338 received in evidence.)

10             MS. FOSTER:  Your Honor, now I think we're ready to

11   close, unless there's any other issues.

12             THE COURT:  Okay.  Whenever you're ready.

13             MS. FOSTER:  Thank you, Your Honor.

14             Ms. Franklin, if you wouldn't mind so that everybody

15   can see.

16             Your Honor, can you see?

17             THE COURT:  Yes, I can.

18             MS. FOSTER:  Defendants Ryan Samsel, James Tate Grant,

19   Paul Russell Johnson, Stephen Chase Randolph and Jason Benjamin

20   Blythe came to the Capitol to fight and stop the certification

21   of the vote on January 6, 2021.

22             They tried to achieve that goal by being the first to

23   breach the outer barricade and enter the restricted perimeter,

24   opening the way for hundreds of rioters to stream in behind

25   them.
```

1          Being the first to pick up the barricade and use it as

2     a deadly and dangerous weapon to overrun the five U.S. Capitol

3     police officers on the other side, U.S. Capitol police officers

4     who were there just trying to do their jobs that day.

5          They were also amongst the first to take up posts on

6     the West Front of the Capitol, and then they stayed there for

7     hours.  During this time these defendants were assaulting

8     officers, throwing objects at officers, whipping up the crowd

9     over a megaphone, climbing through a broken window to enter the

10    Capitol and then accessed Senators' offices, refusing to back

11    away from police lines and refusing to leave, even though they

12    had repeatedly been ordered to do so.

13         I've broken this indictment up by location.  The bulk

14    of the charges stem from the defendant's assault of officers at

15    the second manned barricade near the Peace Circle.  That's

16    counts 1 through 9.  Counts 11 through 13 focus on defendant

17    Samsel's assaultive behavior at the West Terrace.  And finally,

18    count 10 is the obstruction count.  For that, we're asking this

19    Court to take into account each defendant's behavior on the

20    Capitol grounds, put into context by their behavior before they

21    got there and after they left.

22         As the Court has heard a lot, there were initially two

23    barricades between the protestors and the U.S. Capitol Police

24    officers.  The first one was at the sidewalk near the road.  As

25    the Court can see, it's right here on this image.  And the

```
1    second one is in front of the temporary stairwell, about a
2    quarter of the way up that Pennsylvania walkway.  Right up
3    here.
4             The first round of assaults occurs between the Peace
5    Circle and the stairwell and the barricades that are very
6    clearly marked that the Capitol grounds are closed.  And they
7    were closed that day in anticipation of the certification of
8    the 2020 presidential election.
9             Counts 1 through 9, I put them up here but, as the
10   Court will note, all defendants are charged on all counts,
11   except for count 4, where it's solely as to defendant Randolph
12   and his assault of Officer Cruz.
13            Let's go through what happened at the Peace Circle
14   chronologically.  First, the defendant Johnson was riling up
15   the crowd in anticipation of a fight to stop the certification.
16   Here at the Peace Circle, before any barricades are breached,
17   he's yelling to the crowd, Get on the fucking front line.  Then
18   he says something like, Until we get up there -- pointing to
19   the Capitol -- it means nothing.  He tells them, This is where
20   it's at.  Right here.
21            Your Honor, just for ease of reference, you will note
22   that at the bottom of each of these slides, to the extent that
23   we're citing to exhibits, we've listed the exhibit number.  So
24   this is Government's Exhibit 340.
25       (Video played.)
```

1          MS. FOSTER:  In this video, you will hear defendant

2    Johnson bemoaning the fact that it's only women at the front

3    line and encouraging the men to move to the front line, saying

4    things like, Where's all the men at?  And, This is our Capitol.

5          Defendant Samsel, with his flag, is right next to

6    Johnson, and you will see that at the end of this clip the two

7    begin to walk towards the first barricade at the curb of the

8    Peace Circle.  Why would you want men at the front line?  You

9    want men at the front line because it's the men.  Men like

10   Samsel, men like Johnson, who are going to fight.

11       (Video played.)

12          MS. FOSTER:  There's Johnson.  There's Samsel.

13       (Video played.)

14          MS. FOSTER:  Johnson continues to encourage the crowd

15   to move forward to the front line and compares this moment to

16   1776.  He says, Think George Washington would be standing

17   behind this motherfucker?  Johnson is encouraging people to

18   breach the barricade so they can be like George Washington.

19   And Samsel, in his jean jacket, is standing right next to

20   Johnson, as they look toward the Capitol police officers

21   positioned on top of the stairs on the Pennsylvania walkway.

22   You can see the officers right here.  You can see defendant

23   Johnson right here and defendant Samsel next to him.

24       (Video played.)

25          MS. FOSTER:  Samsel then walks to the front of the

1    barricade, unlatches it and marches through.  You heard Officer

2    Cruz and Sergeant Lively testify that the man in the red hat

3    and the jean jacket was the first to breach the barricade, that

4    first barricade.  Agent Curcio explained that that man was

5    Samsel.  And the videos corroborate their testimony.

6          The Court will notice there's a blue square here or

7    rectangle.  That's to redact out the time that is an incorrect

8    time.

9          I would ask the Court to keep your eye on defendant

10   Samsel.  He's right here.  I circled him with my laser pointer.

11         As you watch him you will see him lean down at the

12   front of that barricade, look like he's kind of fiddling with

13   something and then stand up.  And you'll hear a clang as

14   Samsel's hand flies left and the barricade goes down.  And then

15   you're going to hear the crowd grow significantly louder as

16   Samsel marches through that first barricade.

17         And then the crowd will follow.

18      (Video played.)

19         MS. FOSTER:  There he is, leaning down.

20      (Video played.)

21         MS. FOSTER:  Here is the same thing, but it's from the

22   camera at the top of the Capitol building.  You'll see Samsel

23   come in from the right side over here.  It's hidden by this

24   tree.  And the tree is blocking the camera's view.  But you're

25   going to see Samsel come in from the right, raise his arms as

1    if to wave the crowd forward and then head directly towards

2    these five officers standing here on the walkway.

3         And then you're going to see Grant right behind him.

4         As you may remember, when Officer Cruz was asked on

5    cross how sure he was that the first man through the first

6    barricade was the man with the red hat and the jean jacket,

7    Cruz responded he was a hundred percent sure.  Office Cruz is

8    standing right here in the middle.  He has a clear view of what

9    is happening over here on the right, unlike the camera that you

10   see here.

11       (Video played.)

12       MS. FOSTER:  Here comes Samsel, raising his arms.  And

13   then he heads towards the officers.

14       In fact, on January 6th and 7th, Samsel confirms that

15   Cruz was right.  He texts his friends:  Dude, no shit.  I

16   started it.

17       And then he says:  I'm on the cover of Time Mag.  I

18   was first.  I was the first one over the fence, bro.  And

19   everybody followed me.  We went nuts LOL.

20       Samsel started it.  He was the first one over the

21   fence.  And Samsel knew what he had done and he was proud.

22       Now, let's talk about Grant.  Grant was right behind

23   Samsel.  Here in this video you're going to see Grant and then

24   Johnson.  Both of them are calling the crowd forward, Grant

25   with his body by jumping up and down and waving and Johnson

1  with his megaphone.  You'll hear Johnson hollering at the

2  crowd, Let's go, and, Fuck this shit.

3      (Video played.)

4          MS. FOSTER:  Here's the same event with no audio and

5  from a different viewpoint.  Again, you're going to see Samsel

6  come through from over here and then you're going to see Grant

7  right behind him, following him, jumping up and down and waving

8  the crowd on.

9      (Video played.)

10         MS. FOSTER:  Here comes Samsel.  There's Grant.

11     (Video played.)

12         MS. FOSTER:  And you'll see all those barricades fell

13  down and all the rioters walked in after Samsel opened that

14  first barricade to the right.

15         Now Johnson is inciting the crowd at the second

16  barricade.  At this point, he is not only aiming his megaphone

17  at the crowd yelling, Let's go, and, Fuck this shit, he turns

18  it on the U.S. Capitol Police officers, and he's yelling at

19  them through his megaphone, sometimes within about a foot of

20  the officers.  He's yelling, We pay your bills, and, Move, and,

21  Back the fuck off.

22     (Video played.)

23         MS. FOSTER:  There's Johnson right there.  There are

24  the officers, right across from him.

25             Let's talk about Blythe and Randolph.  They're close

1   behind the first three defendants.  Blythe weaves his way

2   through the crowd so he can get to the barricade.  He's

3   intentionally getting right up against the bike racks or right

4   next to them.  You will see that on the video to the left here.

5      (Video played.)

6        MS. FOSTER:  There's Blythe.

7      (Video played.)

8        MS. FOSTER:  The same is true for Randolph.  As the

9   crowd screams, "Stop the Steal," you can watch Randolph very

10  intentionally weaving his way through the crowd to get to the

11  front, so he can be at the bike rack directly across from

12  Officer Edwards.  Randolph is hidden in this first image by

13  this individual with the jacket.  But you'll see him more

14  clearly as he gets closer to the Capitol building.

15     (Video played.)

16       MS. FOSTER:  He's right there.

17     (Video played.)

18       MS. FOSTER:  There he is, working his way to the

19  front.

20     (Video played.)

21       MS. FOSTER:  And now there's Randolph right across

22  from Officer Edwards.

23      You will see as Johnson and Samsel and Grant prepare

24  for the fight, as Johnson approaches the officers he gets right

25  up at the barricade, continues to scream at them into his

1   megaphone within inches of their faces.  Meanwhile, Grant and
2   Samsel appearing to talking and gesturing in an animated manner
3   at the officers.  Cruz and Lively testified that they were
4   telling the rioters that they couldn't come through, that they
5   couldn't come in.
6          Samsel starts to pull on the barricade.  So you'll see
7   Officer Cruz raises his fist.  Officer Cruz told you that he
8   raised his fist, not because he was going to punch any of the
9   rioters but because he was going to use the fist to slam onto
10  the barricade, onto the railing, to keep the rioters' hands off
11  of that barricade, so that that way those rioters couldn't push
12  or pull the barricade.
13         Now, that movement, that fist, was all that Samsel and
14  Johnson needed.  Johnson responded by telling somebody hold my
15  backpack and presumably his megaphone.  He turns around and
16  hands that off to somebody off camera.  Samsel hands off his
17  jacket to somebody behind him, and then he takes his hat and
18  flips it backwards like he's preparing for the fight to come.
19  And the Grant keeps talking at the officers in an animated
20  manner.
21         And you'll see in a last-ditch effort someone
22  approaches Samsel and tells him that the officers are not the
23  enemy.  It's to no avail.
24      (Video played.)
25         MS. FOSTER:  There's Samsel, Johnson, Grant.

```
1          (Video played.)

2              MS. FOSTER:  Samsel, the fist.

3          (Video played.)

4              MS. FOSTER:  Let's talk about the assault on Officer

5      Edwards.  You will see in this video -- and this is in slow

6      motion -- Randolph is pushing up against Officer Edwards.

7          (Video played.)

8              MS. FOSTER:  You're going to see as Randolph pushes,

9      Samsel will join in.  You'll see them right there, put his

10     hands on and start pushing.

11         (Video played.)

12             MS. FOSTER:  And then Johnson is right there to the

13     left.  He also has his hands on the barricade and starts

14     pushing as well.

15         (Video played.)

16             MS. FOSTER:  As the Court well knows, Blythe and Grant

17     are just to the left of them.

18         (Video played.)

19             MS. FOSTER:  So here they are, pushing into Officer

20     Edwards.

21         (Video played.)

22             MS. FOSTER:  They're not just pushing.  They're also

23     lifting that barricade.  So it's at the officers' faces,

24     turning this barricade into a lethal weapon.  You heard what

25     each one of these barricades weighs, between 30 and 50 pounds.
```

1    So five of these linked together, that's 150 to 250 pounds

2    coming directly at Officer Edwards.  And now she's down, having

3    banged her head up against this railway and down on the ground.

4          Although Randolph took no responsibility for actually

5    pushing Officer Edwards into the handrail, he did describe the

6    assault and the injury aptly to an undercover officer a few

7    months later.  He tells the UC that he saw a lady cop getting

8    slammed.  He thought she had a concussion because of how hard

9    her head bounced off the handrail.  He added that after that

10   she just lay there in the fetal position.

11       (Video played.)

12         MS. FOSTER:  Let's talk about the injuries to Officer

13   Edwards.  A hundred and fifty to 250 pounds of barricade

14   barreled into Officer Edwards's face.  The metal barricade

15   first hit her left cheek on the metal barricade, as the rioters

16   were lifting that barricade up and pushing it.  She testified

17   that the impact of the lifted-up barricade on her face caused

18   her to lose her footing.  At that point, all of the defendants

19   are pushing on this barricade and lifting it up.

20         Then Officer Edwards testified that she hit her chin

21   on the right side on the metal stairwell.  She testified that

22   the last thing she remembered was the clang of her jaw hitting

23   that stairwell.  Finally, she hit the back of her head on the

24   stairs.

25         As you can see in this still from Government's

1   Exhibit 308, she hit the stairwell with such force that you can

2   see her feet, they're off the ground.  She is being pushed back

3   so fast and so hard that she's airborne.  So she hits that

4   stairwell and then the stairs behind her with the force of the

5   bike racks, the rioters pushing onto those bike racks and the

6   entirety of her body weight.

7         Let's talk now about the assault on Officer Cruz.

8   I've slowed down Exhibit 904 so that you can see in slow motion

9   what happens.

10      (Video played.)

11      MS. FOSTER:  First, right here is Officer Randolph

12  pushing into Officer Edwards.  Then you see Samsel join in.

13      (Video played.)

14      MS. FOSTER:  He pushes with his entire body.  He lets

15  go for a second.  There's Johnson, pushing as well, but then he

16  his hands are right back on there pushing.  They are all using

17  their upper bodies and their legs to push on the barricade.

18  It's no coincidence that the highest point here of this

19  barricade is right where Blythe, Johnson, Grant are all

20  pushing.

21        Sergeant Lively testified that he's six-foot-five, and

22  that barricade, it's over his head.  Not only did the

23  defendants lift the barricade and heave it at the officers, the

24  defendants were also intentionally pushing the officers into

25  that staircase behind him.  You heard Officer Cruz testify

1    repeatedly that he was concerned about getting pinned on the

2    stairwell and he didn't want to get trampled.

3         (Video played.)

4         MS. FOSTER:  Now, others joined in the pushing --

5    sorry, obviously, there's Officer Edwards down on the ground.

6    Others joined in, pushing the backs of these defendants, but

7    these are the defendants who started it.  They're the ones up

8    front pushing this barricade.

9         Let's talk about the second assault on Officer Cruz.

10   As Officer Edwards lies prone on the ground, Randolph doesn't

11   stop to check on her.  He jumps over the barricade and beelines

12   directly towards Officer Cruz.  This is not an accidental trip.

13        (Video played.)

14        MS. FOSTER:  If you watch the video, you can see

15   Randolph right here.  He jumps very intentionally over the

16   fence.  He gets his foot hooked just a little bit there at the

17   back end, as you can see.  But then he turns around, goes

18   straight for Cruz, grabs onto his jacket and holds on.  Now

19   he's pulling.

20        Even when Sergeant Lively goes over to try to pull him

21   off, it is very hard to happen.  Now you see Grant and you see

22   Blythe, also pulling on Randolph, but he doesn't let go.

23        (Video played.)

24        MS. FOSTER:  I'm running this video a little bit long

25   because I want to show you what happens after they're able to

1  separate Cruz from Randolph.

2      (Video played.)

3      MS. FOSTER:  So there they are.  They've separated the

4  two.  There's Cruz.  And what does Randolph do?  He's over here

5  fighting with Sergeant Lively and then he turns around and goes

6  straight at Lively, trying to assault Sergeant Lively.  There

7  are those orange gloves.  They're wrapped around Lively.

8      (Video played.)

9      MS. FOSTER:  Now, Grant's counsel made the point that

10 Grant grabbed Randolph, which is true.  But there's two things

11 to keep in mind.  First, Grant is not charged with this assault

12 and second, both Cruz and Lively told this Court that their

13 main concern was Cruz getting dragged into the crowd.  And

14 that's exactly what Grant and Blythe were doing as they were

15 pulling Randolph towards the crowd.

16     So all three of the defendants were pulling Officer

17 Cruz towards the rioters.  So by getting involved, Grant and

18 Blythe are interfering with other officers' ability to separate

19 Randolph from Cruz.

20     The civil disorder.  Even after this barricade goes

21 down, the defendants and others, they're ignoring the U.S.

22 Capitol Police officers attempts to put the barricades back up.

23 They're ignoring their orders to back up.  And Samsel even

24 grabs an officer's arm and shoves it down and tells the officer

25 something like, I saved you all, as if being the second guy to

1   pick up Officer Edwards, after shoving a barricade at her so

2   hard that she gets slammed to the ground in the first place,

3   means that he saved her.

4        (Video played.)

5        MS. FOSTER:  Later that night, when recounting his

6   exploits, Johnson brags about fighting cops at that second

7   barricade.

8        (Video played.)

9        MS. FOSTER:  Once that barricade goes down, hundreds

10  of rioters stream in, running and walking around and over the

11  downed barricade, overrunning officers and forcing their way

12  onto Capitol grounds.  The defendants were amongst the first to

13  stream in.  In this video, on the left you're going to see

14  Blythe, followed by Grant, followed by Samsel, coming right at

15  the front end of the people coming in to the West Front.

16       (Video played.)

17       MS. FOSTER:  There's Blythe.  There's Grant.  There's

18  Samsel.

19       (Video played.)

20       MS. FOSTER:  In this video you also saw the protestors

21  safely removing the barricades by pulling them back towards

22  them and putting them down.  Potentially still a crime but it's

23  not an assault on officers.

24       If you look at the video on the right, you will see

25  that as officers are streaming in you can see Johnson.  He's

1    already gotten to the West Front but he doubles back, just to

2    remove additional bike racks and throw them over the walls,

3    just to make it easier for more rioters to come on to the

4    Capitol grounds.

5         (Video played.)

6         MS. FOSTER:  There's Johnson back there.

7         (Video played.)

8         MS. FOSTER:  The breach and the subsequent assaults

9    lasted a very short period of time, but that does not diminish

10   the seminal importance of the event.  Here, the Capitol grounds

11   were breached, U.S. Capitol Police officers were injured and an

12   angry mob was unleashed on the Capitol.  There is little debate

13   but that this moment ignited a fire that burnt for over

14   four hours in and around the Capitol.  And the arguments that

15   the defendants will no doubt make that the others pushed too

16   does not diminish these defendants' culpability.

17        (Video played.)

18        MS. FOSTER:  Here the Court can see, as the rioters

19   are streaming around the barricades, headed up the Pennsylvania

20   Avenue walkway, towards the Capitol building.

21        (Video played.)

22        MS. FOSTER:  Let's talk briefly about the elements of

23   the offenses.  I recognize that I'm speaking to a judge and not

24   a jury, and so I'm going to focus on the elements that appear

25   to be at issue in the nine counts charged at the Peace Circle,

1    and then as to the other counts as well.

2            The first element is covered if the Court finds the

3    defendants obstructed, impeded or interfered with Officers

4    Edwards, Cruz or any other officers.  And the third element is

5    covered by the testimony of Tippit (ph) and Hawa and Schrager

6    (ph), which is in the stipulations.

7            It would surprise no one that Safeway's business was

8    adversely affected on that day and there were at least three

9    federally protected functions that were adversely affected that

10   day.  The riot adversely affected U.S. Capitol Police officers'

11   abilities to police the U.S. Capitol building and grounds.  It

12   adversely affected Secret Service's ability to ensure that the

13   Vice President, his wife and daughter safely presided over the

14   vote certification.  And last, it adversely affected Congress's

15   ability to certify the vote.

16           Note that this charge includes an attempt.  So if the

17   Court were to find the defendants guilty -- sorry, the Court

18   could find the defendants guilty even if they didn't actually

19   achieve their goal.

20           Now, the question is:  Did the riot at the U.S.

21   Capitol count as civil disorder?

22           An issue was raised during a Rule 29 motion about

23   whether the assaults occurred incident to and during a civil

24   disorder.  The argument being that the civil disorder happened

25   later on that day.

1          That's just not correct.  Civil disorder is defined in

2     the statute as any public disturbance involving acts of

3     violence by groups of three or more persons, which -- and I

4     would ask the Court -- it's an "or."  So I would ask the Court

5     to focus on A and C.  Which causes an immediate danger of

6     injury to another individual or results in injury to another

7     individual.

8          The Court has seen the evidence, heard the officers'

9     testimony.  Law enforcement officers -- sorry, law enforcement

10    officers were engaged in the lawful performance of their

11    official duties when three or more people caused injury to

12    another individual.

13         The difference between counts 2 and 3 are the

14    victims -- count 2 is Edwards, count 3 is Cruz -- and in the

15    fact that in the case of Edwards the Government has charged the

16    defendants with inflicting bodily injury.  And that's in the

17    alternative.  So it's either that they used a deadly or

18    dangerous weapon or that they inflicted bodily injury.

19         As to count 3, there's no bodily injury charged.  So

20    the focus is on whether the barricade was a deadly or dangerous

21    weapon.  We are not arguing that the barricade is inherently a

22    dangerous -- a dangerous or deadly weapon.  We would focus on

23    that second part of the definition.  The term "dangerous

24    weapon" is not restricted to such obviously dangerous weapons

25    as guns, knives and the like, but can include virtually any

1  given object given the appropriate circumstances.

2        The trial memo collects -- the Government's trial memo

3  collects examples.  They include a mop handle, a mouth and

4  teeth, a wine bottle, shoes, a rake, a chair leg.  The point is

5  that it's about how you use what you have.  Here, the

6  defendants had a 150- to 250-pound barricade.

7        Sergeant Lively testified that the rioters grabbed the

8  bike racks and attempted to crush them with the bike racks.

9  Officer Cruz testified that he was just holding on so he

10  wouldn't get run over and trampled.  The rioters didn't pull

11  the bike racks back so they could get through without hurting

12  the officers, as occurred in earlier demonstrations.  Instead,

13  the rioters lifted and pushed that entire bike rack into the

14  officers, clearly intending to injure them.

15        And it worked.  Officer Edwards was so severely

16  injured that she suffered from vertigo for months and couldn't

17  get out of be bed.  She didn't return to regular duty for a

18  year and a half.  And she still has migraines, sometimes once a

19  month, sometimes once a week, where she can't do anything for

20  hours and sometimes days.

21        There is no doubt that this barricade, used in the

22  manner that these defendants used it, was capable of serious

23  bodily injury.  In fact, it actually caused serious bodily

24  injury.

25        The defendants have also argued about causation, that

1    Randolph, who was on the right, could not be liable for the
2    assault on David Cruz on the left.  And Grant, on the far left,
3    could not be liable for the assault on Officer Edwards on the
4    right.
5          That argument cannot be right.  First of all, all of
6    these defendants should be liable as principals.  As the Court
7    pointed out on Tuesday, if there were three individuals that
8    beat up on one victim with three different baseball bats, all
9    three people are criminally liable for those victim's injuries.
10   If you decide to pick up a bat and beat on a victim, you are
11   liable for their injuries, even if two other people are also
12   beating on that same victim.
13         Similarly, if you decide to pick up a bike rack -- a
14   series of bike racks, which are very clearly attached to other
15   bike racks, and you know full well that you have control of
16   that entire set of five bike racks, and you shove that set of
17   bike racks into a line of five police officers, you shouldn't
18   be able to say that you're only liable for one of the assaults.
19         That being said, the Court can find in the alternative
20   defendants guilty of aiding and abetting if the Court finds
21   beyond a reasonable doubt that the assault on each officer was
22   committed by somebody else and the defendant at issue knowingly
23   and intentionally aided and abetted that person in committing
24   the assault.
25         So let's take Randolph.  If Randolph were the

1    principal in assaulting Officer Edwards, and the other
2    defendants performed an act in furtherance of that offense,
3    picking up and shoving that bike barricade towards the police
4    officers, Randolph couldn't do that alone.  He needs his
5    co-defendants to be able to achieve the goal.  There is no
6    doubt but that the goal of these defendants was to lift the
7    fence and push it into the officers on the other side.  And
8    they should therefore be found guilty for doing exactly that.
9          If the Court finds the defendants not guilty or can't
10   decide as to counts 2 or 3, we would ask the Court to consider
11   the lesser offense as set out in the jury instructions and the
12   verdict form.  In the lesser offense the Government would have
13   to show that each defendant made physical contact with Officer
14   Edwards or Officer Cruz, depending on the count.  Or another
15   way that the Government could prove the lesser offense is if it
16   were to be able to prove that the defendants acted with the
17   intent to commit another felony.  In this case, that would be
18   count 1, the civil disorder.
19         Count 4, this is the assault where Randolph hopped the
20   fence, turned and grabbed Officer Cruz.  It appears that the
21   issue here is whether Randolph voluntarily and intentionally
22   attacked Officer Cruz or whether Randolph just tripped into
23   Officer Cruz.
24         It is clear that Randolph meant to do what he did.  He
25   had just rammed a barricade into Officer Edwards.  So we know

that he was trying to assault officers.  Then, if you watch the
video, it's clear that he is not just being propelled with
forward momentum.  He could have gone straight.  He could have
gone right.  But he didn't.  He actually regroups, hops the
fence, and once over the fence he turns hard left, takes a
step, grabs on to Officer Cruz and doesn't let go.

And even once separated, Randolph turns around and
tries to get back into it, this time with Sergeant Lively.

Counts 5, 6 and 7 have overlapping elements.  All
three require that we show the defendants entered and remained
on restricted grounds and that they were on the grounds with a
deadly or dangerous weapon.  Let's talk about those elements
briefly.

Defendants knew they were on restricted grounds but
chose not only to enter but also to remain on those restricted
grounds.  Defendants also knowingly used a deadly and dangerous
weapon on those restricted grounds.  As discussed in the
Rule 29 conversation, the term "deadly or dangerous weapon" has
a similar meaning to the term in counts 2 or 3, but for 1752
offenses the defendants need not have actually used the object
in that manner; they could have just carried it.

Let's talk about the restricted building or grounds.
Restricted building or grounds is defined as any posted,
cordoned off or otherwise restricted area of a building or
grounds.  Now, Lieutenant McCree told you about the

1    cordoned-off perimeter and all the many things the U.S. Capitol

2    Police did to delineate that perimeter.

3            And the U.S. Capitol Police Officers Lively, Cruz and

4    Edwards also told you about this restricted perimeter.

5    Exhibit 5, which is up on the screen now, is a map of that

6    restricted perimeter.  Right over here to the left, this is the

7    Peace Circle.  It is outside of that restricted perimeter.  And

8    all of the defendants were there when Samsel initially opened

9    up the fencing that is demarcated by this red line, and they

10   all had to get across this first barricade to get to that

11   second manned barricade.

12           And once they got to that second manned barricade,

13   which was undoubtedly in the restricted perimeter, five U.S.

14   Capitol Police officers were telling them that they couldn't

15   come through, and any argument that they thought they were not

16   allowed inside the restricted perimeter is very hard to credit.

17           In fact, Johnson tells his colleague that he knew it

18   was a restricted perimeter.  He knew he wasn't supposed to be

19   in there and he went in anyway.  In this video, he's talking

20   about the barricade at the Peace Circle and how he and, quote,

21   another guy looked at each other, knew what time it was,

22   dismantled the barricade and started bum rushing towards the

23   Capitol.

24       (Video played.)

25           MS. FOSTER:  For count 6, we've discussed restricted

 1   grounds and deadly and dangerous weapons.  So I'll focus on

 2   disorderly or disruptive construct and impeding or disrupting

 3   the orderly conduct of business.

 4          So the question is:  What does disorderly or

 5   disruptive conduct mean in this case?  As soon as these

 6   defendants crossed the first barricade at the Peace Circle and

 7   walked towards the second, the defendants were disturbing the

 8   public peace and undermining public safety, and the Court can

 9   find disorderly conduct.

10          Count 7, the only difference is this act of physical

11   violence.  The Court will note that act of physical violence is

12   any act involving an assault or infliction of bodily harm on an

13   individual.  So that could be the assault on Edwards, the

14   assault on Cruz or both.  We would also note that the

15   alternatives are deadly or dangerous weapon or serious bodily

16   injury.  We contend we've proved both.

17          Count 8, disorderly or disruptive conduct is the same

18   as count 6.  So the added variable is the intent to impede,

19   disrupt or disturb the orderly conduct of a session of Congress

20   or either House of Congress.  By breaching the barricades at

21   the Peace Circle, spending at least an hour and a half for

22   Samsel, and multiple hours for everybody else on the West

23   Terrace, it is clear that the defendants acted with the intent

24   to impede, disrupt or disturb the orderly conduct of a session

25   of Congress.

1          Finally, count 9, as to the Peace Circle.  Act of

2     violence is defined as any act involving an assault or other

3     infliction of bodily harm on an individual.  So again, that

4     could be Edwards or Cruz.  And the Government also charged this

5     under an aiding or abetting theory.

6          Let's talk about Samsel and what he did on the Capitol

7     grounds for approximately an hour and a half, which is charged

8     at counts 11 through 13.  For the bulk of that time he was

9     interfering with, assaulting and generally attempting to

10    aggravate officers at the West Terrace.  For his behavior at

11    the West Terrace, grabbing the police shield, scuffling with

12    officers, waving a flag in their faces and acting like he was

13    going to strike them with it, throwing a two-by-four at the

14    officers, throwing a pole at them, all which happened during

15    the riot on January 6th, Samsel has been charged with civil

16    disorder, which is that count 11.

17         He has also been charged separately for grabbing at

18    that U.S. Capitol police officer's shield, which is count 12,

19    and showing the two-by-four at MPD officers.  That's count 13.

20         You will see from the videos that defendant Ryan

21    Samsel is charged with multiple assault and one count of civil

22    disorder for his criminal activities on the West Terrace.  You

23    will see that he is over here on the right, on the south side,

24    assaulting officers, grabbing officers' shields.

25         (Video played.)

```
 1          MS. FOSTER:  He then works his way over to the north,
 2    pulls down scaffolding, is throwing that two-by-four at
 3    officers over here.  He's over here in the middle, waving his
 4    flag at the officers.  He heads over to the media tower over on
 5    this side and starts throwing a pole at the police line.  He's
 6    all over the West Terrace.
 7          (Video played.)
 8          MS. FOSTER:  Samsel grabbing the officer's shield.
 9          So by this point in the day, Samsel is on the West
10    Front.  He first berates officers, gets in a tussle with
11    officers and other rioters, and then grabs and pulls an
12    officer's shield.
13          (Video played.)
14          MS. FOSTER:  There's Samsel grabbing, pulling at the
15    shield.
16          He told Agent Curcio that he pushed on the shield, he
17    didn't pull on it.  That is a clear indication of knowledge of
18    guilt.  He's trying to minimize his behavior on the Lower West
19    Terrace.
20          Samsel then moves down the police line, where he jaws
21    at and then gets into another scuffle with another officer.
22          (Video played.)
23          MS. FOSTER:  By 1:13 p.m., Samsel is involved in
24    another scuffle with the police.  Here, rioters are pushing at
25    a police barricade.  You'll see him in the back behind this
```

1    tall man with those reflective sunglasses.  Samsel moves

2    forward towards the police line.  Rioters shove on the

3    barricade.  And then an officer sprays at the rioters and the

4    rioters stop.

5         (Video played.)

6              MS. FOSTER:  There's Samsel.

7         (Video played.)

8              MS. FOSTER:  There's Samsel at the end right there.

9    There's the officer spraying them.

10             Samsel is proud of what he did, as reflected in his

11   texts, because later on January 6, 2021, he texts a friend:  I

12   broke through.  Got hit with gas a few times but worth it LOL.

13             Like he does at the Peace Circle, Samsel yells at the

14   officers that he's a Marine, and that the officers should be

15   ashamed of themselves for treating him, a former Marine, who

16   fought for their freedom, so poorly.  You'll hear that in the

17   video on the left side.

18        (Video played.)

19             MS. FOSTER:  These statements matter for a few

20   reasons.  First, to show that Samsel is an opportunist.  He

21   will try an angle to get an advantage.  Maybe officers will

22   treat him differently or treat him better, since he's allegedly

23   a Marine.

24             MR. WOODWARD:  Objection.

25             THE COURT:  Overruled.

1          MS. FOSTER:  And second, to show that he paints

2     himself as the victim.  He switches the narrative.

3     Astoundingly, it's the officers who should be ashamed of

4     themselves for treating Samsel so poorly.  Further, although

5     you can hear an officer yelling until he's hoarse that the

6     rioter should back up, Samsel does no such thing.  You can see

7     basically the same thing in Exhibits 408 and 407 and 411.

8          Samsel then moves down the line and waves his flags at

9     and on the officers.  He puts it right on their heads to

10    impede, interfere, distract and annoy them.  Samsel then fakes

11    like he's going to swing the flagpole at them a few times.

12    You'll see it in the video on the right.

13        (Video played.)

14         MS. FOSTER:  There's the flag.  There's Samsel waving

15    it.

16        (Video played.)

17         MS. FOSTER:  And there he is faking like he's going to

18    hit them with it.

19        (Video played.)

20         MS. FOSTER:  Captain Augustine testified that at

21    Exhibit 413 you can see the man in the red hat, later

22    identified by Agent Curcio as Samsel, walk across the West

23    Front towards that scaffolding.  Then Augustine explained that

24    that same man tears away the scaffolding on the West Front.  In

25    the video on the left, you can see Samsel in the left corner

1    industriously pulling down the scaffolding.  It's right over

2    here.

3         (Video played.)

4              MS. FOSTER:  Now, the video on the right is a close up

5    view with Samsel, again, right here on the left, pulling hard

6    on the scaffolding.

7              I would ask you to pay close attention to what is at

8    Samsel's feet.

9         (Video played.)

10             MS. FOSTER:  Planks.

11        (Video played.)

12             MS. FOSTER:  Those are the same two-by-four planks,

13   the kind of planks that Samsel throws at MPD officers a few

14   minutes later.

15             Defendant Samsel then hangs out in this denuded

16   construction area for a while, and you can see, there's the

17   plank in his hand.  And then if you play Exhibit 324, you'll

18   see the police with the neon yellow jacket up here.

19        (Video played.)

20             MS. FOSTER:  And then you can watch as Samsel walks

21   out from the scaffolding area back to the West Front to

22   position him right across from the MPD officers that he throws

23   a plank at later on.

24        (Video played.)

25             MS. FOSTER:  Here's Samsel right here.

1          (Video played.)

2               MS. FOSTER:  He walks down and he walks out towards

3     the West Front.

4          (Video played.)

5               MS. FOSTER:  Now, you heard Captain Augustine narrate

6     how Samsel walked -- or the man with the red hat later

7     identified as Samsel walked towards the scaffolding at the

8     north side, ripped the scaffolding, picked up the plank and

9     walked back to the West Front, and then he threw it at the

10    officers standing on the landing, forcing one of the officers

11    to duck.

12               Now, in the video on the left, you can see it from the

13    vantage point of an officer's body-worn camera -- sorry, not

14    the video -- the video in front of you, you can see from the

15    vantage point of an officer's body-worn camera.  Admittedly,

16    the bodies are small but Samsel is recognizable in his jean

17    jacket and red hat.

18         (Video played.)

19               MS. FOSTER:  So there's Samsel right there.  He's

20    walking over.  You can see him behind this man in red right

21    here.

22         (Video played.)

23               MS. FOSTER:  He lines up and throws the plank.

24               Now, in this video you can see a zoomed-in version of

25    that CCTV camera.  It's at Exhibits 202 and then 902.  Here,

1   this is Captain Augustine.  This is the officer that you're

2   going to see is going to duck.  And then over here is

3   Mr. Samsel.

4        (Video played.)

5        MS. FOSTER:  Watch Samsel.  He backs up a little.  He

6   lines up and he throws the plank and that officer ducks.

7        You heard Captain Augustine's testimony that if this

8   plank had actually hit the officer, it could have seriously

9   injured him.  Specifically, he testified that a two-by-four

10  like this could, quote, cause severe injury, such as

11  lacerations, concussions, and it could even end somebody's

12  career.  It could kill somebody.

13       By this point, it's 2:00 in the afternoon.  Samsel has

14  been wreaking havoc on the West Terrace for over an hour, but

15  Samsel's not done.  He throws another object at the police.  So

16  here, you can see the police line back here.  Samsel is

17  standing up against the media tower.  You'll see when I play

18  this video, he's over here on the left.  And within a second,

19  you're going to see Samsel lean down, pick up a stick or a pole

20  and then throw it at the police line.

21       (Video played.)

22       MS. FOSTER:  That's the police line.  Here's Samsel,

23  he leans down, stands up, throws it.

24       Now, Samsel was proud of himself.  He was proud of

25  what he had accomplished that day.  He even takes a video of

1    himself and his girlfriend and pans all around the riot to

2    commemorate the moment, to celebrate how he breached the

3    Capitol.

4         (Video played.)

5         MS. FOSTER:  Now, Samsel explained to a blogger that

6    on January 6th he was, quote, at the front gate because he was

7    a pissed-off American.  He explained to the blogger that he had

8    never heard of a nonviolent patriot and that sometimes civil

9    disorder is needed.

10        (Audio played.)

11        MS. FOSTER:  Now let's turn to count 10, which is that

12   obstruction count.  This is the last count -- or the last count

13   that I'll talk about.  This count encompasses not only what the

14   defendants did that day but what they did in the days leading

15   up to and the days after January 6th.

16        Now, there appears to be little question that the

17   certification was an official proceeding and that it was

18   obstructed.  The issue is whether each defendant had the

19   intent.  Did each defendant intend to obstruct the proceedings?

20   Was each defendant aware that his accessing the restricted

21   perimeter, assaulting officers along the way and then staying

22   inside that perimeter for hours would obstruct the official

23   proceeding?  And did he act corruptly, acting with an unlawful

24   purpose and with consciousness of wrongdoing?

25        So let's start with the second element, about whether

1    the defendants intended to obstruct or impede an official

2    proceeding.  This is the obvious.  Why else do you bust through

3    the barricades at the Capitol building?  If you want to support

4    Trump, he is speaking at the Ellipse.  The only thing happening

5    at the U.S. Capitol on January 6th is the certification of the

6    vote.

7            In the jury instructions, "corruptly" is defined.

8    Again, these defendants knew what they were doing was wrong.

9    They were doing the most basic criminal act.  They were

10   assaulting law enforcement officers to get into a restricted

11   area.  Johnson, as you heard, talked about fighting with cops.

12   Randolph talked about the lady cop's head bouncing off the

13   stairwell.  And Samsel was proudly proclaiming that they

14   breached the Capitol.  Of course they knew what they were doing

15   was wrong.

16           It is also worth noting that while the defendant must

17   act with the intent to obstruct the official proceeding, this

18   need not be his sole purpose.  A defendant's unlawful intent to

19   obstruct an official proceeding is not negated by the

20   simultaneous presence of another purpose for his conduct.  So

21   maybe the defendants also entered the Capitol grounds because

22   they loved Trump or because they wanted to assault officers,

23   but that does not make them innocent of the obstruction count.

24           I'm going to talk now about specifics as to each

25   defendant and how we, the Government, can show that these

1  defendants intended to obstruct the vote certification and they

2  knew what they were doing was wrong.

3       Let's talk first about Samsel.  As reflected in

4  Samsel's statements to a blogger, he saw himself as a patriot

5  and he had never heard of a nonviolent patriot.  Also, as you

6  just saw, he posted a video where he proudly proclaims, "We

7  breached the Capitol."  And then, let's not forgot what Samsel

8  was wearing that day and waving about.  He had on a MAGA hat, a

9  Trump T-shirt and a Trump Rambo flag.

10      Samsel's goal is to stop the certification through

11 violence and disruption, to reinstall President Trump.  That's

12 why he goes to the Capitol.  That's why he breaks through the

13 first barricade after Johnson incites the riot, because the

14 defendant wants to be like George Washington, and that's why he

15 lifts and shoves the barricade into U.S. Capitol Police

16 officers at the second barricade.  And that's why he wreaks

17 havoc on the West Terrace for an hour and a half.

18      There's more evidence of the defendant's corrupt

19 intent.  Samsel sends this text on the morning of January 6th

20 to a friend, who he also believed was at the Capitol this day.

21 This text was talking about how the fucking Democrats won

22 Georgia.  That it can only mean one thing.  Samsel is upset

23 about the certification and the fact that Donald Trump is about

24 to lose.

25      In this text, the defendant says:  Me on news breaking

through the line.  And he attaches a picture from *The New York*
*Times*.  Samsel is proud that he is the guy right here in the
red hat.  Under the heading it says:  Halting Congress's
counting of electoral votes.

And he, or someone, underlines the part which reads:
Supporters of President Trump.

Let's talk about Grant.  Like Samsel, we are asking
the Court to consider everything that's been discussed so far
when it considers Grant's intent:  His enthusiastic leading of
the mob at the Peace Circle, his arguing with U.S. Capitol
Police officers at the manned barricade, his assault on the
U.S. Capitol Police officers when they refused to let the mob
in, and there's more.

Grant sends two texts.  Now, Grant is confident that
if the Georgia legislature doesn't decertify, the nation is
over and the rule of law will break down.

He tells the other Georgia legislator that President
Biden is a China plant and President Biden's election is an
obvious fix.  In Grant's opinion, at least as of January 1st,
2021, which is five days before these events, stopping the
certification is the only way to save the country.

Now, after Grant assaults the officers at the Peace
Circle, he's at the police line on the West Terrace.  Here's a
screenshot from Exhibit 330.  It's about 50 seconds.  And
here's Grant, right at the police line.

1          Now, if you watch the video at Exhibit 330 -- I'm

2    sorry, at Exhibit 208, you will see that while David Cruz up

3    here is trying to politely ask these rioters to get off of this

4    part of the building, Grant is down here below, shoving up

5    against the police line.

6          (Video played.)

7          MS. FOSTER:  There's Grant right there.

8          (Video played.)

9          MS. FOSTER:  And then at 2:49, you can see Grant

10   entering the U.S. Capitol building through a broken window

11   right over here.  This is the Senate wing doors, which is the

12   first breach at 2:13, as you know from Government's

13   Exhibit 101.  Here comes Grant, climbing through the window and

14   taking a turn and going off camera.

15         (Video played.)

16         MS. FOSTER:  After he enters the U.S. Capitol

17   building, Grant finds his way to a Senate office.  You know

18   this because you can see right up there it says S140.  And then

19   he sits and poses for a picture very comfortably in the U.S.

20   Capitol building conference room.  He finally leaves the

21   Capitol building approximately 30 minutes later at about

22   3:18 p.m.  This is almost two and a half hours later, after he

23   broke through the Peace Circle.

24         Now Johnson.  Johnson is like a general directing his

25   troops.  He is telling people, the rioters, where to go and

1   what to do, with a goal of ensuring that the legislators don't

2   certify the election.  Like his co-defendants, we're asking the

3   Court to consider all of Johnson's statements and actions at

4   the Peace Circle when deciding whether Johnson is guilty of

5   obstruction.

6          But Johnson was doing more.  He was doing everything

7   he could to get the mob to the front line, to get the mob to

8   assault the U.S. Capitol Police officers, and then to get

9   through to the West Terrace.

10          Once at the West Terrace, you can see Johnson

11   continuing to incite the crowd.  First he uses his voice but

12   then that's not enough, so he grabs his megaphone and calls out

13   to the crowd to get on the front line, everybody.

14      (Video played.)

15          MS. FOSTER:  There he is.

16      (Video played.)

17          MS. FOSTER:  And here go the rioters, all streaming

18   towards the front line at the West Front.  Later on in the day,

19   Johnson is announcing to the crowd, quote, We got to move.

20   They already stole it.

21          Then members of the crowd respond with, Stop the

22   Steal.

23          And seconds later, Johnson gets back on his megaphone.

24   He says, They got the vote, guys.  You-all pissed off now?

25   Check your phones and check your social media.  Don't stand

1    around and watch.  We need to push the shit down.

2            And if you watch, when the camera scrolls you'll see

3    rioters.  They're checking their phones.  They're doing exactly

4    what Johnson has asked them to do.  His advocacy is working.

5    You can see this on the video on the left.

6        (Video played.)

7            MS. FOSTER:  There they are, right there, checking

8    their phones, checking their social media.

9            In case there was any question about what Johnson was

10   talking about, he gets back on the megaphone and hollers out to

11   the crowd, They certified the vote.  Are you going to stand

12   around and watch now or are you going to move?  They just stole

13   it.

14           He is directly inciting the crowd to obstruct the

15   certification of the vote.

16       (Video played.)

17           MS. FOSTER:  Johnson also directed the rioters to wrap

18   around and surround the Capitol.  Why would you do that?  Why

19   would you want to wrap around the Capitol?  You do that to

20   scare the legislators.  You want to do that because you want

21   them to get scared and not certify the election.  So in this

22   video, you see Johnson for the first second and then you'll

23   hear him.  This is the one on the left.

24       (Video played.)

25           MS. FOSTER:  Seconds later, Johnson hears from someone

1    in the crowd that the legislators could hear the crowd inside

2    the Capitol.  So what does he do?  He encourages the crowd to

3    get loud.  He encourages the crowd to get loud so that the

4    legislators could hear them.  And Johnson wants the legislators

5    to hear the rioters as a scare tactic.  He wants to scare the

6    legislators into not certifying the vote.

7         (Video played.)

8         MS. FOSTER:  Defendant Johnson is also texting things

9    like:  Fucking the Capitol up, yeah.

10        And:  Just took over the Capitol.

11        What's important about this is the time.  The Court

12   will note that the times are 2:30 and 2:43 p.m.  Agent Curcio

13   testified that D.C. time was UTC time minus five.  So these

14   times matter because the Capitol building was breached at 2:13.

15   So Johnson is celebrating not just the entry onto the Capitol

16   grounds, he's celebrating the breaching of the Capitol building

17   itself.

18        Now let's talk about Randolph.  Similarly, we are

19   asking you to consider what defendant Randolph did at the Peace

20   Circle in your assessment of his culpability on the obstruction

21   count.  He was at the front of the first barricade.  He marched

22   forcefully to the second barricade.  At the time, he was

23   surrounded by rioters chanting Stop the Steal, and then he

24   shoves Caroline Edwards into a handrail, assaults Officer Cruz.

25   All of that to get on to the Capitol grounds.

1          Now, when Randolph talked to this undercover, which is

2    at Exhibit 523, there are a few things that are really notable

3    for purposes of the obstruction count.  First, he knew about

4    the first barrier at the Peace Circle.  He says the barriers

5    were set up before the grass starts and you couldn't get in.

6    He knew it was restricted but he went in anyway.

7          Second, he left Trump's speech early because, quote, I

8    knew people were going up there.  And Randolph wanted to be a

9    part of that.  He wanted to be a part of the people going to

10   the Capitol grounds.  Why else are you going to the Capitol

11   grounds, beyond an interest in stopping the certification?  He

12   described the atmosphere at the Peace Circle as shit went

13   crazy.  And talking about the Capitol building:  Burn this

14   mother fucker down.  And then he talks about how it was nuts

15   and it was a war zone, and he wanted to be in that war zone.

16   He put himself in that war zone, fighting that war.

17      (Video played.)

18      MS. FOSTER:  It gets cut off but he says, People are

19   just tired of this shit.

20          Now you can see with Randolph is standing.  The video

21   pans out, so you get some idea of the crowd and where Randolph

22   is located.  By this point, he has moved himself far onto the

23   Capitol grounds, close to the actual Capitol, with a bird's-eye

24   view of the assaults that are happening down at the Lower West

25   Terrace.

1          The defendant admitted in an exhibit that reflects --

2    sorry, defendant Randolph admitted in an exhibit that reflects

3    that this defendant, based on that body-worn camera, was at the

4    Capitol grounds up until at least 3:30 p.m.  So three and a

5    half -- sorry two and a half hours after he entered.

6         (Video played.)

7          MS. FOSTER:  There's Randolph.

8         (Video played.)

9          MS. FOSTER:  In his talk with the undercover, Randolph

10   confirms that he was on Capitol grounds, high enough to see and

11   so he could look down at the archway on the Lower West Terrace.

12        (Audio played.)

13         MS. FOSTER:  So Randolph pushes his way into this war

14   zone by assaulting officers, watches other rioters assault

15   other officers, and he describes all of it as fucking fun.

16          Like others, Blythe was near the front at the first

17   barricade, marched purposefully to get at the front of the

18   second barricade, and then joined the others when he saw that

19   they were pushing on the second barricade to shove the U.S.

20   Capitol Police officers back onto the stairs.

21          Now, Blythe drove 12 hours from Texas and he came

22   ready for battle.  He had on his helmet, he had on his camo

23   jacket and he had on that body armor under his shirt.

24          Blythe took a series of videos on his phone.  You will

25   see them.  They're Government's Exhibit 1101B and 1101C.  The

1  one on the left reflects that Blythe had climbed into the media

2  tower and was taking video from the media tower.

3      (Video played.)

4        MS. FOSTER:  Now, if you listen to what the crowd is

5  saying, they're cheering, We want Trump, we want Trump.  They

6  knew exactly why they were there.  They were there to obstruct

7  the certification.  Now, the one on the right, Blythe was on

8  the steps, on these stands that were right in front, as you can

9  see, right in front of the Capitol building.

10      (Video played.)

11        MS. FOSTER:  It's 4:38 p.m.  Law enforcement officers

12  have been battling rioters for over three and a half hours.

13  Sergeant Foskett explained that their job was to clear the

14  area.  In this video, you'll hear Sergeant Foskett telling the

15  rioters very calmly that they need to leave, and the rioters,

16  including Blythe -- you'll see him on the right -- respond by

17  yelling at him and refusing to follow his order.

18      (Video played.)

19        MS. FOSTER:  There's Blythe.

20      (Video played.)

21        MS. FOSTER:  After several minutes of the officers

22  telling the rioters, including Blythe, that they need to leave,

23  and the rioters, including Blythe, refusing to do so, you will

24  see -- see this woman in red over here on the left?  You will

25  see her again in this video on the right.  She gets rigid.

1    Blythe grabs ahold of her to hold her back, to try to keep her

2    on that area where they are.  Then she's removed and then he's

3    removed.  And you can see him flailing his arms and legs as an

4    officer grabs him and removes him.

5         (Video played.)

6              MS. FOSTER:  There's Blythe.

7         (Video played.)

8              MS. FOSTER:  There's the woman.

9         (Video played.)

10             MS. FOSTER:  There's Blythe's arm.

11        (Video played.)

12             MS. FOSTER:  Now she's removed and he's removed.

13   Given the circumstances, what were these officers supposed to

14   do?  You heard Lieutenant McCree testify that the only way that

15   the certification could resume is if this whole area was clear.

16             Finally, in a text conversation with his mother,

17   Blythe tells her that only two or three people were arrested.

18   But then he says two cops also got arrested by the crowd.

19   Presumably, he's referring to the officers at Peace Circle.

20             Now, the defendants came ready the fight on

21   January 6th.  They started the January 6th Capitol breach riot.

22   Now they must take responsibility for their actions.  As

23   Officer Cruz told the Court, when these defendants breached

24   that manned barricade it was like a very bad day for us and for

25   our country.

1              And based on all this evidence presented at this

2      trial, we urge the Court to reach the only verdict consistent

3      with that evidence and find all five of these defendants

4      guilty.

5              Thank you, Your Honor.  I'm done.

6              THE COURT:  Closing for Mr. Samsel.

7              MR. WOODWARD:  We're not going to stop midway?

8              THE COURT:  How long do you think -- is it more than

9      30 minutes?

10              MR. WOODWARD:  It could be 30, 40 minutes, actually,

11      yeah.

12              THE COURT:  Do you want to try to get one in and then

13      we'll take a shorter lunch break?

14              MR. WOODWARD:  It's okay with me.

15              THE COURT:  Is that okay with everyone?

16              I will not interrupt you in the middle of the closing.

17              MR. WOODWARD:  I'm ready when you are.  Thank you,

18      Your Honor.

19              I want to start where the Government left off.  Your

20      Honor, the Government's theory of this case has been that these

21      defendants started the riot.  That's just not true.

22         (Beeping sound.)

23              I don't know what that was.

24              I think history, and only history, will tell us

25      ultimately who started the riot on January 6th, but we can't in

good faith submit that one person or even five people are
culpable for the events that day.  And Your Honor, the video
doesn't show that.  When we opened a week ago, we asked Your
Honor to think of the evidence in this case like one of those
Magic Eye posters.

I look at it, you look at it, the Government looks at
it, the public looks at it, and the reality is we see what we
want to see.

The Government has looked at the evidence in this case
and has now come and stood before you and concluded by saying
these five people started a riot on what is one of the worst
days in our history.  These five.  They have to now take
responsibility for the riot.  These five people?  Why do we
have over a thousand other prosecutions in these cases if it's
these five people?  Because it's not these five people.

And when Your Honor looks at the evidence in this case
against these defendants, against Mr. Samsel, it's a very
different picture than what the Government sees.

There are obvious inconsistencies in the Government's
presentation of evidence.  It sensationalizes and exaggerates
the evidence that it does have at every opportunity.  And it
completely glosses over the truth.

A theme in our case, Your Honor, has been what did the
Government not do.  How is it that the case agent responsible
for the investigation never bothers to look at any of the

```
1   video, any of the photographs that the FBI has collected over
2   the last three years?  How is it that the case agent can tell
3   you he doesn't know what GETTR is but the video that he's
4   collected is good enough, is reliable enough, is sufficient for
5   the charges against Mr. Samsel?
6          You see in all of the Government's exhibits the dozens
7   of people that are holding cell phones, holding cameras,
8   holding camcorders.  They are capturing all of the angles of
9   the back and forth at Peace Circle and of everything that
10  happens on the West Terrace.  You see all of that in the video
11  that the Government has brought before you.
12         We know that they collected cell phones.  Each and
13  every one of these defendants had their cell phone seized.
14  Every other person arrested and charged with the events that
15  day had their cell phone seized.  The case agent didn't look at
16  any of it.  What doesn't the Government want you to know?
17         And Your Honor, if the picture that you see, as the
18  neutral fact finder in this case, isn't quite the way the
19  Government describes it, that's reasonable doubt.
20         Now, let's start with one example.  Again, the
21  Government tells you these five individuals, their actions at
22  Peace Circle are responsible for the riot that day.
23         This is Defense Exhibit 2.  Your Honor will recognize
24  the vantage point.  We're looking at the West Terrace.  This is
25  CCTV footage.
```

1          (Video played.)

2               MR. WOODWARD:  We see by the end of the day a sea of

3     people.  1:35 p.m.  It's undisputed that Mr. Samsel is gone,

4     spends an hour and a half at the Capitol building.  Here, at

5     1:35 p.m., he's responsible for the riot that day, that

6     whatever happened at Peace Circle led to this crowd of people

7     gathering on the West Terrace.  But let's look closely at the

8     video.

9          (Video played.)

10              MR. WOODWARD:  Here we are at 12:55 p.m.  The CCTV

11    video that we have of the Peace Circle tells us that this is

12    roughly the same time that the events are occurring there.

13    Peace Circle is off to the right.  Pennsylvania walkway is over

14    to the right.  We see people over on the right-hand side, yes,

15    that's true.

16         (Video played.)

17              MR. WOODWARD:  12:57 p.m., they're not coming from

18    Peace Circle, Your Honor.  That's two minutes after the events

19    at Peace Circle.

20         (Video played.)

21              MR. WOODWARD:  They have to be coming from someplace

22    else.  And yet, Mr. Samsel is responsible for the riot that

23    day.  Now, I don't know where those folks came from, but the

24    Government tells you that the entire area was cordoned off.  So

25    under the Government's telling, they had to have breached.  Not

1  with Mr. Samsel, somewhere else.

2      (Video played.)

3          MR. WOODWARD:  The Government has cherrypicked

4  evidence to present to Your Honor.  They've had every

5  opportunity to prove this case, and they've failed.  Agent

6  Curcio told you that he began this investigation either on

7  January 6th or in the days after.  He's had three years to

8  collect evidence to make this case ironclad.  And we'll go

9  through each of the counts and we'll show Your Honor why they

10  failed.

11          Repeatedly, the Government has told you that

12  Mr. Samsel opened the gate at Peace Circle.  They've shown you

13  a video where they describe him flailing his hand and we hear a

14  bang.  And Officer Cruz tells us that must be the gates

15  opening.  The Government reminds you that Officer Cruz said

16  with a hundred percent certainty.

17          Well, what else do we know about what Officer Cruz

18  said?  This is Government's Exhibit 302.

19      (Video played.)

20          MR. WOODWARD:  The Government played this for you.

21  I'm at 32 seconds on the marker.  I'll start at 24 and pause.

22      (Video played.)

23          MR. WOODWARD:  There's Officer Cruz.

24      (Video played.)

25          MR. WOODWARD:  That, he asked you to believe, is him

putting his fist up in the air for the purpose of holding down the barricade.  Officer Lively seems to know how to hold down that barricade.  You see his hands resting firmly on the barricade.

No, Your Honor.  Officer Cruz isn't preparing to swipe anyone's hands off that barricade.  He's preparing to punch Ryan Samsel in the face.

Now, given the events that are occurring, I'm not suggesting there's anything wrong with Officer Cruz being in a defensive posture.  The problem with Officer Cruz's testimony is that if he lied about that, just a little lie -- that's what my kids tell me -- what else is he lying about?  Nobody saw anything with a hundred percent certainty that day.  Every single officer told us that there was a lot going on.

Government's Exhibit --

MR. BRENNWALD:  Mr. Woodward.

MR. WOODWARD:  Yes, sir.

(Discussion between Brennwald and Woodward.)

MR. WOODWARD:  Government's Exhibit 204.  Sorry.

No, it was 204.

The Court will no doubt recall our cross of Officer Cruz culminating in his testimony that he was a hundred percent certain that he could see what was happening.  The Government saw where we were going with this.

They say, oh, to be clear, Mr. Samsel definitely

1    opened that gate.  He just did it behind the trees.

2          The thing is, though, Your Honor, we don't have to

3    prove that Mr. Samsel didn't open the gate.  The Government has

4    to prove that he did.

5          Now, he's not charged with opening the gate.  This is

6    all context for what he is charged with.  But like Officer

7    Cruz, if the Government is trying so hard, so hard to convince

8    you that it was Ryan Samsel who opened that gate, Ryan Samsel

9    who's clearly standing in front of the gates when he's

10   gesticulating in this video, and Ryan Samsel who started the

11   riot on January 6th, the question is why.  Why?  Why are we

12   here?  Ryan Samsel is not January 6th and January 6th isn't

13   Ryan Samsel.

14         Count 1, civil disorder.  The Government tells you you

15   have to find beyond a reasonable doubt that there was a civil

16   disorder occurring when these individuals approached that

17   barricade.

18         No, Your Honor.  There was no civil disorder at the

19   time that the individuals approached the barricade.  This is

20   the Government taking the facts both ways.  Did they start the

21   riot?  No, of course they didn't start the riot.  But here the

22   Government would say they started the riot and the civil

23   disorder, and, therefore, they have to be guilty of the same.

24   It doesn't matter what happened after.

25         There's no civil disorder at 12:55.  And we know that

1    because they'd charge Mr. Samsel with a separate civil disorder

2    count.  I wasn't aware there were multiple riots that day.

3    Government hasn't proven there were multiple riots that day.

4            What other evidence does the Government ask the Court

5    to rely on?  And I'll blend here a little bit the 111(b)s in

6    counts 2 and 3.  Government's Exhibit 308A.

7        (Video played.)

8        MR. WOODWARD:  This is the exhibit they created to

9    slow down, so you get a good look at Mr. Samsel and others at

10   the barricade that afternoon.

11       (Video played.)

12       MR. WOODWARD:  And we would ask you to get a good look

13   at Mr. Samsel and others.  And I'll emphasize "and others."

14   There are dozens of people at that barricade.  There are dozens

15   of people pushing that barricade.

16           Now, I don't have the fancy ability to highlight video

17   the way the Government does here, but what I do have and what

18   the Court has is the ability to watch the video for yourself.

19           What do you see in this Magic Eye poster?

20           Mr. Samsel is not even holding the barricade.

21           I've stopped at marker 21 seconds.

22           You heard Officer Edwards testify that she couldn't be

23   sure he was pushing the barricade.  In fact, you also heard her

24   testify that she didn't really remember what had happened.  And

25   again, that's okay.  That's understandable given the

1    circumstances.  But it's not Ryan Samsel's burden to prove that

2    he wasn't pushing the barricade; it's the Government's burden

3    to prove that he was.  And they chose to rely on this video,

4    this video, and only this video, to show that he's pushing the

5    barricade.

6          Why didn't they watch the other video?  Why didn't

7    they go and gather video from the scene?  Can you think of any

8    other investigation where the FBI is deliberately ignoring

9    evidence?

10         Now about that barricade.

11    (Video played.)

12         MR. WOODWARD:  Watch what happens here, Your Honor.

13    The Government doesn't talk about this because it doesn't help

14    them.  But what you'll see in this video is on the right-hand

15    side of this barricade, which Officer -- forgive me -- either

16    Lively or McCree testified about being tied down with snow

17    fencing to a -- I think a stanchion I think is what he called

18    it, that pole that had been driven down.  Watch what happens to

19    the right side of this barricade as it's being pushed towards

20    Officer Cruz.

21    (Video played.)

22         MR. WOODWARD:  It's caught.  It can't go anywhere.

23    Somebody detaches that barricade, not just from the wall.  You

24    see it clearly; it's caught on the wall.  And this gentleman,

25    we don't know who he is, pulls it off the wall and somebody has

```
1    detached the snow fencing from the stanchion.  If that's not
2    done, the barricade's not going anywhere.
3         (Video played.)
4         MR. WOODWARD:  We also saw this whole video.
5         (Video played.)
6         MR. WOODWARD:  This is Government's Exhibit 309, which
7    somewhat comically the Government redacted in its closing
8    argument because they say the time code isn't correct.
9         (Video played.)
10        MR. WOODWARD:  In Government's Exhibit 309, Your
11   Honor, we see a group of protesters gather at the left side of
12   this barricade.
13        (Video played.)
14        MR. WOODWARD:  Here, again, is the barricade connected
15   to the stanchion with the snow fencing.
16        (Video played.)
17        MR. WOODWARD:  And here at marker one minute exactly
18   we see the dozens and dozens of people on the other side of
19   this barricade all the way on the left.  And we see them start
20   to push it.
21        (Video played.)
22        MR. WOODWARD:  The Government would have you believe
23   that it was these five defendants, that it was Ryan Samsel who
24   caused that barricade to topple.  But in Government's
25   Exhibit 309 we see very clearly that there are dozens and
```

1   dozens of people pushing that barricade.

2        (Video played.)

3        MR. WOODWARD:  And you heard, I believe it was Officer

4   McCree testify about how that barricade rolls.  When you push

5   on the left-hand side, you move the right-hand side.  When you

6   pull the left-hand side, you move the right-hand side.  Because

7   they're attached.  They're attached by snow fencing.  They're

8   attached by zip ties.

9        Indeed, the Government doesn't dispute this.  But they

10  mischaracterize the evidence, Your Honor.  The Government would

11  have you believe that it was these defendants and only these

12  defendants who pushed those five barricades up against Officer

13  Edwards.  Some 150 pounds of weight.

14       Your Honor, my client's a big guy, but he's not moving

15  five barricades by himself and the video doesn't suggest

16  otherwise.  In fact, the video shows us that there are dozens,

17  maybe a hundred people pushing that barricade.

18       The Government relies on this clip, Exhibit 309.

19       (Video played.)

20       MR. WOODWARD:  Why and how does it jump from the left

21  side of the barricade to the right side of the barricade?

22       (Video played.)

23       MR. WOODWARD:  What don't we see?  Why don't we have

24  the devices, the cell phones, the cameras, the camcorders

25  showing us this angle?  In any other case, the accident

1   reconstruction would be impeccable.  We'd see the view from

2   every angle.  We'd see exactly what was happening.

3        The Government glosses over what's happening.

4        I'm going to go back to Exhibit 308A and what the

5   Government conveniently neglects to acknowledge.  I am at

6   marker 19 seconds of 308A.  Is that the gentleman in the red

7   hat is standing in front of Officer Cruz, not Officer Edwards.

8   And you heard Edwards testify that when she looks over to her

9   right to see what's happening, she's not looking at the man in

10  the red hat.  She didn't remember him from that day.  She's

11  looking at her fellow officers.

12       (Video played.)

13       MR. WOODWARD:  And then finally with respect to this

14  video, I want to point out two more small but important facts.

15  There's a still shot the Government loves to use of Mr. Samsel,

16  alleging he's in some sort of combative position.  It's right

17  here.  This is the image they love to use to remind the Court

18  of who Mr. Samsel is.

19       But let's watch and see what's actually happening in

20  this combative stance.  In fact, they mischaracterize the

21  evidence.

22       (Video played.)

23       MR. WOODWARD:  Our friend in the red hat isn't getting

24  ready to jump the fence and battle with police officers.  Where

25  did he go?

1    (Video played.)

2         MR. WOODWARD:  Right.  He does run around that

3    barricade.  He goes to pick up Officer Edwards.  Why?  Because

4    there's a crowd of thousands coming.  Exhibit 309 shows us how

5    massive the crowd is behind the person holding this device.  We

6    don't know who it is, of course.  Officer Edwards lays on the

7    floor there any longer and she's about to get trampled.

8         Why did Ryan Samsel have to yell, I helped save your

9    officer?  He wasn't doing it in a nefarious way.  He was doing

10   it because now we're in the middle of this protest and that's

11   the only way to communicate.

12        Unless there be any doubt about whether our friend in

13   the red hat was concerned for Officer Edwards, let's remember

14   that in Government's Exhibit 309 we watched -- I'm at roughly

15   2:55 seconds on the counter.  As our friend in the red hat goes

16   to visit with Officer Edwards to make sure she's okay and

17   returns her hat to her.

18        Now, she testified that that made her uncomfortable,

19   but that's not the point.  What was Ryan Samsel's intent?  The

20   Government asks you to rely on all of his actions that day, all

21   of his words.  We do too, Your Honor.  And Ryan Samsel is doing

22   no harm.

23        Officer Edwards told you that she arrested someone on

24   January 6th, that day.  She didn't arrest Ryan Samsel because

25   she didn't think she had any reason to.  That's what she told

1  us.

2         Now, I'll address briefly the Government's argument

3  that this barricade is being used as a deadly or dangerous

4  weapon.  It's not, Your Honor, it's being pushed.  And Officer

5  Edwards fell; the video shows that.  Her feet are in the air;

6  the video shows that.  But that doesn't make the way that the

7  barricade is being pushed deadly or dangerous.

8         The barricade is being pushed, just like any other

9  object can be pushed.  And Officer Edwards happens to fall.

10 And there's nothing good about that, but that doesn't make the

11 way the barricade is being pushed deadly or dangerous.  It does

12 not convert that otherwise harmless object into a deadly and

13 dangerous weapon.

14        Nor, Your Honor, has the Government proven beyond a

15 reasonable doubt that Officer Edwards was injured that day.

16 Her testimony is that she was concussed.  But she also agreed

17 that the medical records don't show that.  That she had

18 numerous head scans, none of which gave her a diagnosis of a

19 concussion.

20        She went to three different medical providers in the

21 week after January 6th.  What caused her headaches?  What

22 caused her to black out?  What caused the burns on her face?

23 We don't know, Your Honor, but it's not our obligation, it's

24 not our burden to prove.  The Government had every opportunity

25 to bring a witness in here and prove their case up.  They

1    didn't do it.

2            Was it the bear spray that she'd never been sprayed

3    with before?  Was it the stress that she understandably has

4    suffered these last three years?  We don't know, but that's

5    reasonable doubt.

6            She wasn't -- the Government has failed to prove that

7    she was injured beyond a reasonable doubt.

8            Now, I'll go quickly through the 1752 charges.  The

9    Court has ruled on the law and obviously we respectfully

10   disagree.  But we will point out that if the barricade's not a

11   deadly or dangerous weapon for the purposes of the 111 charges,

12   it's obviously not a deadly or dangerous weapon for purposes of

13   the 1752 charges.

14           And there's even some question, as we've argued

15   already, whether Mr. Samsel was indeed carrying the barricade.

16   Officer Edwards told us she couldn't be sure.  The video

17   clearly shows that he's releasing the barricade, and what

18   happens next, we don't know.  We'd love to see more angles, but

19   it's not our burden to prove.

20           With respect to count 12, now we're moving on to the

21   West Terrace.  The Government showed you video of Mr. Samsel

22   touching a riot shield.  They tell you that he must have been

23   lying to Agent Curcio when he told Agent Curcio that he was

24   pushing it and not pulling it.

25           This is Defense Exhibit 1.  And Your Honor, because I

1    had referenced the entire exhibit in cross-examination, I've

2    left here about 12 minutes of blank video at the beginning, so

3    that the timestamps match up in the record.  And so at 12:33 --

4    no.  It is 12:33.  We see the events that led to that

5    interaction with the officer.

6         Now, the Government didn't want you to see this

7    portion of the video.

8       (Video played.)

9         MR. WOODWARD:  Didn't think it relevant, but what we

10   see in this video -- and there's actually sound here but I

11   don't want to talk over the sound, is a very different picture

12   of our friend in the red hat on the West Terrace than the one

13   they've described.  Not a person spending an hour and a half

14   going around causing misery and mischief, but a protester, like

15   thousands of others, one here who's concerned about another

16   protester who's been shot in the face with an object.  Whether

17   a rubber bullet or a paintball, we don't know.  It has pierced

18   his cheek, such that there is literally a hole in his face.

19      (Video played.)

20        MR. WOODWARD:  And our friend in the red hat, that

21   menacing villain having his way with the West Terrace, is there

22   helping the injured, ensuring that he receives prompt medical

23   attention.

24        By the way, do you see any devices in this video?

25   Devices that we could capture additional angles from?  Hear

1   better audio?  Understand what's really going on?  They're

2   there, but the case agent on this investigation didn't think

3   they were necessary.

4        (Video played.)

5        MR. WOODWARD:  Our friend in the red hat's not being

6   aggressive toward this officer, not until he and his injured

7   colleague feel threatened by the officer.

8        (Video played.)

9        MR. WOODWARD:  What we see in this video, Your Honor,

10  is not a group of protesters who are randomly attacking police.

11  They were sitting calmly and that officer inserted himself and

12  Mr. Samsel pushed back.

13       (Video played.)

14       MR. WOODWARD:  Did the officer holding the riot shield

15  testify he was pulled?  No, Your Honor.  That officer didn't

16  testify at all.  So what we're left with is the video.

17       (Video played.)

18       MR. WOODWARD:  The plank throw.

19       (Video played.)

20       MR. WOODWARD:  The Government would have you believe

21  that it's a two-by-four.  How do we know that?  Well, the

22  Government tells you, here's video of a stack of two-by-fours

23  and here's video of Mr. Samsel holding a two-by-four.  So it

24  must be a two-by-four.  Except we had Officer Augustine tell

25  us -- he doesn't know whether it's a two-by-four, what it's

1    made of.  It looks like a two-by-four.  It must be a

2    two-by-four.  But that, Your Honor, that's reasonable doubt.

3         What actually is Mr. Samsel holding that day?  This is

4    Government's Exhibit 316.  I'm at 1:09:15.

5       (Video played.)

6         MS. FOSTER:  Your Honor, just for the record, I don't

7    believe this is in evidence.

8         MR. WOODWARD:  316 is not in evidence?  I'll clear

9    that up and we can strike it if it's not in evidence.

10         THE COURT:  Okay.

11       (Video played.)

12         MR. WOODWARD:  At 1:09:15 the Government tells you

13    that this gentleman in the blue jean jacket exits the media

14    tower or the -- well, it doesn't matter, and that he's holding

15    the infamous plank.  But I'll ask you to watch carefully, Your

16    Honor, and I'll slow this down, because in the seconds that

17    follow, he drops the plank.  He gets sprayed with some chemical

18    and he walks away from it.

19       (Video played.)

20         MR. WOODWARD:  The Government would have you rely on a

21    grainy image, a zoomed-in CCTV that even Officer Augustine

22    couldn't use to identify Ryan Samsel without the assistance of

23    the Government placing a big, old circle around him to conclude

24    that that is proof beyond a reasonable doubt that Mr. Samsel

25    has used a deadly or dangerous weapon in furtherance of this

1    offense.  But we don't know anything about what the object was
2    and we really can't say for certain that it was Ryan Samsel at
3    all.  That's reasonable doubt.
4              Turning, Your Honor, to the 1512 count.  The
5    Government says proof of Mr. Samsel's understanding of what was
6    happening in the Capitol building that day is a text message
7    about the Democrats winning Georgia.  That, they say, must mean
8    that Mr. Samsel knew about the certification of the Electoral
9    College vote.
10             Now, we're all lawyers and so it's easy for us to
11   remember that there's a certification of the Electoral College
12   vote.  But we don't see anything about any vote at all in
13   Mr. Samsel's images.  In fact, the Georgia vote on January 5th
14   was the Senate runoff, in which the democrats won two Senate
15   seats.  So "see you soon" must mean he's heading to the Capitol
16   building?  We don't see any discussion of the Vice President
17   and the role that the Vice President plays.  We don't see any
18   discussion of Stop the Steal.  Government says, well, he was
19   wearing a Make America Great Again hat.  He was carrying a flag
20   with Trump superimposed on Rambo's body.  Clearly, he came to
21   Washington, D.C. to stop the certification of the Electoral
22   College vote.
23             And Your Honor, to quote the late Jimmy Buffett:
24   Don't try to describe a Trump rally if you've never seen one.
25             There were thousands of red hats and thousands of

1    flags.  There's no proof that Mr. Samsel had any knowledge of
2    what was happening in the Capitol building that day, and
3    there's certainly not proof beyond a reasonable doubt.  Nor was
4    his mere presence on the Capitol sufficient to establish his
5    guilt on this count.
6            Your Honor, I've gone long, and so I'll conclude --
7    I'll conclude as follows, Your Honor.  That Magic Eye poster
8    that I spoke about in opening, that I've referred back to here
9    in closing, as you look at the evidence in this case, it's a
10   different picture from what the Government would have you
11   believe.
12           As I said earlier, Ryan Samsel is not January 6th and
13   January 6th is not Ryan Samsel.  You've done this a long time
14   as of high.  The Government is prosecuting Ryan Samsel for
15   pulling a riot shield?  What the Court must now do is divorce
16   itself from the abhorrent events of January 6th and look at the
17   facts as applied to the conduct with which Ryan Samsel has been
18   charged.  He's not charged with starting a riot.  He's not
19   charged with starting a riot because he didn't.
20           He's charged with assaulting officers.  But what does
21   the evidence actually show him doing?  Our nation, this city
22   and this courtroom have seen its fair share of protests that
23   result in arrest.  And while I'm not happy about what happened
24   to Officer Edwards, whether it being pushed or falling down the
25   stairs in the Capitol building or sprayed with chemical spray,

1   is it clear beyond a reasonable doubt that Ryan Samsel pushed

2   over that barricade?  No, Your Honor.

3        And in any other case would we accept as gospel video

4   sourced from YouTube or GETTR to prove these offenses?  No.  We

5   expect more of our law enforcement and our prosecutors in

6   seeking the truth.

7        Did Ryan Samsel travel to Peace Circle and the Lower

8   West Terrace?  Yes, he did.  But is it clear beyond a

9   reasonable doubt what happened next?  Were this some other day,

10  some other protest turned violent, we would be relying on other

11  evidence, not grainy 7-Eleven CCTV footage.  We'd have

12  eyewitnesses.  We'd have others testify about what they

13  actually saw, not what they see on the video.

14       We may never know why they didn't prove their case

15  that way.  Why they didn't bother to speak to others in the

16  crowd, get statements about what those people saw, collect a

17  video from what their devices observed.

18       We do know that the Government now expects you to

19  disregard that significant oversight.  That the Government asks

20  you to conclude that Ryan Samsel and these five defendants

21  started that riot.

22       But that's not why we're here.  We're here because

23  they were charged with specific offenses that the evidence does

24  not prove.

25       To accept just this one time YouTube as an all mighty

1    source does Ryan Samsel a disservice.  If this were any other

2    case, we would expect more of our evidence.

3         So Your Honor, we implore you, look at the picture.

4    What do you see?  The image is different for everyone, and for

5    you, it is not a presumption of guilt but of innocence.

6         Thank you, Your Honor.

7         THE COURT:  Thank you.  Okay.  We'll take a lunch

8    break and everyone come back at 2:00.

9    (A recess was taken at 1:13 PM)

10        THE COURT:  Okay.  Ready whenever you are.

11        MR. FEITEL:  Thank you, Your Honor.  Good afternoon.

12   Your Honor knows I represent defendant James Grant, who's

13   sitting here in the courtroom to my right.  And Your Honor

14   knows that it is my job to represent him.  It is not my job to

15   assist the Government in helping to muster evidence against the

16   co-defendants in this case, but I do believe part of that is

17   what's going to happen during my summation.

18        I also want Your Honor to understand that the purpose

19   of the summation is to convince Your Honor that, based on the

20   evidence adduced by the Government, this Court, sitting as the

21   finder of fact, should acquit Mr. Grant of all the counts in

22   the indictment, with the reservation, and I leave it to Your

23   Honor's judgment, whether my client is guilty of a 111(a) with

24   respect to count 3 of the indictment, the charges and assault

25   against Officer Cruz.

1          I wanted to start -- it seems like we've been here

2    forever, but it's only been six days of trial.  I noted that 11

3    Government witnesses testified and by my count approximately

4    141 exhibits were introduced into evidence by the Government.

5    I didn't include two of three defense exhibits in my

6    calculation.

7          I note this for Your Honor, not solely because I'm

8    taking careful notes during the trial but because it raises the

9    question, out of all the Government's witnesses, Lieutenant

10   McCree, Officer Lively, Caroline Edwards, who I think is now a

11   sergeant, and all the rest, who exactly is it that identified

12   or talked about my client?  And the answer is that none of the

13   Capitol Police officers who were present that day who you've

14   seen over and over again in the video were asked to identify my

15   client.  None of them did so.  The only person who was able to

16   do so was Special Agent Noyes, and he was only able to do so

17   because he was participating in the arrest of my client.

18         I think the Government's failure to elicit

19   identifications from the actual participants signals that they

20   were paying no mind and no attention to Grant at the time, that

21   he was a non-event or cipher in the larger scheme of what

22   happened at the Peace Circle on January 6th.

23         Your Honor, I want to focus to begin with on counts 2

24   and 3, and I won't belabor the law since the finder of fact is

25   not only an attorney but a judge of long-standing experience.

1    But it does merit noticing that in order to convict Mr. Grant

2    of counts 2 or 3, the Government has to prove that my client

3    intentionally used a dangerous or deadly weapon and that he

4    inflicted bodily injury in the commission of the assault.

5         I took these slides exactly from Your Honor's

6    submission of the jury instructions in this case, so there

7    would be no doubt as to what the elements of proof would be for

8    the Government, because, of course, the burden is on the

9    Government to prove each and every element.

10        Your Honor also defined "assault" to include an

11   intentional attempt or threat to inflict injury upon someone

12   else, and that the finder of fact has to find beyond a

13   reasonable doubt that the defendant intended to inflict or to

14   threaten injury.

15        I point that out because the mental state involved in

16   the assault counts in this case is not by inadvertence, by

17   accident.  It's not even by design.  It's with actual intention

18   to inflict harm on someone else.  And in the context of the

19   111(b) charge against Officer Edwards, the term "to inflict"

20   means actual physical touching, as Your Honor has defined it in

21   the jury instructions.

22        I'm going to try to analyze my client's conduct

23   against the requirements of the law in this case.

24        I want to start with where I began when this trial

25   began, which is that there is a problem with causality with

respect to count 2, the assault on a police officer charge

involving Caroline Edwards.  I want Your Honor to recall that

this is not a conspiracy case.  The defendants did not know

each other before the January 6th events.  They didn't

communicate with each other.  There is no evidence adduced at

this trial of any plan or preparation or consultation among

them.

And there really is no concerted action.  The

Government said, well, they all walked together to the bicycle

racks.  Everybody in the line was marching forward.  There is

no evidence that the defendants communicated, I don't believe,

either directly, indirectly or by implication.  And it bears

noting that after the events at the bicycle rack, the

defendants are never seen together again.  I think it's

confirmation of the notion that they do not know each other, as

people say, from beans or from a hole in the wall.

Also, there is no strict liability in this case the

way the Government has structured the crime.  They did not

bring a conspiracy case.  So there is no automatic liability

for the acts of many as to the acts of one.  So the Government

has to prove individualized guilt of the assault count.

Your Honor, I'm sure it has not escaped your attention

the irony that I'm trying to use the very videos that I

objected to in an effort to exonerate my client, and that's

because it's the only tools that the Government has given us in

1    this case.  It's the only evidence of record.  By my count,

2    there's about 25 seconds of snippets of video.

3         And I pointed out earlier and I want to repeat it,

4    these are not videos taken by professional documentary

5    video-takers.  It's not people who lined up in front, in back,

6    to the side with professional cameras staging what they would

7    capture as these events unfold.  Rather, these videos are taken

8    from unknown third-parties, as everyone has acknowledged, who

9    are randomly holding up cameras and the video is later posted

10   to YouTube or some other streaming purpose.

11        More importantly, for purposes of trying to analyze

12   what my client did and where culpability and criminal

13   responsibility lies, there's not a single video taken from

14   Mr. Grant's point of view.  There's nobody next to him who

15   shows what he saw.  There's no one directly behind him who

16   shows exactly what he saw.  All these videos are taken by

17   persons who are changing angle and changing perspective moment

18   to moment as the events take place.  And I think that has

19   limited Your Honor's ability to consider what actually happened

20   in total during these events on January 6th.

21        So the question of the day, the question of the

22   moment, is what happened at the bicycle racks.  Your Honor has

23   heard the testimony.  I think some of it does bear repeating.

24   The bicycle racks are five across.  They're about 6 feet or so

25   in length each.  And they are, by all objective standards,

1    loosely connected.  They are not bound together to form a

2    uniform wall.  This is not a solid object that moves

3    collectively.

4            The bike racks, by the Government's own admission,

5    were not bound tightly together.  I believe Officer McCree said

6    they pivot at the joint.  In fact, they do move independently,

7    as Your Honor will see in the next set of photographs and on

8    the videos.

9            Officer Lively admitted during cross-examination that

10   the bicycle racks buckled inward when they were moved, and when

11   they are lifted, Your Honor can see on the videos that they

12   tilt both forwards and backwards as they are moving.

13           And Your Honor may also remember several questions

14   asked of the witnesses, which establish that the bike racks in

15   general were moving to the left during these events.  And

16   that's because there were individual and independent pressure

17   against each of these loosely-connected bike racks.  So the

18   defendants did not, for example, gather together behind one

19   bike rack or organize pushing against them.  There's a later

20   slide in which I say no one yelled, "one, two, three, go," and

21   everybody pushed together.

22           Everybody at those independent bike racks is acting as

23   an independent agent from one another.  Not merely in law, but

24   in fact.

25           Your Honor can see my client, Mr. Grant.  He is

standing to the left.  He is two and a half bike racks away

from the end, where Officer Edwards ultimately winds up.  There

are two sets of pivoted joints and two sets of other connectors

between him and, ultimately, Officer Edwards, and there are

people standing between them.

        Your Honor may recall this picture.  It's what happens

when everybody starts pressing against the racks.  They buckle

inwards.  The pressure on the left and the pressure on the

right are not distributed uniformly across the bike racks.

They begin to cave in an inverted V, or a V, depending on your

perspective, I suppose, away from the people that are pushing

on them.

        And the reason I bring this out is not simply because

it's shown on the video but because it has a fundamental effect

on the verdict in this case involving Mr. Grant.

        Your Honor must recognize, and I think even the

Government would have to agree, there is some physical limit to

causality in a case like this.  As Mr. Woodward pointed out,

there are lots of people standing in front of the bike racks,

pushing.  They're pushing each other and they're pushing the

people in front of them and some are pushing the bike racks.

        But the Government did not charge everybody, even

those who were standing at the bike racks, directly pushing and

lifting them, with the assault on Officer Edwards.  I believe

that the Government has made sort of a ad hoc decision about

```
1    where criminal liability for these matters ends.

2              And I want to remind Your Honor there are a lot of

3    people standing at the bike rack.  And if Your Honor will

4    notice -- and I am not touching the screen for obvious reasons

5    during my lack of ability.  But there's a gentleman wearing a

6    green jacket whose back is facing the bike racks, and Your

7    Honor may remember that there was video of him that was shown

8    in this case.  He is actually doing the one, two, three, heave

9    ho on the video.  He and the person to his immediate right as

10   from his vantage point lift up the bike racks.

11             Mr. Grant is one person over to the right here, and

12   yet Mr. Grant is here in court today and this gentleman in the

13   black wool hat is not.  Nor is his compatriot to the right.  I

14   think the point is that the Government made an arbitrary

15   decision about where they were going to cut off the limits of

16   causality.  I don't believe that they can prove causality but I

17   can't think of a principal reason why my client is here, when

18   he's more than two bike racks away from Officer Edwards, and

19   these two gentleman are not.

20             As I said, he is the furthest away from Officer

21   Edwards of all the defendants.  He is closer to the center of

22   the bike racks.  And if Your Honor looks at the videos -- I am

23   not going to play the videos again.  I believe that we have

24   seen the 20 seconds repeated in as many different ways as a

25   person possibly can.
```

1            But his head is down.  He is looking forward.  His

2    view of what's going on is obstructed both to the front of him,

3    where there is the sign, and his view is obstructed to the

4    right of him, where other people are standing.  I think if you

5    look at the photograph, you'll see that my client is looking

6    exactly forward.  There's no evidence that he saw Officer

7    Edwards.  And more to the point, there's no evidence that

8    Officer Edwards saw him.  She didn't mention him at all, not by

9    description of clothing and not by description of conduct,

10   during her testimony in this case.

11           I think it is indicative of the fact that as to these

12   events, my client was far from the action, as people say.

13           The other problem that I think that this case has,

14   Your Honor, is I think that the Government has left you, as the

15   finder of fact, in a largely untenable position.  I would have

16   thought that the Government would have tried, by use of expert

17   testimony or otherwise, to prove the element of causality, to

18   find someone who's extraordinarily more knowledgeable than any

19   of the lawyers who are trying this case to come in and explain

20   how force migrates from one bike rack to another, and how

21   pushing from different angles would affect what happens to the

22   bike rack.  I mean, the Government didn't try.

23           What they're doing is they're leaving it to Your

24   Honor, I believe, to have to speculate about what actually

25   happened in the moment.  More importantly, they're leaving you

1   to engage in what I would consider fairly said conjecture and

2   guesswork about where criminal liability exists in this case.

3          You can imagine if there was a case in which the

4   Government charged someone with defective structural integrity

5   of a building that collapsed, they would bring in an engineer

6   or somebody who had some experience in these matters to try to

7   explain where the fault existed and how it could have been

8   remedied.  There's nothing like that in the case.  All there

9   are are the videos.

10          And to the point of what Mr. Woodward said, I think

11  it's more the case that after the Government identified the

12  defendants in this case, via tip and via hotline and via facial

13  recognition or whatever it was they did, I think after they

14  identified the defendants they stopped investigating this

15  matter.  They felt it had been resolved without a careful and

16  considerate and prudent analysis of what actually went on and

17  what the videos actually disclose.

18          So in that regard, Your Honor, I don't think my client

19  has sufficient causality under the circumstances, or there's no

20  sufficient proof beyond a reasonable doubt of causality with

21  respect to Officer Edwards, and more importantly, under the

22  controlling jury instructions that Your Honor has circulated,

23  my client did not inflict harm on Officer Edwards.

24          I'm not going to belabor the point.  I know Your Honor

25  labored over the jury instructions because you modified them.

But in this case, inflicting harm requires that there be actual physical contact.  And as to my client there is none.  He is not anywhere in the position to have actual physical contact. We had cited some cases to Your Honor.  There's been a review of the law in this case.  I think that it is clear that under the standard of proof required to inflict harm, Mr. Grant is not guilty of that particular component of that element of the offense.

The other argument that I had made before and I'm going to make again is that even if there was some causality in this case, some theory that, well, maybe, maybe, maybe moving bikes to the left -- bike racks to the left, move bike racks to the right, there are at least two independent intervening causes.

And before we broke and we discussed the jury instructions we did discuss the Supreme Court's case, which notes that but-for causality, when there is more than one possible cause, requires the Government to prove that each independent cause was the but-for cause.

As to that, Your Honor, I do not think the Government has even tried.  I think they have treated this case in a way that defies -- or ignores, better, the requirements of the law. They have not at all explained how Mr. Grant's pushing would be an independent but-for cause of what happened to Officer Edwards, given the distance that he was from the bike racks,

1    given what he was doing and given what ultimately happened.

2           And I wanted to point out to Your Honor that there is

3    evidence of record that others were standing much closer to

4    Officer Edwards and others that were pushing.  It's the people

5    described in this exhibit that the Government introduced, and

6    it's also what happens in the next exhibit, in which

7    co-defendants are standing right in front of Officer Edwards.

8    Mr. Grant is nowhere to be seen.  And because he's nowhere to

9    be seen, I think he is nowhere to be found guilty for this

10   offense.

11          These acts are completely -- were completely

12   unpredictable to Mr. Grant in the moment, Your Honor.  He

13   didn't go with the other co-defendants with a plan that said --

14   or even if it was even a momentary plan, we're going to go to

15   the bike racks and we're going to push them and get everybody

16   out of the way.  So he's not responsible, I don't believe, and

17   I don't think Your Honor should find him so, for the

18   intervening what may be criminal acts of third persons.

19          Independent of the others pushing on the bike rack,

20   Your Honor, you've seen some video.  I'm going to talk about it

21   briefly.  Mr. Woodward talked about it.  During the Rule 29

22   motion hearing the prosecutors argued that pushing on the --

23   excuse me, I didn't get this correct, pushing on the left side

24   of the bike rack caused the right side of the bike rack to move

25   forward further than it otherwise would have.

1          I want to be clear, that is not what happened.  The

2     pushing on the left doesn't cause the bike rack on the right to

3     spring forward and knock down Officer Edwards.  It is yet

4     another independent intervening cause.  Your Honor has seen

5     that in the case.

6          There is the person standing to the right with what

7     appear to be black sweatpants with a white and red square on

8     them.  He is the person who releases the bike rack when it gets

9     caught on a low wall after it's come loose from its moorings.

10    And, Your Honor, we saw a small piece of the video.  I'm going

11    to play one more.

12        (Video played.)

13          MR. FEITEL:  Maybe it's the next one.

14        (Video played.)

15          MR. FEITEL:  Maybe it's the same twice.

16        (Video played.)

17          MR. FEITEL:  So much for my ability to manipulate the

18    videos in this case.

19          But Your Honor will recall from Mr. Woodward that the

20    bike rack gets stuck on the right-hand side, and when it's

21    released, like a spring that's been wound up, it explodes

22    forward against Officer Edwards, knocking her down.

23          And to the extent that the Government says that

24    Mr. Grant is somehow criminally responsible for what happened,

25    our reply is he is not.  He is far removed, both physically

1    from the events, and he's not the cause of the bike rack

2    knocking anybody forward.  It's the unidentified person who

3    decides to help things out by releasing it from -- where it's

4    captured against the low wall.  And Mr. Grant has absolutely

5    nothing to do with that person or with that conduct and nothing

6    to do with this offense.

7            Now, the Government has articulated yet another theory

8    in this case, which is aiding and abetting.

9            I want to just very briefly point out to Your Honor

10   that aiding and abetting requires knowledge on the part of

11   Mr. Grant that a crime using a dangerous or deadly weapon or

12   bodily injury was going to be committed or was being committed

13   by others.  And it also requires that the defendant have

14   performed the acts in furtherance of the offense.  The

15   Government is articulating, I think, a theory of strict

16   liability, which doesn't apply in this case.

17           This is not a conspiracy where everyone's responsible

18   for what everyone else does, and I do not recall, because there

19   was none, at least not from my failure of memory -- I do not

20   recall a single piece of evidence to suggest that Mr. Grant

21   knew what the others were going to do or that he took his

22   actions to assist in what the others were going to do in this

23   case.

24           So I think, Your Honor, at the end of the day,

25   Mr. Grant should be found not guilty of both the greaters and

1    the lessers for count 2 of the indictment.  I pointed out,

2    again, the aiding and abetting theory doesn't work.  It doesn't

3    really apply in this case, absent some proof that there was

4    concert of action among the defendants.

5           I think it goes without saying that had there been

6    some prior plan, or even momentary plan or plan in the moment,

7    we would have seen the defendants acting differently, both at

8    the bike racks and thereafter.  No one stops to congratulate

9    each other, job well done.  No one high-fives each other.  All

10   the defendants independently move forward towards the next line

11   of police officers to do whatever business they had being at

12   the Capitol that day.

13          But none of them stopped to acknowledge each other.

14   None of them stopped to help each other.  All that they do is

15   happen to have the misfortune, the karmatic misfortune, of

16   being at the same place at the same time.

17          So for all these reasons, Your Honor, because

18   Mr. Grant was more than two bicycle racks away from Officer

19   Edwards -- and Your Honor can see the bike racks are like

20   6 feet along at least.  If they're 6 feet long and he's in the

21   middle of the third bike rack, he's more than 12 feet away from

22   her.  There's no evidence that he saw her of record and there's

23   no evidence that she saw him.  And the Government had the

24   chance to ask when she was on the witness stand.

25          So for all those reasons and because there is no

1    automatic and there is no vicarious criminal liability in this

2    case, I think Your Honor must acquit Mr. Grant of count 2 of

3    the indictment.

4         With respect to count 3, Your Honor, as things stand

5    now, the Government is not arguing bodily injury from the

6    events at the Peace Circle.  So the only thing that the

7    Government has left to prove on a 111(b) charge is that a

8    dangerous weapon was used.  I'm going to try to address that

9    particular issue in as much detail as I can.

10        I think it's notable, Your Honor, that the officers

11   involved in the case -- I think Officer Cruz himself said no

12   dangerous weapon was used.  He said that at the time.  He later

13   caveated with, well, except for the bike racks.  But in the

14   moment he did not perceive these as being dangerous weapons

15   because that's not how they were used.

16        What the Government has done is it has stretched the

17   legal theory about what constitutes a dangerous or deadly

18   weapon to try it in circumstances that it was never intended to

19   apply to.  For that reason, I think Your Honor needs to find my

20   client not guilty of the greater offense involving Officer Cruz

21   in count 3.

22        What I wanted to say was the definition that Your

23   approved is that the object is not inherently or obviously

24   dangerous.  It's a deadly or dangerous weapon if it's capable

25   of causing serious just bodily injury or death to another

1   person and the defendant used it in that manner.

2          I want to focus on both aspects of that as it pertains

3   to Officer Cruz, who's the victim charged in count 3 in this

4   case.

5          So I was surprised.  I thought the Government might

6   try to identify a number of factors that were relevant to

7   determining whether an object is dangerous or deadly.  Lawyers

8   love to have lists of factors.  Everything you read, people are

9   trying to identify factors.  So I tried to identify some that I

10  thought would be representative and fair for Your Honor to

11  consider in the determination about whether or not the bike

12  rack was used as a dangerous or deadly weapon.

13         The one obvious question I think is preparation.  Did

14  somebody bring -- did Mr. Grant bring a weapon with him?  Well,

15  he did not in this case.  There's no allegation that he dragged

16  the bike racks, not to be facetious, with him.  And the

17  question is:  What was the object?  It was a bike rack.  Why

18  did this get selected by everybody in this case?  I think

19  because it was there.  I mean, I don't mean to be facetious.

20  They didn't bring any other weapons with them.  They choose to

21  use what was in front of them in a manner not designed to be a

22  weapon but for something entirely different.

23         The other thing Your Honor might want to ask is what's

24  the context?  What did people say about their conduct?  I mean,

25  obviously there's no statements from Mr. Grant in the moment.

1   There's no video of him yelling, I'm going to run you over and

2   then I'm going to bury you with this bike rack.  That horrific

3   set of circumstances would make this an entirely different

4   case.  There's nothing.  There's no statement.  There's no

5   contemporaneous announcement or admission by Mr. Grant that he

6   was trying to use the bike rack as a weapon.

7           So the question is:  Does Mr. Grant say anything

8   before or after about the event?  And the answer to those

9   questions is a resounding no.  There's nothing prior about

10  violence and there's nothing after about violence.

11          More to the point, Mr. Grant -- during this trial no

12  evidence was admitted that my client had social media in which

13  he talked about coming and committing violence at the Capitol.

14  I'm sure Your Honor is familiar that a lot of people said a lot

15  of things about their intentions for coming.  There's no such

16  evidence against Mr. Grant that suggests that he came with

17  blood in his eye, in the vernacular, or with the intent to do

18  violence.

19          So when Your Honor considers whether or not it was a

20  dangerous or deadly weapon, I think it's also pertinent to know

21  what the people in the moment said.  I've discussed what

22  Officer Cruz said.  Sergeant Lively, I think, admitted on the

23  stand that no weapon was used.  And both of them were present

24  at the Peace Circle.

25          I think it's also important to try to kind of look at

1   conduct and demeanor.  The Government has taken a one-second

2   piece of the video of my client jumping up and down and waving

3   his arm, and made it the sine qua non of every other action

4   that he did in this case, and I don't think it translates to

5   this event or any other subsequent charges in this case.

6          I want to remind Your Honor that Mr. Grant's behavior

7   and demeanor was very different as these events progressed.  He

8   tried to pull one of his co-defendants back and away from

9   Sergeant Lively.  And Your Honor may remember, for his act of

10  doing so he got punched in the face by Officer Lowman, which I

11  think, one, was probably a violation of Capitol Police officer

12  use-of-force regulations, as admitted to, I think, by Sergeant

13  Lively, and, two, it explains why Officer Lowman didn't come to

14  court and testify.  I certainly would recommend that he receive

15  counsel to prevent him from incriminating himself in this

16  courtroom for the gratuitous punch of my client.

17         Your Honor may remember that even Officer Cruz had a

18  hard time when I said to him, well, didn't Officer Lowman -- in

19  common parlance, didn't he wail my client?  Officer Cruz

20  couldn't even bring himself to say that.  Well, he punched him.

21  I think the video shows something entirely different.  It shows

22  Officer Lowman rushing down the stairs.  To point of fact,

23  Officer Lowman is not involved in the goings on at the bike

24  rack at all.  He's somewhere completely different.

25         He rushes into this event, and I don't know if he had

```
1    imperfect knowledge or simply didn't care but his conduct
2    reflects kind of a callous disregard for everybody else in the
3    case.  I think it's laudable that the officers in this line
4    maintained their composure.  I don't think anyone can say
5    otherwise.  Officer Lowman comes out of the blue and he decides
6    the way to fix this problem is to punch my client full on.
7         (Video played.)
8         MR. FEITEL:  And there are two points I wanted to make
9    about what happened with Officer Lowman and my client and
10   Sergeant Lively.  One is that my client is trying to pull his
11   co-defendant away from the officer.  Under examination, the
12   officers testified that they were concerned about being pulled
13   into the crowd.  Well, that's all well and good but there's no
14   way of knowing that Mr. Grant knew that at the time.  Mr. Grant
15   pulled his co-defendant away and kind of off of the officer.
16        And as I mentioned, his reward for doing this -- I
17   wasn't expecting him to get a pat on the back but he got wailed
18   in the face.  But more to the point, when Your Honor tries to
19   think about conduct and motive and whether this bike rack was
20   used by Mr. Grant as a dangerous weapon, it is notable that he
21   doesn't respond with violence.  Mr. Grant gets -- surprisingly
22   is still able to stand up.  He doesn't get up in a fighting
23   stance.  He doesn't get up and confront the officer.  He simply
24   continues doing what he was doing.
25        So in the final analysis, Your Honor, I think some of
```

1    the factors in figuring out whether this was a dangerous weapon

2    was were there any other acts of violence by my client that

3    day, and I think the answer is a resounding no.

4           I think another one is how was the bicycle rack used

5    and what was the intent.  I think that is really the crux of

6    this.  And I think the answer, from the evidence in this case,

7    is the bike rack was used to move or to push the officers away

8    and not to attack them.  They didn't lift it up and they didn't

9    take it apart.  They didn't turn it sideways and use it as a

10   battering ram.  And as I said, it wasn't used as a weapon and

11   it wasn't one, two, three, heave ho.

12          Everybody in this case was acting apart, and while it

13   certainly would have been better if no one pushed and they had

14   pulled, in the end I don't think the distinction between

15   pushing and pulling changes this bike rack from a utilitarian

16   object to a deadly or dangerous weapon in the context of this

17   case.

18          And so I would ask you to find my client not guilty,

19   certainly of the 111(b) charge contained in count 3 of the

20   indictment.  I leave it to Your Honor whether there's a lesser

21   included offense for which he's culpable.

22          I want to turn to what is the other really large

23   charge in this case.  It's the 1512(c), the obstruction of a

24   Congressional proceeding.  This is the issue that's been

25   briefed to the ends of time by lawyers all over this

1    courthouse.  It was briefed in this case and it was recently,

2    as Your Honor acknowledged, a Court of Appeals D.C. Circuit

3    opinion.

4          With respect to Mr. Grant's conduct, the Government

5    has to prove, because the statute requires it, that he had a

6    corrupt intent.  And as to that, I say to Your Honor, candidly,

7    what does the Government have to offer in that regard?

8          Well, the principal rationale is Mr. Grant's protected

9    First Amendment communications with members of the Georgia

10   legislature.  I mean, I'm going to turn to them in a second,

11   but he doesn't write to members of Congress.  He doesn't write

12   to a House member in the U.S. House of Representatives or a

13   U.S. Senator.  He writes to Georgia state legislators.  And to

14   the extent that the Government is trying to piggy back his

15   comments to Georgia legislators as evidence that he intended to

16   obstruct the Congressional proceeding here in Washington, D.C.

17   several days later, I say to the Government, that's not proof

18   of anything.

19         One, it's not direct proof of a single thing.  There's

20   no threat, direct, implied or otherwise in Mr. Grant's

21   communication.  And Your Honor may remember that I had

22   Officer -- excuse me, Special Agent Noyes on the witness stand,

23   and I said to him -- he happened to have the misfortune of

24   being a lawyer before he became an FBI agent.  And I said to

25   him, how is this not classically-protected First Amendment

1   activity, petitioning your government?

2          All he could think to do was to say, well, I think

3   there might be an implicit threat.  Your Honor may recall, I

4   somewhat facetiously said, take your time, I'll wait.  He had

5   no answer.

6          It is a distorted world view as to my client that

7   these communications to members of the Georgia legislature are

8   evidence of corrupt intent on January 6th here in Washington,

9   D.C.  I ask Your Honor as a matter of the law and as a matter

10  of common sense and as a matter of respect for the First

11  Amendment to say to the Government these may not be the most

12  eloquent emails ever sent, and Your Honor may completely

13  disagree about the idea that the nation is over and the rule of

14  law will break down if the election is not decertified in

15  Georgia, but nonetheless, those are protected First Amendment

16  activities in the context of what Mr. Grant did.

17         And I think it also bears noting -- well, I said

18  Officer Noyes was unable to articulate even an implicit threat

19  because there was none.  But more importantly, Mr. Grant's

20  phone was seized by the officers in this case, by the FBI.

21  Your Honor may remember they used the ruse of dragging him down

22  to the local Cary County police station, rather than simply

23  asking him if he would surrender and letting him know that he

24  was wanted.

25         And the agent said, well, people can destroy evidence.

1    The common tagline for every time a law enforcement officer

2    wanted to execute a warrant is we're concerned about the

3    destruction of property.  Well, all well and good.  But those

4    concerns were totally unjustified in this case.

5         When Mr. Grant was arrested, Your Honor may recall the

6    officer -- the agent said he was wearing some of the clothing

7    from January 6th.  They found the other clothes in his home,

8    and when they searched his phone they found the emails the

9    Government would love to rely on and they also found some

10   photographs of Mr. Grant.  This is the other sort of hinge that

11   the Government wants to use for 1512.

12        Your Honor, it is the case that not everyone who

13   entered the Capitol gets charged with obstruction of a

14   Congressional proceeding.  That is because it requires corrupt

15   intent.  I don't see anything from Mr. Grant sitting in this

16   office to have been corrupt intent or him standing in the

17   hallway or him entering the building through the broken window.

18        His conduct at the Peace Circle is remote temporally

19   from what happened inside of the building.  I don't think it

20   evidences any kind of intent to act corruptly, nor do I think

21   any of these activities inside do the same.

22        If the Government had charged this case as an

23   overarching conspiracy, where everyone came together and people

24   dressed the same, people all wore similar body clothes, people

25   wore helmets -- because there are subgroups inside of this case

1   in other courtrooms in this courthouse where people came

2   together.  They had matching clothing, they had matching

3   intent, because they conspired beforehand to come here.  But

4   that's not the case.

5          Unless it is true that everybody who entered the

6   Capitol or the building on that day is guilty of 1512,

7   Mr. Grant should not be either.  I think that the Government's

8   reliance on those emails is sort of an indicator to Your Honor

9   about just how weak the case is and the paucity of evidence

10  against Mr. Grant with respect to 1512(c).

11         So on balance, I would ask Your Honor, based on the

12  evidence, to find my client not guilty of count 10 of the

13  superseding indictment that charges him with a violation of 18

14  United States Code 1503 -- I'm getting kind of tired, Your

15  Honor.  So I want to go over -- a long day.  And at least today

16  it's not nearly as warm as it's been previously in this

17  courtroom.

18         So, Your Honor, there are some remaining counts in

19  this indictment, and I have to say, this is really classically

20  duplicative overcharging.  I imagine, without being mean

21  spirited or facetious, that the prosecutors looked through

22  every single crime delineated in Title 18, and then when they

23  were done they had to go into Title 40 to find more charges to

24  bring against Mr. Grant.  I think, as the Government kind of

25  candidly admitted in their summation, all of this activity

1  turns on the exact same events that underline counts 2 and 3.

2  That is the events at the Peace Circle.

3         With respect to the civil disorder charge, I'd ask

4  Your Honor to find that my client did not obstruct, impede or

5  interfere with a Capitol Police officer during a civil

6  disorder.

7         The civil disorder in this case, I believe by the

8  Government's evidence, and I think by their own admission in

9  opening, the opening round of summation, starts after the bike

10  racks go down and everybody starts pouring past towards the

11  Capitol.

12         So to the extent that there needs to be obstructing,

13  impeding or interfering that is connected to an event, the only

14  event that they have for civil disorder is what happens before

15  the civil disorder begins.  This is not civil disorder in any

16  other manner.  The Government I thought had possibly argued to

17  Your Honor that all of their being involved later, all of the

18  events staying on the grounds, somehow implied that they were

19  guilty -- that my client was guilty of civil disorder.  But in

20  the indictment the civil disorder is inexplicably intertwined

21  with the events at the bicycle rack.

22         So I'd ask Your Honor to find my client not guilty of

23  that offense, which is count 1.

24         Finally, the remaining counts all concern entering and

25  remaining in the Capitol, using or carrying a deadly or

1   dangerous weapon during and in relation to the events -- to the

2   offense.  And those are the counts contained in 6, 7, 8 and 9.

3          As was the case with count 2, Mr. Grant did not use

4   the bicycle rack as a dangerous or deadly weapon in connection

5   with the assault.  And I don't believe that it is possible for

6   him to have used the bike rack as well in connection with the

7   disorderly, disruptive, physical violence and disorderly

8   conduct charges that are charged in counts 6, 7, 8 and 9.

9          There's also an argument that I want to preserve, that

10  my client did not have sufficient knowledge, not that the

11  grounds were off-limits, because the sign is in front of him,

12  but that Vice President Pence was going to be there and that

13  there was going to be Secret Service.  So it became, under law,

14  a different status of a protected space.

15         And I will say that in the Government had evidence of

16  my client opining in social media or talking to friends or

17  texting, hey, I'm going to go Stop the Steal, the classic

18  January 6th claim, I'm going to Stop the Steal, there's nothing

19  about that in connection with the events on Capitol Hill in

20  Washington, D.C. on January 6th of 2021.

21         I ask you to find my client not guilty of all the

22  felony offenses.  I reserve for Your Honor's conclusion, based

23  on the evidence, whether he's guilty of the misdemeanors that

24  are sort of duplicative counts in the context of this case.

25         So I want to end where I began in my opening statement

1  to the Court.  My oration is not a defense of the events of

2  January 6th.  To the contrary, it's not offered as an excuse,

3  explanation or any other rationale for what happened just

4  around the corner from here.  But we have an individualized

5  system of justice in the United States.

6       And I won't belabor the reasonable doubt, burden of

7  proof, presumption of innocence oration that I like to give to

8  jurors in as much of a way as I possibly can because Your Honor

9  if fully versed with those requirements.  But those aren't just

10  words enshrined in the Constitution.  They have an active and

11  effective meaning in the context of a criminal case.

12       I do not think that the Government has proven beyond a

13  reasonable doubt, for all the reasons I've articulated, my

14  client's guilt as to counts 1, 3, the others that he's charged,

15  and as to count 2, I reserve with Your Honor about whether or

16  not there might have been a lesser included offense for

17  impeding for involving Officer Cruz.

18       But at the end of the day in this case, the defendants

19  are not here for a conspiracy.  There's no plotting.  There's

20  no planning.  There's no covert communications.  As I said in

21  opening and as I continue to believe today, these are five

22  misbegotten, woebegone people who had the karmatic misfortune

23  to be at the same place at the same time.

24       And independent of what anyone else said or what

25  anyone else did, I do not think the Government has carried its

1    burden of proof for Mr. Grant, and I ask Your Honor to find him

2    not guilty of the charges, as I've argued in the summation.

3    And I do thank you for your time this afternoon, Your Honor.

4            THE COURT:  Thank you.

5            Okay.  Closing argument for Mr. Johnson.

6            MS. ROSEN:  Good afternoon, Your Honor.  As my

7    colleague stated at the beginning of this trial, Mr. Johnson

8    admits he committed a crime on January 6th when he -- and the

9    Court can choose a verb -- forcibly, impeded, resisted,

10   assaulted.  When he pushed the bike rack.

11           This is not a case where Mr. Johnson is attempting to

12   shirk responsibility.  This is a case where the Government has

13   overcharged an individual who without a doubt made a very poor

14   decision but one that does not support all the charges the

15   Government has lodged against him.

16           Of the nine charges he faces in the indictment, all

17   but one stem from the 15-seconds or less long encounter at

18   Peace Circle.  When the Court goes back and watches the video,

19   his hands are on that fence for 15 seconds or less.  And for

20   the substantive counts, the counts relating to the incidents at

21   Peace Circle, he's charged as both a principal and an aider and

22   abettor.

23           And I think we have to be very careful because in

24   opening statements the Government used words like "these

25   defendants," "their joint conduct," "their collective act."

1    That's not the law.  Despite the fact that the Government chose

2    to charge all these individuals together, the Court has to

3    consider the conduct of each person separately.

4            And I won't belabor the point because I believe

5    Mr. Woodward did a good job of explaining it, but these men are

6    not charged as being the architects of what happened on

7    January 6th.  If the Government had that evidence, they would

8    have brought that charge.

9            And when the Court steps back and looks at all of the

10   evidence, it's clear that Mr. Johnson was an individual who

11   found himself at the front of a surging crowd.  When you look

12   back when we start at the beginning, we know that Sergeant

13   McCree, other officers testified there was a permitted First

14   Amendment protest scheduled that day.  And this Court saw

15   Mr. Johnson's text messages.  He planned to attend.  He planned

16   to stay at a hotel.  Him and his wife talked about bringing

17   snacks, a cooler, where they would use the bathroom if one

18   wasn't available.

19           What weren't they planning?  What wasn't he planning?

20   No plans to engage in violence.  No plans to break into the

21   Capitol.  No plans to disrupt any proceedings.  There was no

22   coordination or evidence of any links to any group that had any

23   plan to do any coordinated act on January 6th.  The only plan

24   he had was to make sure he had snacks and could use a bathroom.

25           And the Court should consider what Mr. Johnson came to

1    the protest with.  The Government talked a lot about the

2    megaphone, and we'll talk about the megaphone too.  A megaphone

3    is a means of peaceful protest.

4         And the Court saw in the images and videos displayed

5    during this trial that people did come to the Capitol prepared

6    to battle.  Not Mr. Johnson.  He didn't have any weapons.  No

7    gun, no knives, no pepper spray, no protective or tactical

8    gear, no vests or gas masks.  He wasn't thinking he was going

9    to get pepper sprayed.  He came with a bullhorn.

10        And this is circumstantial evidence of Mr. Johnson's

11   intent.  He didn't come to the Capitol to impede or obstruct

12   the electoral vote or any other Congressional proceeding.  He

13   came to have his voice heard.

14        A bit before 1:00 p.m. he's at Peace Circle in front

15   of the first row of bike barricades, and as Officer Cruz

16   testified, within less than 10 minutes, from 12:45 to 12:53,

17   the crowd goes from a handful of people to about 500.  The

18   energy intensifies.  And then -- and this is an important

19   note -- protestors easily get through the first bike rack

20   barricade.

21        I'm not clear on how that bike rack barricade was

22   opened or fell, but we know from the cross-examination

23   Mr. Woodward conducted that it happened within seconds.

24        Mr. Johnson, like others, walks through.  He

25   approaches the second set of bike rack barricades, and we

1    agree, he makes a bad decision.   One he admits is criminal.

2              But Mr. Johnson did not commit an offense against

3    Officer Edwards.   And the Government certainly cannot show

4    beyond a reasonable doubt that he did.

5              He didn't use any weapon against her, more or less one

6    that would be deadly or dangerous.   And he certainly was not

7    the direct cause of any injury she may have suffered.   And

8    while Mr. Johnson acknowledges that pushing a bike rack would

9    impede -- or is a forcible resisting or impeding of an officer,

10   the way he pushed that bike rack, that was not the use of a

11   deadly or dangerous weapon.

12             After the bike racks fell, Mr. Johnson, as was his

13   purpose in pushing the bike rack, walks up the walkway, which

14   we know on other days would be a public walkway.   As he's

15   going, as the Government showed, he pulls bike racks off the

16   walkway and puts them in the grass.   And then he hung out on

17   the fringes of the protest for an unspecified time.

18             The videos the Government introduced, no timestamps --

19   the third-party videos, the Court has no witnesses to the

20   contents of those videos.   But what they do show is Mr. Johnson

21   mostly in the grassy area right by the Lower West Terrace using

22   the megaphone.

23             After he left the Capitol, in a taped interview,

24   Mr. Johnson made exaggerated statements of his conduct that

25   day.   That's not to say that what happened that day wasn't

1    wrong.

2         But I want to turn to count 2.  Because Mr. Johnson is

3    not guilty under any theory of liability for the offense

4    against Officer Edwards.  We are cognizant of what happened to

5    Officer Edwards was serious and deserves this Court's careful

6    attention.  But what Mr. Johnson did, the undisputed evidence

7    that he pushed the fence to the left, away from Officer

8    Edwards, that's accounted for in the 111(a) charge that deals

9    with Officer Cruz.  There is no other act committed by

10   Mr. Johnson that constitutes a distinct, forcible act against

11   Officer Edwards.  And the Government certainly cannot show to

12   the contrary beyond a reasonable doubt.

13        To begin with, as counsel just pointed out for

14   Mr. Grant, no one named Mr. Johnson as responsible for driving

15   the bike racks into Officer Edwards, causing her to fall.  Not

16   one person identified Mr. Johnson as the person responsible for

17   the force that caused her to fall backwards.  And that is

18   because his forceful actions were directed away from her.

19        If I could ask Adam to pull up Government's

20   Exhibit 308 at 40 seconds.

21        What I'm about to show the Court is a still from a

22   video that we've all watched endless times.  And the still that

23   will be hopefully be pulled up soon clearly shows -- no, it's

24   not.

25        Here we are.  Clearly shows Mr. Johnson facing to the

1    left, pushing to the left, as co-defendants next to him are

2    pushing forward.

3            And if we could go to the next slide still, too, which

4    is Government's Exhibit 302 at 59 seconds.

5            Again, in this photo we see Mr. Johnson pushing to the

6    left.  And if the Court actually looks at the bill of his hat,

7    his face is pointed to the left.  All the video evidence that

8    the Government entered at trial show that Mr. Johnson was

9    pushing the fence to the left, away from Officer Edwards.

10           And the testimony of the officers on the stand

11   confirmed this.  Officer Cruz, who was directly in front of

12   Mr. Johnson, stated that he was being pushed to the left --

13   left on the screen, his right in real life, because the people

14   in front of him, ie., Mr. Johnson, were pushing that way.

15           Sergeant Lively, who stood next to Officer Cruz --

16   between Officer Cruz and Officer Nicole Roth, also confirmed

17   that he was being pushed to the left.

18           Any force that Mr. Johnson exerted was a discrete act

19   to the left away from Officer Edwards.  It follows that he

20   couldn't have forcibly impeded, resisted, assaulted her, much

21   less use any type of weapon or a deadly or dangerous weapon,

22   when any force he was exerting was away from her.

23           Along that same line of reasoning, Mr. Johnson is not

24   the direct cause of any injury that officer suffered.  And I

25   think it's important to note a number of theories of liability

1  have been put forward to the Court today about how Officer

2  Edwards fell back, about if she suffered an injury and what is

3  the root cause of that.

4          We don't take a position on that.  But it's clear that

5  Mr. Johnson's acts are not an independently sufficient cause of

6  her injury.  In other words, his pushing to the left, with no

7  other acts, would not have resulted in her to fall back in the

8  way she did.

9          If we could pull up Government's Exhibit 308 at

10 37 seconds.  Still three.

11         During her testimony, Officer Edwards identified the

12 two people directly in front of her as the men who pushed the

13 fence into her, as the people who caused her to fall as the

14 cause of her injury.  She also did note that she was relying on

15 both her memory and her review of the videos.  And so in this

16 still we pulled up, Government's Exhibit 308 at 37, this is one

17 of the persons she was referring to.

18         If we could move to still four.

19         And again, the two people directly in front of her,

20 who were exerting force directly in front of Officer Edwards.

21         When Sergeant Lively was asked to review Exhibit 308,

22 he stated that the two in front of her were the individuals

23 driving the barricade back towards the stairs, knocking the

24 officer down.

25         If the two men in front of Officer Edwards had not

1    been pushing forward, Mr. Johnson's independent pushing of the

2    fence to the left would not have caused her to fall.  He is not

3    the direct cause of her injury and the Court cannot find that

4    he inflicted injury on this officer.

5           Now, the Government is also proceeding under a theory

6    of aiding and abetting liability.  And to convict him of that,

7    the Court would have to find beyond a reasonable doubt that,

8    first, Mr. Johnson knew an offense was being committed, and

9    with that knowledge and only with that knowledge, that he took

10   an affirmative step to assist the people committing the

11   offense.

12          If the Court found that these two men assaulted

13   Officer Edwards, there's absolutely no evidence that

14   Mr. Johnson knew that Officer Edwards was being assaulted with

15   a deadly or dangerous weapon or that people were inflicting

16   bodily injury on her, and there's no evidence that, with this

17   knowledge, he took an action to aid in that.  His hands were on

18   the fence, looking away, the entire time.

19          And if the Court recalls the testimony of Officer

20   Cruz, who was directly in front of Mr. Johnson, he didn't see

21   Officer Edwards fall.  At the time, he was focused on what was

22   happening in front of him.  If a fellow officer in the same --

23   I'm sorry.  If a fellow officer in close to the same position

24   as Mr. Johnson, with less people surrounding him, does not see

25   what was happening to Officer Edwards, how can the Court find

1    that Mr. Johnson did?  It can't.

2           I do think there is an example of aiding and abetting

3    liability in the Government's evidence, and it's not

4    Mr. Johnson but it's a clip that we've talked about a lot

5    during this trial.

6           And if we could go to Government's 308A, 25 seconds to

7    38 seconds.

8        (Video played.)

9        MS. ROSEN:  This is when a man in a black hoody, who

10   is clearly watching what's happening in front of him --

11          If we could pause it.

12          He sees that the fence is being driven by two people

13   at Officer Edwards.  The fence gets stuck on a stone wall.

14   Perhaps the snow fencing is stuck too.  He sees that, knows an

15   offense might be happening, and makes a knowing decision to

16   dislodge the fence and spring it forward.  We would submit to

17   the Court that that is an example of aiding and abetting

18   liability on these facts.

19          You can play the rest of the video.

20       (Video played.)

21       MS. ROSEN:  What Mr. Johnson did is not.

22       Thank you, Adam.

23          At the end of the day, a lot of people had their hands

24   on the bike racks.  On the left-hand side, on the right-hand

25   side, in the middle.  In fact, even people who didn't have

1    their hands on the fence were exerting force by pushing the

2    people in front of them, as seen in clip stills from

3    Government's Exhibit 302.

4            If we could pull those up.

5            Not everyone present at Peace Circle is legally

6    responsible for the offense against Officer Edwards, even

7    though in small ways it may be true that hundreds of people

8    contributed.  That's because the law requires more.  Whether

9    it's under aiding and abetting liability or whether it's under

10   the causation standard of inflicting injury.

11           Just like the hundreds of people who exerted force on

12   that fence that day, Mr. Johnson is in no way guilty of any

13   forcible act against Officer Edwards.

14           Now, in their opening the Government posited that each

15   of the five men approached the linked bike racks, the fence,

16   and pushed it, knowing that they would be together, forcibly

17   impeding, resisting all the officers on the line.

18           I think there's a very important assumption that this

19   theory rests on, and that's that Mr. Johnson knew or any of

20   these men knew that the bike racks were securely linked, and

21   that assumption is not supported by the evidence.  We saw

22   however that first bike rack fence was breached, it was done

23   easily and within seconds.  There was no reason that

24   Mr. Johnson or anyone else had reason to know that the second

25   bike rack fence was more secured.

1              But two, even if the Court accepted that theory of

2      liability, that somehow Mr. Johnson aided and abetted the group

3      generally by forcibly resisting, impeding, the Court could pick

4      a verb under the statute, all the officers on the line, that's

5      a misdemeanor.  Because the force Mr. Johnson exerted on the

6      bike rack did not cause contact with Officer Edwards.

7              And I think it's important to note that all the

8      officers were holding the fence -- or at some point were

9      holding the fence, touching the fence, when people engaged with

10     the fence.  So the mere fact that you are touching an object

11     another person is touching and it moves a little, I don't think

12     is the forcible contact contemplated by the statute.  It would

13     require something more.  And what it required would be the

14     forcible resisting, impeding assault that Mr. Johnson directed

15     at Officer Cruz, not Officer Edwards.

16             So in sum, as to the count alleging Mr. Johnson as to

17     count 2, there's absolutely no force exerted towards or

18     directed at Officer Edwards, and the Court cannot find beyond a

19     reasonable doubt that Mr. Johnson inflicted injury on her or

20     used a weapon against her or forcibly assaulted her.

21             Turning to count 3, as we stated in opening statements

22     in this trial, as we've reiterated again, Mr. Johnson accepts

23     he forcibly impeded, pick a verb, the Officer Cruz.  But the

24     manner he used the fence was not in a deadly or dangerous

25     weapon.

1          And the Government talked about how high the fence was

2   and I have the clip of that up right now.  Yes, Sergeant Lively

3   was tall, 6-feet-5, but he's bending down in this picture.

4   They didn't get the fence above his head when he was standing

5   straight up.  And I think that's important to note.

6          You can take the photo down.

7          I also think when we consider how this object was

8   used, it's important to parse the individual acts of each

9   person.  We saw videos of defendants pushing and pulling the

10  fence back.  And what Mr. Johnson does is he pushes for

11  15 seconds or less to the left.  Mr. Woodward showed the Court

12  how many people were exerting force on the fence that day, and

13  if we consider Mr. Johnson's actions alone, it would have done

14  very little in its own right.

15         I query whether he would have been able to move the

16  fence forward at all on his own.  This is not an action

17  indicative of use of a deadly or dangerous weapon.

18         And I think it's important to consider the difference

19  between forcibly making contact or forcibly resisting or

20  impeding and using a deadly or dangerous weapon to do so.  And

21  I think we can look to some of the circumstantial evidence that

22  counsel for Grant pointed out in the last summation.

23         How the bike rack was being used, part of that

24  analysis is the intent of the people pushing the bike rack.

25  And I think it's abundantly clear that the bike rack was being

1   used to push past officers.  The bike rack was not being used

2   as an intentional weapon against officers.

3           And I believe in the summation, Government counsel

4   noted that Officer Cruz testified that he was worried he could

5   be trampled by the crowd or caught under the -- caught under

6   the fence if it had fallen.  And I think it's important to note

7   that the dangers he felt were collateral to how the bike rack

8   was pushed.  He didn't come to the Court and say, they were

9   swinging the bike rack at my head, I was scared they were going

10  to knock me down, cause me to black out.  What he said was he

11  was scared of the crowd.  He was scared of the moment.  And

12  those are all collateral to how the bike rack was being used.

13          Second, it clearly wasn't Mr. Johnson's intent to use

14  the bike rack to trap or trample officers.

15          If we could pull up Government's Exhibit 308A at 46 to

16  52 seconds.

17          As soon as the bike racks fall, the Court will see on

18  this clip, Mr. Johnson moves the bike racks away.

19      (Video played.)

20          MS. ROSEN:  Thank you.

21          Clearly, it was his intent to get past the officers

22  and not to use the bike rack as a weapon against the officers.

23          I would also point out, obviously, the Government has

24  abandoned a theory of bodily injury as to Officer Cruz.

25  Officer Lively wasn't injured because of the bike rack push at

1    all.  Officer Cruz, at best case, had a bruise, but we don't

2    know where that bruise had come from.  This is not what we

3    would expect if Mr. Johnson, the person directly in front of

4    Officer Cruz, was wielding a dangerous weapon at him.

5          I think it's clear the circumstantial evidence shows

6    that the bike rack was not weaponized; it was pushed.  And that

7    doesn't rise to the high statutory level of capable of causing

8    death or serious bodily injury.

9          Turning to the 1752 counts, we would submit that

10   because Mr. Johnson did not use a deadly or dangerous weapon,

11   and I don't think the carry verb applies, he's not guilty --

12   and because he didn't cause serious bodily injury, he's not

13   guilty of the higher charges and, of course, we would ask the

14   Court to only convict him on the underlying misdemeanors.

15         Lastly, I'm going to turn to counts 8 and 10.  And

16   obviously, this is where the megaphone comes into play.

17         The Government spent a lot of time talking about the

18   statements Mr. Johnson made through a megaphone.  But at the

19   end of the day, the best evidence of his intent is what he

20   actually did.  And what did he do?  He never went inside the

21   Capitol.  He never went near a door to the Capitol.  He never

22   approached crowds that were attempting to push their way into

23   the building.  He never went to the Upper West Terrace.  He

24   remained outside the fray of the general melee that was taking

25   place that day.

1             If we could pull up the stills 9 and 10.

2             These are stills from the clips the Government showed.

3      He's on the grassy area.  And the Government -- I can't

4      remember the exact phrase but something like a sergeant

5      following orders, and pointed to people looking at their cell

6      phones.  Who doesn't look at their cell phone these days?  The

7      Government is asking this Court to convict Mr. Johnson of a

8      1512 by layering assumption on top of assumption.

9             I go back to the fact that Mr. Johnson did not come to

10     the Capitol with any gear or weapon indicative of an intent to

11     fight.  He was talkative.  But he was one voice in a sea of

12     voices.

13            And the Government hasn't shown you evidence that

14     anyone was proactively listening to him.  The fact that a

15     person in a picture with Mr. Johnson was looking at his cell

16     phone does not mean they were checking social media because he

17     said that, in fact, the Electoral College had voted and the

18     vote had been passed.

19            The calls to get to the front line and flank the

20     Capitol, there's no indication that's anything but what

21     Mr. Johnson had been doing, attempting to have his voice heard.

22     If he encouraged the crowd to wrap around the Capitol, he

23     didn't say enter the Capitol.  The Government's theory of

24     liability is that he was chanting and getting the crowd riled

25     up as a scare tactic.

1          But the evidence equally supports the theory that he

2     just wanted his voice to be heard and that he wanted others to

3     have their voice being heard.  Protesting is a perfectly legal

4     goal.  Having your voice heard is a perfectly legal goal.

5     That's quite different from preventing the vote from occurring.

6          We don't disagree that he intended to have his voice

7     heard and perhaps wanted other people's voices to be heard.

8     But that's different than actually entering the Capitol and

9     stopping Congress from certifying the vote.

10          With all this said, Mr. Johnson acknowledges he pushed

11    his way into that area but his actions after that show that he

12    personally had no intent to obstruct or impede the proceedings.

13    If he did, why would he voluntarily stop so far away from

14    everything?

15          This is not proof beyond a reasonable doubt and it

16    certainly wasn't Mr. Johnson's intent to obstruct or impede the

17    electoral vote or any other Congressional proceeding.  And for

18    that reason, we're asking the Court to return a not guilty

19    verdict on counts 8 and 10.

20          In conclusion, Your Honor, it's the cornerstone of our

21    system of justice that this Court cannot convict unless each

22    essential element is proven beyond a reasonable doubt and only

23    if each individual defendant's acts support each element of the

24    crime beyond a reasonable doubt.

25          Mr. Johnson's then-held beliefs were not criminal.

```
1    His choice to protest was not criminal.  And we don't debate
2    that he made a moments-long decision that without a doubt
3    amounts to a crime.  But he didn't come to the Capitol planning
4    to be in an altercation with police.  He was not part of some
5    greater plan or scheme to break into the Capitol.
6             And because the bike rack was not used as a deadly or
7    dangerous weapon, because he did not commit a forcible act
8    against Officer Edwards or inflict injury on her, the Court
9    should return not guilty verdicts as to count 2, and find him
10   guilty of the lesser included as to count 3.
11            Thank you.
12            THE COURT:  All right.  Cross-examination for
13   Mr. Randolph -- I'm sorry, I just asked if we should take a
14   break.  Yes, closing argument.
15            MS. HALIM:  Let's do cross.
16            Good afternoon, Your Honor.  Give me just one moment
17   to get set up here.  I don't need this just yet.
18            All right, may I proceed?
19            THE COURT:  Yes.
20            MS. HALIM:  The record is devoid of any facts telling
21   us what Stephen Randolph's motivations and intentions were in
22   coming to D.C. for January 6th.  Devoid of any facts telling us
23   what he knew about the certification of the Electoral College
24   vote, what he expected, what he anticipated what he desired
25   relative to the certification.
```

1           We cannot presume what his intentions or motivations
2    were.  And we cannot speculate about his knowledge base.  The
3    Government wants you to do exactly that, Your Honor.  The
4    Government wants you to both speculate and presume.  But we
5    cannot do that here in this court of law.
6           I believe that to truly honor the
7    beyond-a-reasonable-doubt standard, we have to give Stephen
8    Randolph the benefit of the doubt.  Particularly where the
9    record is completely silent as to some key facts.
10          Your Honor, but for those few seconds at the bike
11   racks where his conduct appears indefensible, Mr. Randolph is
12   calm.  He is quiet.  He is never shouting.  He is composed.  He
13   is peaceful and he is even earnest and helpful when he is
14   telling those officers that they might want to get down off of
15   those bleachers.
16          He had nothing with him or on his person besides the
17   clothes on his back.  He brought no weapons.  He did not take,
18   use or carry anything as a weapon.  We'll talk, of course, in a
19   bit why those bike rack were not weapons.
20          He didn't enter the Capitol building.  But for those
21   few seconds at the outermost perimeter of the restricted
22   grounds before the Joint Session had even started, Mr. Randolph
23   was not agitated.  He was not violent.  He was not angry.  He
24   was not disorderly.
25          Defense counsel who's come before me have made a

1    variety of very excellent points.  So I'm going to truncate to
2    the extent that I can the recitation of the facts.  I do have
3    to get into them a bit because there are some points that are
4    specific to Mr. Randolph.  So I apologize for the
5    repetitiveness that you might hear as we move into the events,
6    those few seconds at the Peace Circle.
7          There's not a ton that's in dispute.  But Your Honor,
8    what we do dispute is significant to the point of being
9    dispositive.  I'll remind the Court of Government's
10   Exhibit 201, that CCTV footage from the far-out vantage point,
11   where you see the Peace Circle, and the exhibit starts at
12   12:40 p.m., 20 minutes before 1:00.  And we see that a crowd
13   starts to form at the outermost row of bike racks, on the
14   outside portions of the Peace Circle.
15         And for the next 15 minutes, we see that crowd
16   steadily grow, steadily swells and it never slows down.  There
17   are a constant flood of people coming in from both sides off
18   screen the entire time.  Just like Sergeant Lively said, and I
19   believe Officer Cruz acknowledged this too, the more people
20   there were, the louder it was and the more frenetic the energy
21   of the crowd.
22         At about five minutes before 1:00, we know that the
23   crowd gets past that first row of bike racks.  We don't know
24   exactly how.  I don't credit the Government's version of
25   events.  But somehow the crowd does and the crowd moves forward

1    to the first perimeter, when the five U.S. Capitol police

2    officers come down and put their hands on the bike racks.

3            Your Honor, when you look at the videos you will see

4    that Mr. Randolph is not among the first row of people at the

5    rack initially.  He is not one of the people engaging with the

6    officers initially.  He is not encouraging or beckoning anyone

7    else.  He is not shouting.  He is not chanting.

8            Various people along the entire link of the racks

9    start pushing and/or pulling, and initially Mr. Randolph is not

10   one of them.

11           When he does go up to the racks, I think it's

12   important to note that he's both pushing and then pulling back.

13   That's key.  He's not lifting the rack.  He's not trying to

14   drive that rack forward for the purpose of attacking the

15   officers.  He's got his feet planted squarely on the ground and

16   he is pushing and pulling backwards.

17           Now, as you've heard -- I've lost count at this point,

18   it's so many times -- those five racks are joined together.  It

19   is people to Mr. Randolph's left that are doing the lifting and

20   the driving forward, not Mr. Randolph.

21           Now, it might look initially like that row of racks is

22   just going to keep moving forward indefinitely.  But that's not

23   true, Your Honor.  There was a hard stopping point, well before

24   the set of stairs and before any officer fell.

25           You've seen this and I'm not going to take the time to

1    pull it up now.  I'm cognizant of the waning hour and I want to

2    make sure that we get through everything today.  So I'm not

3    going to pull up the still images that I prepared or

4    Exhibit 308.  But Your Honor, it's at about the 42-second to

5    the 45-second mark.  You slow that down and you will see that

6    the portion of the rack where Officer Edwards is and

7    Mr. Randolph and others are, there's a whole other segment to

8    the right of them.

9          That segment gets stuck up against a stone and

10   concrete ledge.  I took the time on my cross-examination of I

11   believe it was Officer Cruz to get the details about the feet

12   of those racks because it's important.  The feet of those racks

13   in total are about 24 inches, and the part that gets stuck,

14   which forms a perpendicular angle to the upright portion of the

15   bike rack, there in that corner, that corner gets wedged onto

16   that stone and concrete ledge, and those racks, at least those

17   two portions where Officer Edwards is standing, cannot move

18   forward.

19         Until that guy, that mystery man -- who, by the way,

20   isn't in the courtroom here today -- affirmatively, proactively

21   dislodges it.  He has to pull it to the side to get it out.

22   Because moving forward, that rack isn't going anywhere.  He

23   pulls it out to the side, and when he does that there's --

24   because all five segments have people pushing on it, it lurches

25   forward in a way that would not have happened but for that

1    mystery man wearing all black with the black hoody and the red

2    sneakers.

3           That guy.  That guy dressed in all black, who

4    affirmatively and proactively dislodges it and causes the two

5    racks on the right to spring forward, as Mr. Feitel said, is

6    the direct and proximate cause of Officer Edwards's injuries.

7    Mr. Randolph is not.  And the Government cannot meet that

8    element that requires them to show beyond a reasonable doubt

9    that Mr. Randolph inflicted bodily injury on Officer Edwards.

10          Now, Your Honor, I acknowledge, Stephen Randolph

11   acknowledges, that his conduct does qualify and meet every

12   element of 111(a) on count 2, and that's the count pertaining

13   to Officer Edwards, on the basis that he resisted and impeded

14   and made physical contact with Officer Edwards by virtue of the

15   fact that he was holding on to the same set of bike racks that

16   she was.

17          But he did not cause her injury.  He is not the direct

18   and proximate cause of the injury and he was not using the bike

19   rack as a deadly or dangerous weapon.

20          Now, with respect to Officer Cruz, Mr. Randolph is not

21   guilty of the entirety of count 3.  Turning to the deadly or

22   dangerous weapon -- again, I'm trying to truncate here because

23   so many excellent points have already been made by Mr. Feitel,

24   Mr. Woodward and Ms. Rosen.

25          But for Mr. Randolph specifically, what I would like

1    the Court to focus on is the fact that he wasn't using it in a

2    manner that was capable of causing serious bodily injury

3    because he was both pushing and pulling at a safe distance away

4    from the stairs.  It's not, Your Honor, until people to the

5    left, the two segments at the very end and maybe that third

6    segment from the left side, where there's much greater

7    concentration of people that have their hands on those racks --

8    it's the people on the left that lift it and make the rack

9    airborne.

10          You won't see that it's airborne on the side

11   Mr. Randolph is on until after the swell of people on the left

12   have already lifted it up in the air.  They're the ones lifting

13   and driving forward.  Mr. Randolph is doing nothing more than

14   pushing and pulling for the purposes of getting past the

15   officers.  Not to attack anyone.

16          Mr. Randolph is not guilty of 111(b) for count 2 and

17   he is not guilty of count 3 in its entirety.

18          During my opening statement I said that it was going

19   to be critical that there is no single uninterrupted video that

20   shows us a complete version of events as it pertains to

21   Mr. Randolph.  There is no single unobstructed view that shows

22   the totality of what happened.  When you look at the video and

23   when you see that mystery man pull the rack loose, so that

24   everything goes forward suddenly much more quickly than anyone

25   was anticipating, I think it looks like Mr. Randolph loses his

1    balance and loses his footing.  I think it looks like he's

2    lurched forward as a result of the force of that guy in black

3    who's dislodging the bike rack.

4          Now, Mr. Randolph goes over the rack, and I

5    acknowledge from the video that we have, the angles and the

6    vantage points that we have, it does look as though he

7    purposefully intended to cross over that rack to get to the

8    other side.

9          Your Honor, here's where I ask you to give him the

10   benefit of the doubt.  He could have had any number of reasons

11   for wanting to get to the other side.  Maybe he wanted to help

12   Sergeant Edwards.  Maybe he wants to get up the steps.  Maybe

13   he wants to get away from the deafening roar and the press of

14   the very large amount of people that are behind him in the

15   crowd.

16         As he goes over, he stumbles on the rack.  A rack, by

17   the way, that's still moving because people are doing various

18   things with the rack.  So his right foot gets caught on the

19   rack.  He sees Officer Cruz's arm already outstretched towards

20   him.  His left foot that's on the ground, his ankle is turned

21   and his body then starts veering to the left.  His hands are

22   open.  His arms are flailing.  There are points at which

23   neither of his feet are on the ground.  He and Officer Cruz

24   come toward one another and they lock together.

25         Mr. Randolph never throws a punch -- and I encourage

1    the Court -- and again, I'm not going to take the time right

2    now to pull them up, but specifically Randolph 1, Randolph 1.1

3    and Randolph 1.3 shows you the sequence of events.  And in

4    Randolph 1.1, you see that Officer Cruz's arm is outstretched

5    toward Mr. Randolph.

6         When they lock together, from that point forward

7    Mr. Randolph is just trying to get free from him and Officer

8    Cruz is trying to get free from Mr. Randolph.  He never throws

9    a punch.  He never kicks.  He never heaves his body weight

10   against any of the officers.  They're both trying to get free

11   and Mr. Randolph has hands all over him.  He doesn't lunge

12   towards Sergeant Lively.  He doesn't make any movements towards

13   him.  Sergeant Lively comes to him, grabs him and throws him

14   back towards the fence.  He's got people from the crowd with

15   their hands on his back, pulling him.

16        If we give him the benefit of the doubt, to which he

17   is entitled, as to why he went over the rack in the first

18   place, from the moment that he stumbles, from the moment that

19   his right ankle gets caught in that moving rack, from the

20   moment that he doesn't have a solid footing, from the moment

21   that his left ankle is turned and rolled over he is not acting

22   forcibly and he is not acting intentionally.

23        Now, I can understand why, during the chaos of the

24   moment, Officer Cruz thought it was an intentional act.  I get

25   it from his perspective.  But that's not the standard.  That is

1    not the lens through which we view Mr. Randolph's conduct.

2              Your Honor, I submit that he cannot be convicted of

3    111(a) on count 4.

4              Now, all of that took me so much longer to say than it

5    happened in real life.  It was a matter of seconds.  From that

6    tipping point, everything moves so fast and it was immediate

7    chaos for everyone.  The speed at which things happened becomes

8    particularly pertinent when we're examining whether or not

9    Mr. Randolph aided and abetted the conduct of complete

10   strangers.  Aiding and abetting requires a level of cognition

11   that was not possible for Mr. Randolph in those moments.

12             I'm going to move through the remainder of the charges

13   as efficiently as I can, and I'm going to focus on the elements

14   of offenses that are particularly in dispute, and I'll start

15   with count 1, 231(a)(3), which is the civil disorder.

16             There was no civil disorder at the moment of

17   Mr. Randolph's intentional conduct in pushing and pulling the

18   bike rack, which means that he was not acting at that moment

19   with the intended purpose of interfering with officers who are

20   engaging in duties incident to or during a civil disorder.

21             His purposeful conduct is more akin to the elements in

22   111(a), which is that he is attempting to thwart the duties

23   that the officers were engaged in in protecting a perimeter,

24   not incident to a civil disorder.  Civil disorder doesn't

25   happen until after Mr. Randolph's purposeful and intentional

1    conduct.  And for that reason, he cannot be found guilty of

2    count 1.

3           For counts 5, 6 and 7, first of all, each of those

4    charged the aggravated statutory factor of using or carrying a

5    deadly or dangerous weapon.  I'm not going to repeat what I

6    already said before.  The record doesn't support that.  The

7    record doesn't support that finding at all.  So for that

8    reason, Mr. Randolph cannot be convicted of the greater

9    offenses for counts 5, 6 and 7.

10          Now, when it comes to the definition of "restricted

11   ground," "restricted" is defined as an area where a Secret

12   Service protectee is going to be.  There is a question that

13   this record is silent on that we don't have the answer to, and

14   I think the fact that we can't answer that question means that

15   the Government hasn't met its burden of proof with respect to

16   the definition of a restricted area, as it pertains to the

17   events at the Peace Circle.  I want to be clear I'm talking

18   about the events at the Peace Circle because the indictment is

19   clear that all of the 1752 charges are anchored in the events

20   at the Peace Circle.

21          Officer McCree testified that there were a variety of

22   reasons for setting up a perimeter, one of which had been in

23   place for a very long time due to the COVID pandemic.  The

24   other was that they were doing the build-out of the inaugural

25   stage.  Now, Lanelle Hawa's stipulated transcript that the

1    Court has says that an additional reason is that former Vice

2    President Mike Pence was going to be visiting the Capitol

3    building.

4          Now, her transcript does say that the combination of

5    reasons is why there was that restricted perimeter, which is

6    reflected in Government's Exhibit's 5.  But here's the

7    question:  If the only event -- we're not in a pandemic.  There

8    is no inaugural build-out.  If the only event is that former

9    Vice President Pence is going to be at the Capitol building,

10   would the restricted perimeter still extend all the way out to

11   the very outermost portions of the Peace Circle which is

12   ordinarily a public space?

13         And I think the fact that we can't answer that

14   question on this record means the Government has failed in its

15   burden as to that element, and Mr. Randolph should be acquitted

16   of counts 5, 6 and 7 in their entirety.

17         Moving on, I'll very quickly move to count 8 because a

18   lot of what I'll talk about is encompassed in my count 10

19   arguments.  The Government has to prove that Mr. Randolph

20   engaged in disorderly or disruptive conduct on the grounds,

21   with the intent to impede, disrupt or disturb the orderly

22   conduct of a session of Congress.  That just doesn't exist.  So

23   right back at the beginning.  The record is completely and

24   totally silent as to his intent, as to his knowledge, as to his

25   motivations, as to his understanding of the certification of

1    the Electoral College vote.  So he cannot be convicted of

2    count 8.

3            Finally, on count 10, there is just no nexus between

4    Mr. Randolph's conduct at the Peace Circle and the obstruction

5    of the certification proceeding that hadn't even started yet at

6    the time of his conduct at the Peace Circle.

7            There's no proof of his intent.  No speech of any

8    kind, not verbal, not written, not from before January 6th, not

9    the day of on January 6th, not once since January 6th,

10   including various statements that they got from Mr. Randolph,

11   not one statement regarding the certification.  "The vote,"

12   "the certification," those words don't come out of his mouth at

13   any point.

14           The Government implies by suggesting that when

15   Mr. Randolph was at the Peace Circle, that others were shouting

16   "Stop the Steal."  Well, first of all, I think that's pretty

17   weak sauce because if you go back and listen the overwhelming

18   chant that you hear is "USA."  The loudest thing that you hear

19   from all of the videos that show the Peace Circle conduct is

20   "USA, USA."

21           To suggest that "Stop the Steal" means stop a

22   certification that hasn't yet started, the record doesn't

23   support that.  There is zero evidence on this record that Stop

24   the Steal is tied inextricably and only to the certification.

25   If we had a jury, this is the point, Your Honor, where I would

1    say, you know, you don't have to check your common sense at the

2    door.  You get to bring that in here with you, folks.

3           We've all lived in this world before January 6th.  We

4    knew that for a month, five weeks, six weeks before

5    January 6th, when there were a variety of other proceedings

6    that had to happen relative to the election, Stop the Steal was

7    everywhere.  It was in every social media space.  It was on the

8    news media.  It was not tied inextricably and only to the

9    certification on January 6th.

10          So the fact that some of the others were chanting

11   that, not Mr. Randolph, some of the others, is not evidence

12   that his intent in those moments was anything other than to get

13   past those officers, having nothing to do with the

14   certification that had not yet started.

15          And then, lastly, the evidence that we do have in the

16   record establishes that Mr. Randolph wasn't acting corruptly.

17   Once he's through the barriers and no longer at the Peace

18   Circle, you don't ever see him combative.  You don't see him

19   angry.  You don't see him acting out.  You don't see him

20   fighting.  You don't see him yelling.  You see none of that.

21          I reread last night the Circuit's decision in the

22   Robertson case.  The Circuit makes clear to point out that it's

23   only a sufficiency review.  So they're doing a limited inquiry.

24   And the facts that they bring out about Robertson in that

25   case -- you know, he was posting things about a rigged election

1  long before January 6th.

2          He was going to join a counterinsurgency.  Traveled

3  with others.  Packing provisions.  Bringing a gas mask.  He

4  goes into the Capitol.  He carries a stick, uses it as a

5  weapon.  He's enthusiastically joining a riot, both inside and

6  outside the Capitol.  And then afterwards, he's bragging about

7  storming the Capitol.

8          And by the way, on all of those facts, nonetheless,

9  Mr. Robertson was given an opportunity to surrender, unlike

10  Mr. Randolph.  Mr. Randolph's conduct is wholly and markedly in

11  contrast with what the Circuit said under a limited sufficiency

12  review was enough for them.

13          I'm going to pull up a still shot from Randolph 2, the

14  video, where we see there's a set of risers, and we can see

15  from the video that there are only officers up on those risers.

16  He goes up to them.  He says, They're taking the bolts out of

17  the bleachers.  Y'all might want to get down.

18          And this is his face, to show the Court another still

19  shot from that same video at about the same time.  Your Honor,

20  that's not the face of corrupt intent.  That's the face of

21  reasonable doubt.

22          I ask you to find Mr. Randolph not guilty of count 10.

23          Thank you.

24          THE COURT:  Okay.  Thank you.  Why don't we take just

25  a 10-minute afternoon break, and then we'll come back with the

1    final defense closing and then the Government's rebuttal.

2          So 10 minutes.

3       (A recess was taken at 3:43 PM)

4          THE COURT:  Okay.  Are we ready?

5          MR. BRENNWALD:  I think so.

6          THE COURT:  Go ahead.

7          MR. BRENNWALD:  Nothing like being last.  Your Honor,

8    just to clarify, if I go to 5:00, does that mean the Government

9    won't get rebuttal?

10         Okay.  Thank you, Your Honor.  I'm just going to try

11   to go through the indictment count by count, so hopefully that

12   will help the Court in its decision-making process.

13         Count 1, obstruction of officers during a civil

14   disorder.  Frankly, I've been talking to my colleagues about

15   this for a while and trying to figure out what the civil

16   disorder was at that point.  Because we have to be talking

17   about the bike rack incident because there was nothing else

18   that they would have been aware of at that point.  So they had

19   to have been attempting to commit an act to obstruct or impede

20   officers during that civil disorder.  The civil disorder would

21   then have been the bike rack incident.

22         And if that's what we're talking about, is the bike

23   rack incident is the civil disorder, then the third element

24   would seem to be difficult for the Government to prove which is

25   that that bike rack incident affected interstate commerce, or

1   was affecting interstate commerce at that time.

2          There's no question that people going into the Capitol

3   and being in the Capitol and causing people to have to be

4   evacuated obviously delayed commerce in the City.  But it seems

5   like a circular argument.  They're arguing civil disorder,

6   they're doing something during a civil disorder that they

7   caused.  I think a lot of us are kind of confused about what

8   that's supposed to mean and how it works.  But in any event, I

9   submit to you that Mr. Blythe is not guilty of that because of

10  what I just said.

11         Count 2, relating to Officer Edwards.  I submit my

12  client should be found not guilty of everything in that count.

13  He didn't even see her until after the bike rack had been

14  pushed over.

15         If we can go to Government's Exhibit -- if we can go

16  to 308 and starting at 35 seconds, please.

17         DEPUTY CLERK:  Were you asking the Government to pull

18  this up?

19         MR. BRENNWALD:  Yes.

20         So if we could start at 35 seconds, about.

21     (Video played.)

22         MR. BRENNWALD:  Stop right there.  So when the Court

23  looks at this you'll see that Mr. Samsel is there and there's

24  another gentleman on his right.  And again, as Ms. Halim noted,

25  the bike rack there on the right side was locked and somebody

1    pulls it up, which we may see in a couple seconds.

2        (Video played.)

3        MR. BRENNWALD:   Thank you.

4        So it's at that point that Officer Edwards falls.

5    There's another way of trying to convict Mr. Blythe, which is

6    the aiding and abetting theory.   What's interesting about that,

7    Your Honor, is that Mr. Samsel's actions after the officer

8    falls down tell you clearly that Mr. Samsel never thought of

9    that bike rack as a deadly or dangerous weapon.

10       If he had thought about it as a deadly or dangerous

11   weapon, he would have not cared if she fell; he would have just

12   kept going.   I'm trying to hurt you.   I'm using a weapon and

13   you fell.   Who cares?   The fact that Mr. Samsel actually went

14   around the bike rack when he saw her fall and picked her up

15   tells you that he never saw that rack as a dangerous or deadly

16   weapon.   As Ms. Halim and others said, people saw that as a

17   tool of basically obstruction, to push through, not as a weapon

18   to use.

19       So the very fact that Mr. Samsel could not have even

20   seen this as a dangerous weapon, because if he had he would

21   have been pleased, probably, with the officer falling down and

22   he got what he wanted.   He didn't see it that way.   He actually

23   went around to try to help her.   So if he's not guilty of it in

24   that sense, then neither is Mr. Blythe.

25       But in any event, Mr. Blythe was farther to the left,

1    and because of that, and because he didn't actually see --

2    there's a video where the Court can see that Mr. Blythe looks

3    over towards the officer after she fell down.  In fact, other

4    officers looked down that way after she fell down.  People

5    weren't really noticing her, except for a couple people in

6    front of her.

7           So as to that count, you can't assault someone you

8    didn't even realize was there.  And Mr. Blythe, I submit to

9    you, there's no evidence that he even knew Officer Edwards was

10   there at that point, or if she was, she was far off to the

11   right and he never noticed her in the sense that if I push

12   here, she would be hurt.  So he did not act intentionally in

13   hurting her.

14          Furthermore -- again, others have made the argument

15   about the bike rack being a dangerous or deadly weapon.  As the

16   Court has seen in Arrington, which is 309 F. 3d at 40, Page 45,

17   the Court discusses this whole deadly and dangerous weapon

18   issue, and it says:  We now reached a point of the party's

19   dispute.  The foregoing is sensible enough, Arrington says,

20   when the weapon at issue is one that's inherently deadly, like

21   a gun.  But what if the weapon is one that is deadly only if

22   used in a certain manner, like Arrington's car?

23          To this query, the Government responds that a

24   distinction between the two kinds of weapons is indeed

25   appropriate.  For an object that is not inherently deadly, like

1    in this case, the bike rack, the Government concedes that the

2    following additional element is required.  The object must be

3    capable of causing serious bodily injury or death to a person.

4    And I think we concede, at least I do, that if you take a bike

5    rack and slam it in somebody's face with sufficient force or if

6    they're on the ground and you slam it in their head, it

7    certainly can be a deadly or dangerous weapon.  But it says:

8    And the defendant must use it in that manner.

9            None of these people were using that bike rack in that

10   manner, at least not the defendants on trial here today.

11           So as it says in Mr. Arrington's case, that is for a

12   car to qualify as a deadly weapon the defendant must use it as

13   a deadly weapon, and not simply as a mode of transportation, or

14   in this case, as a mode to get through from point A to point B.

15           As the Court already knows, others had been pushing on

16   the bike rack before.

17           If I could have the Government pull up 311 real quick,

18   just so we can see.

19           What we see, Your Honor, is that the Government's

20   shown a specific picture or clip where you see the names of the

21   people, Blythe, Johnson, people like that on there.  And it

22   looks like there's just three of them and there may be somebody

23   else on the side.

24           If we look at 311, and you can play it.  It should be

25   30 seconds or so, the first 30 seconds.

```
1        (Video played.)
2             MR. BRENNWALD:  So at this point, the entire rack is
3    being pushed from the left all the way to the right.
4             If we can keep going.
5        (Video played.)
6             MR. BRENNWALD:  And people are pushing -- those in
7    front of them are pushing father.
8        (Video played.)
9             MR. BRENNWALD:  You can stop it there.
10            There's a woman here in green who's leaning pretty
11   hard into the bike rack on the left side.  And so people in
12   general just pushing on that bike rack, as opposed to just the
13   three folks who are constantly shown in one of the Government's
14   videos.
15            If we could play a few more seconds, please.
16       (Video played.)
17            MR. BRENNWALD:  Okay.  Thank you.
18            So I think you can see there, this is exactly what
19   people on the right side probably thought was going to happen,
20   which is the bike rack kind of leaned over and then people went
21   over it or around it, and that's what they were expecting to
22   happen.  They never took these bike racks, or at least these
23   folks didn't, and use it as a weapon.
24            If we could go to 309, please -- I'm sorry, 331.  331.
25            And if we can go to 1:30 at the bottom.  There you go.
```

1          And the Court will see a gentleman who's in blue and

2     black, a checkered shirt.  He starts to push.

3        (Video played.)

4          MR. BRENNWALD:  Right there on the left.  You see that

5     gentleman right there pushing.  The officer to the left there,

6     Your Honor, above the "ME" under Metro Special, she's just

7     standing there.

8          Okay.  We can keep going.

9        (Video played.)

10         MR. BRENNWALD:  Okay.  Can you stop it there.

11         So we see this gentleman here, who we've discussed

12    before.  And in a few seconds you're going to see him.  He's

13    leaning back on that bike rack, Your Honor, but in a few

14    seconds you're going to see him literally bend down somewhat

15    and lift the bike rack up.

16         If we can keep going.

17       (Video played.)

18         MR. BRENNWALD:  Thank you.

19         So he's not even looking where he's pushing.  He's

20    just lifting up and pushing the bike rack back, obviously

21    trying to get through as well.  It doesn't make it commendable

22    conduct.  It doesn't make it anything that somebody should ever

23    do, but, again, I think it's critical when we look at whether

24    or not the bike rack was used as a dangerous or deadly weapon.

25    I think that should inform the Court about that.

```
 1              If we could go to 309 for one second.  And if we can
 2     go to 35 seconds, please.
 3         (Video played.)
 4              MR. BRENNWALD:  Stop it there.
 5              There you can see the entire line of that fence being
 6     pushed at that point in time.
 7              Keep going.
 8         (Video played.)
 9              MR. BRENNWALD:  Okay.  Thank you.
10              So you can see, again, people are pushing, and it
11     doesn't look like anybody here is trying to assault the
12     officers or even use the bike rack as something to assault them
13     with.  It looks like they're just kind of pushing forward,
14     trying to get past the officers.  Again, they might have to use
15     the bike rack to do that but they're not using the bike racks
16     is an assaultive way, other than merely the pressure of force.
17     But that's different than actually trying to injure somebody.
18              All right.  Keep going.
19         (Video played.)
20              MR. BRENNWALD:  So at some point, Your Honor, you can
21     see somebody pushing on the back of Mr. Blythe's body.  I think
22     that's pretty significant.  People were pushing from behind,
23     pushing people in front of them, who were then pushing people
24     who were at the front.
25              Thank you.
```

1          So as to Officer Edwards, Mr. Blythe did not see her,
2    from the evidence that the Government has submitted here and
3    from what we can see.  Again, the videos speak for themselves.
4    Nobody's really disputing anything that happened here, despite
5    our objections to some of the third-party videos.  What is here
6    is what is here, and the Court has accepted it as evidence.  So
7    our argument, again, as I said earlier in the Rule 29
8    discussion, is that the Government's interpretation of what the
9    legal significance of those actions are is different than what
10   ours is.
11         As to count 3 with Officer Cruz, again, I'll make the
12   same arguments I did as to count 2.  Officer Cruz was not
13   injured.  He admitted -- actually, I think he had some type of
14   issue but he didn't know when it happened.  So at that point,
15   we don't have any proof that any of this caused the injury, and
16   it doesn't appear it would have because he was standing the
17   whole time during this incident.
18         So again, on either count, counts 2 or count 3,
19   count 2, again, as to Officer Edwards, we submit that
20   Mr. Blythe is not guilty because you can't be guilty of
21   assaulting somebody you didn't even realize was there until
22   after the fact.  And secondly, as to count 3, Mr. Blythe did
23   not cause any kind of injury and did not use the bike rack as a
24   dangerous or deadly weapon, eliminating 111(b) for that count
25   at the very at least.

```
 1              THE COURT:  Mr. Brennwald, I'm having some difficulty
 2    hearing you.
 3              MR. BRENNWALD:  I'm sorry, Your Honor.
 4              THE COURT:  Thank you.
 5              MR. BRENNWALD:  Even the lesser included offense, Your
 6    Honor, on count 3, the Government has to prove on element five
 7    that the defendant made physical contact with an officer of
 8    D.C. or acted with intent to commit another felony, and that
 9    could be count 1 or count 10.
10              We submit that Mr. Blythe was not acting with any
11    intent to commit another felony, whether count 1 or count 10,
12    and we'll talk about count 10 in a minute.  So we submit under
13    that theory he cannot be guilty even of 111(a) as to Officer
14    Cruz.
15              Mr. Blythe is not charged in count 4.  As to count 5,
16    entering and remaining, again, with a deadly or dangerous
17    weapon, I will adopt what I said earlier as far as the bike
18    rack not being used as a dangerous or deadly weapon, and I'll
19    just refer the Court back to Arrington.
20              As to count 6, we have a different situation in
21    count 6.  We have a situation where Mr. Blythe is accused of
22    being disorderly or disruptive in a restricted building or
23    grounds, with a deadly or dangerous weapon.
24              Again, we submit there was no dangerous or deadly use
25    of a weapon.  It was not intended to be that.  But aside from
```

1    that, Your Honor, the second element of the offense talks about

2    the intent to impede or disrupt the orderly conduct of

3    Government business or functions.

4         Mr. Blythe came from Texas here to basically see the

5    speech of the president, walked over to the Capitol, walked on

6    the grounds, and then stayed outside for hours.  He did not try

7    to go in.  He did not post any messages, political or

8    otherwise, talking about wanting to go in.  When I questioned

9    the officer -- or the agent, I'm sorry, who testified about

10   Mr. Blythe's texts, I don't know if the Court will remember

11   this, I asked him if he had seen any texts that talked about

12   interference with election.

13        He didn't say no, which was the truth.  The truth

14   would have been to say no.  He said, I don't remember.

15        And I said, Well, wouldn't you have put those in your

16   collection of important texts if they had been there?

17        Yes.

18        Next question:  Did you see any reference to Vice

19   President Pence?

20        I don't recall.

21        I had to go three times to get him to admit there were

22   no such texts, because there weren't.  So this I don't recall

23   business, to make it seem like maybe there were, Your Honor,

24   but I don't know if I found them or not, is just absurd.  So

25   again, we have no evidence at all.

```
 1              And this is especially interesting in the context, and
 2       the Court has seen this before, that a lot of other people in
 3       cases like this -- I know it's not evidence in this case but a
 4       lot of other people in these cases have said a lot of things
 5       about the election, have expressed their dissatisfaction with
 6       it.
 7              Now, a lot of those didn't do anything illegal about
 8       it, and as Ms. Halim said and I think one other person, Stop
 9       the Steal has a connotation to us in this City, because we all
10       live here, I think -- not all of us but a lot of us live here,
11       as basically this January 6th event.  But Stop the Steal is
12       literally the former president's efforts through the courts,
13       through political persuasion, through political rallies, to
14       stop what --
15              MS. FOSTER:  Objection, Your Honor.  None of this is
16       in evidence at this point.
17              MR. BRENNWALD:  It's common knowledge.  It doesn't
18       take an expert to know this.
19              THE COURT:  Overruled.  You can finish.
20              MR. BRENNWALD:  It was the former vice president's
21       effort to, as far as he saw it, illegally Stop the Steal.  Now,
22       this event here turned into something more than that.  But
23       again, just the use of "Stop the Steal," people saying that,
24       doesn't imply any kind of level of criminality or criminal
25       intent.
```

```
1              But there's no evidence at all, because there was no
2    such intent, that Mr. Blythe intended to do anything illegal to
3    try to stop the certification.  Only thing he even knew was
4    happening that day.  He didn't post anything about, oh, I'm
5    here, I know they're inside.  If he had known they were inside
6    and he wanted to Stop the Steal, the smart thing to do would
7    have been what a lot of other people did, go inside, try to go
8    into the House Chamber or the Senate Chamber, find them and
9    say, hey, stop doing this, or interfere physically.
10             You asked me during a Rule 29 colloquy whether or not
11   you can be guilty of obstructing even if you're outside, and I
12   think theoretically you can, if that's coupled with some
13   evidence that you had that intent.  But without that other
14   evidence of intent that he, A, knew what was going on and, B,
15   had some desire to stop it, then I think we're just guessing,
16   conjecture, and people were there, frankly, for a lot of
17   different reasons.
18             When people talk about these January 6th cases, you
19   have a whole range of activity.  You have people who are, like
20   the Oath Keepers and Proud Boys, planning stuff weeks and weeks
21   in advance, talking about QRFs, Quick Reaction Forces,
22   definitely planning certain nefarious activities to physically
23   try to stop this from happening.  You had other people who
24   showed up to go to the rally and just kind of walk to the
25   Capitol because people were going there and there were actually
```

1    supposed to be more speeches, and so they went there to hear

2    that, and the speeches were canceled.  You had other people who

3    were going inside but walking around and five minutes,

4    10 minutes, 30 minutes and left.

5             MS. FOSTER:  Objection, Your Honor.

6             MR. BRENNWALD:  There's just a whole range --

7             THE COURT:  Hold on.  I'll sustain that.  And just

8    talk about what's come in evidence in the case, not what might

9    be present in any other cases.

10            MR. BRENNWALD:  I understand.  I'm just trying to put

11   this in a context of people who were there that day.

12   Mr. Blythe was outside for hours.  At any moment, if he wanted

13   to, if he had that intent, he could have gone in, but he

14   didn't.

15            You see him in Government's Exhibit 405, even 401,

16   402, 403, the body-worn camera footage, standing with his arms

17   to his side, at that point outside, doing nothing.  Now, the

18   Government played those videos and at first the officer who

19   talked about that, the officer who testified about Mr. Blythe

20   being outside, said that Mr. Blythe assaulted officers.  And

21   then I cross-examined him about that and showed him the videos,

22   where you can actually clearly see Mr. Blythe being thrown to

23   the ground, and then once he's on the ground you can see him

24   being literally thrown underneath the bleachers.

25            When the Government came back and redirected that same

1  officer, his tone switched from, Mr. Blythe was assaulting

2  officers to, well, we had to use the force we did because he

3  wasn't moving.  So unless we're going to convict Mr. Blythe for

4  what is the equivalent of a stand-in or a sit-in, where people

5  sit on the sidewalk to block people from coming in to a

6  facility because they're protesting climate or protesting

7  whatever else and they're just limp, that's what he was.  He

8  was just standing there and they had to physically remove him.

9        But that does not constitute an obstruction or attempt

10  to impede what's going on inside, which is a completely

11  separate space.  He never went in the crypt, never went in the

12  Rotunda, never went into Statutory Hall, never went down any

13  hallway, never walked through the doors at all.  Didn't see any

14  broken glass at the front entrance that we can tell that he

15  decided, oh, let me go in through this window.  Didn't see a

16  door to go in.  Didn't go on the east side and go up through

17  there.  He just stood outside.

18        The question then becomes, if he was outside, whether

19  with just by himself or with some other people, and nobody was

20  inside, nobody ever got in, would that have interrupted the

21  proceedings?  Would they have stopped the proceedings because

22  some people were standing outside like he was?

23        I submit to you that they would not have.  In fact, we

24  know that because they didn't stop the proceedings even when

25  people streamed in, up until the very last second, when they

1    said, okay, this is getting a little bit too hairy.  We need to

2    get people out.  But they didn't stop the proceedings until it

3    got too close for confident.

4          So the fact that Mr. Blythe was outside, number one,

5    didn't interfere, and he certainly had no intent to interfere

6    just because he was standing outside.  That's the argument as

7    to count 6.

8          Count 7, it talks about the defendant engaging in an

9    act of physical violence.  Also talks about the use of a

10   dangerous or deadly weapon, which we adopt our former arguments

11   in support of.  And we submit that Mr. Blythe had no intent to

12   inflict bodily harm of anybody.  So when you look at the

13   definition of "act of physical violence" talking about an act

14   involving an assault or other infliction of bodily harm or a

15   threat to do so, we submit that that doesn't apply to

16   Mr. Blythe at all.

17         The same argument about his actions outside the

18   Capitol apply to count 8.  Second element, Mr. Blythe had to

19   have the intent to impede, disrupt or disturb the conduct of a

20   session of Congress.  And there's no evidence that he ever

21   intended to do such a thing.  If he wanted to, he certainly

22   could have.

23         Count 9 talks about an act of physical violence at the

24   Capitol.  Again, I refer the Court back to my discussion just a

25   second ago about whether or not what he did anywhere was an act

1    of physical violence, as that term is defined, which is a

2    threat of death or bodily harm on an individual or an assault

3    or infliction on another individual.

4           As to count 10, Your Honor, the Government said in its

5    closing why would he be here, why would anybody be here if they

6    weren't trying to stop the proceedings?  Again, a lot of people

7    came here and never tried to stop the proceedings.  They were

8    here to protest.  They were here to yell.  They were here to

9    have their voices heard.  There were a lot of reasons they came

10   that had nothing to do with doing anything illegal.

11          Again, I'm not disputing that Mr. Blythe's presence on

12   the Capitol grounds was illegal.  It was clearly illegal

13   because he saw a fence there and he pushed through it or went

14   over it at some point.  But that's a far cry from saying that

15   him being on the Capitol grounds was proof that he intended to

16   stop the proceedings.

17          He stayed there for hours, the Government said.  He

18   did.  And guess what?  During those hours, he never went in.

19   So it's just second after second of him staying outside, not

20   close to the doors, not close to an entrance, not close to any

21   windows, just well below that in some kind of a ledge area

22   where he couldn't jump off one way because it was 20 feet down

23   and about 3-foot ledge on the other side.  That proved that he

24   had no intent to disrupt anything because if he wanted to, he

25   would have gone somewhere else to do so.

1              Again, we would expect to see him say something either

2     online or on video or something.  All the videos that you see

3     of Mr. Blythe, never do you hear him say anything at all about

4     I want to do this, I'm upset with this, F the police, any of

5     that stuff.

6              When the police are trying to remove him and others on

7     that little ledge, he says something, like five or six words.

8     It's hard to tell what he says.  He wasn't pointing at the

9     officers.  He wasn't taunting them.  He just stood there.

10             So basically, what we have, Your Honor, is a situation

11    where Mr. Blythe came to the Capitol from Texas, was

12    unfortunately on that bike rack, in that bike rack area, went

13    over the bike racks, went up to the scaffolding at some point

14    and looked around.

15             The Government played videos for you in closing, Your

16    Honor, that Mr. Blythe took.  He's basically looking and

17    panning the huge crowd that's below and making history, I

18    guess.  He's filming it like this is what he sees.  He wasn't a

19    journalist.  He wasn't qualified to be a documenter of those

20    events but that's what he was doing.

21             And so it would be unfortunate if somehow, because he

22    was at that place at that time, that day, that he's suddenly

23    now responsible for things that he never intended or never had

24    anything to do with.

25             THE COURT:  Thank you.

1          MR. BRENNWALD:  Thank you, Judge.

2          THE COURT:  Okay.  Rebuttal from the Government.

3          MR. MARSHALL:  Good afternoon, Your Honor.  In an

4    attempt to keep things as efficient and brief as possible, I'm

5    going to first walk through a few responses the to individual

6    points that defendants make, and then I'm going to make a few

7    overarching arguments responding to defense arguments regarding

8    111(b) and 1512.

9          Starting with defendant Samsel.  Mr. Woodward showed a

10   CCTV clip on the West Front and said it was, quote, undisputed

11   that Mr. Samsel was gone by 1:35 p.m. that afternoon.

12         At 1:37, Mr. Samsel is captured on body-worn camera

13   waving a flag at officers, taunting them, claiming he was a

14   Marine, acting very aggressive towards them.  Twenty minutes

15   later at 1:57, he's still on Capitol grounds, throwing a

16   two-by-four plank at officers.  We don't know exactly the time

17   that Mr. Samsel left the Capitol but it's clearly longer than

18   what Mr. Woodward represented.

19         Mr. Woodward also commented on Sergeant Edwards's

20   injury, stating that the medical records provided no support

21   that she had a concussion.  First, the medical records were not

22   put into evidence.  And she did not testify that the records

23   established that she did not have a concussion.  She testified

24   that she received two tests, neither of which would have

25   revealed a concussion, regardless of whether she had one.

1          She did testify, also, that she recalls going to the

2     hospital that day for head injuries.  She recalls grabbing her

3     sergeant's arm out of pain, when it felt like the back of her

4     head was ripping open, that the pain was so severe.

5          Her testimony was sufficient to establish bodily

6     injury in a few different ways.  That moment when the bike rack

7     struck her in the face, that moment when her face then struck

8     the handrail and that moment that caused her such great pain

9     later when the back of her head hit the back of the stairs.

10         Mr. Woodward also commented on Mr. Samsel's medical

11    treatment of the other rioter on the West Plaza, claiming that

12    the Government attempted to hide this portion of the video

13    during the Government's case in chief.  It was the Government,

14    in fact, that offered that video into evidence.

15         The relevance of that video, its ability to mitigate

16    any of the charges against Mr. Samsel is also very

17    questionable.  He has not requested a self-defense instruction,

18    defense of others instructions.  And that moment, if anything,

19    indicated clearly that he was not permitted to be in that area.

20         Mr. Samsel claimed that the video evidence showed that

21    Samsel, quote, touched a riot shield.  I won't comment on that,

22    except just to refer to the video evidence there, which I think

23    very clearly contradicts that.

24         Most of Mr. Samsel's closing was directed towards the

25    quality of the investigation by the Government.  Your Honor,

1    without a lengthy response to this, I think what ultimately the

2    finder of fact's role is to consider whether the evidence is

3    sufficient and persuasive, and Mr. Samsel's conduct that day

4    was captured from a variety of angles on a variety of sources

5    that day.

6            And regarding the unadmitted portion of Government's

7    Exhibit 316 that showed Samsel at one point drop a two-by-four

8    plank near the Senate-side scaffolding, first you have

9    unambiguous evidence, multiple angles, multiple different

10   sources, third-party videos, CCV, body-worn camera of him later

11   throwing that plank towards officers.  If that's the plank he

12   ultimately threw, that he dropped in 316, he clearly went and

13   retrieved it at some point.  And the relevance of showing that

14   scaffolding is showing that he very clearly had access to

15   two-by-fours of that kind.

16           Finally, Mr. Woodward commented on the text that

17   Mr. Samsel sent that day, pardon my profanity:  Fucking

18   Democrats won Georgia.

19           First, that there was recount developments related to

20   the Georgia Senate race is not in evidence.  But even if that's

21   true, I think that's pretty granular knowledge by Mr. Samsel as

22   to political developments at that time.  This was texted right

23   before stating "see you soon" to a person he knew was going to

24   be at the U.S. Capitol that day on January 6th.

25           The idea that in order to infer that he had knowledge

1    of the proceeding that day that he would have to say, I will

2    see you to disrupt the Electoral College proceeding, see you

3    there -- I think this clearly provides a very clear inference

4    that he was aware of what was happening at the Capitol that day

5    and that's why he went there.

6          Addressing a few points from defendant Grant.

7    Mr. Grant complained about the authenticity of the video

8    showing Mr. Grant's conduct.  Most of these videos showing

9    Mr. Grant's conduct relate to the Peace Circle.  And here these

10   videos, again, come from various sources, third-party video, in

11   addition to CCV that's zoomed out but corroborates the activity

12   that's happening there.  It's captured from several different

13   angles on the third-party video that appear to be taken on

14   several different cameras that I think corroborate each other.

15   It would be a remarkable thing if these different sources were

16   able to fabricate these events in the exact same way.

17         I think the majority of Mr. Grant's closing was spent

18   on 111.  I think within that discussion it appears he attempts

19   to add several different requirements to what needs to be

20   proved under a 111 charge against him.  First, Mr. Grant

21   appears to limit defendant's potential culpability to a

22   definition of assault where, even for 111(b), that charge can

23   be sustained through other verbs, imposed, impeded,

24   intimidated, interfered, all of which are clearly applicable in

25   this context.

1          I'll address causation a little bit more generally in

2     a moment, but the notion that others could have also been

3     charged in addition to Grant does not in any way mitigate

4     Grant's culpability.  Again, Mr. Grant's notion that for them

5     to have -- first, to establish intent we should be able to

6     point to some contemporaneous statement while the assault is

7     taking place that he's intending to use that bike rack as a

8     weapon is just absurd.  That anyone would make that kind of

9     exclamation as they're conducting an attack is just far from

10    the evidentiary standard that any court has required for that.

11         And that these officers in post-January 6th interviews

12    stating that they didn't observe any weapons did not consider

13    these bike racks to be the legal definition of what for a

14    111(a) charge constitutes a weapon seems of questionable

15    relevance.

16         With respect to the Sergeant Edwards assault,

17    Mr. Feitel said, quote, Mr. Grant had nothing to do with this

18    assault.  Nothing to do with this assault.  That Mr. Grant and

19    the others were just acting alone, independently from one

20    another.  That the bike racks' push didn't really affect one

21    another and that none of the rioters were shown to have known

22    what any of the others were doing.

23         In terms of Mr. Grant being aware of the officers on

24    the other side of the bike rack, I think a few exhibits show

25    this, and for the sake of time I'll avoid getting too much into

1     the videos again, but I'll point to the 30-second mark of

2     Government's Exhibit 302.  And that shows -- the first

3     30 seconds, really, if you watch that entire progression,

4     that's what shows Mr. Samsel and Mr. Grant being the first to

5     approach that police line.  Before anyone else, they approach

6     it in a manner that gives them a full unencumbered view of that

7     police line.  They can see all five members there very clearly.

8             And then at 32 seconds in Government's Exhibit 302,

9     and again at 38 seconds, you can see him looking to the right,

10    looking down at the bike racks and towards both Officers Cruz

11    and Caroline Edwards.  They would have been just feet from him

12    at that point.  So the notion that he somehow wouldn't have

13    been aware of them -- again, this shows the distance we're

14    talking about here.  This is a matter of feet.  So the notion

15    that he just wouldn't have been aware of these people standing

16    directly across from him, after he walked up directly to them

17    again, loudly confronting, them is just wholly speculative.

18            Mr. Feitel also noted that the fact that Mr. Grant

19    didn't use any other objects as a dangerous weapon indicates

20    that he didn't intend to use the bike rack as a dangerous

21    weapon.  To this end, consider immediately after committing

22    this assault, he attempts to jump over that bike rack towards

23    the officers.  He attempts to continue his assaultive conduct.

24    Even though he was unsuccessful, that clearly speaks to what he

25    was intending to do just seconds prior to this.

1          With respect to Mr. Johnson, Ms. Rosen first talks

2     about what Mr. Johnson brought with him to the Capitol that

3     day.  The fact that he was thinking about where to eat and

4     drink, where to go to the bathroom, this showed somehow just

5     the innocence on his intent that day.  But whatever he may have

6     intended going there, I think what he did and he said there was

7     incredibly clear.  It was far more than, as Ms. Rosen

8     described, just being, quote, talkative.

9          I think one significant thing there is that the

10    military language that he's using throughout this period.  He

11    was calling people to the front.  He's asking for able bodies.

12    If he's just trying to be loud, if he's trying to protest,

13    exercise his First Amendment rights -- which again, would have

14    been unlawful at that time having entered into a restricted

15    perimeter.  Even if he was just trying to be vocal, why is he

16    calling for able bodies?  Why, before the first Peace Circle

17    assault, is he just calling for men to get to the front lines,

18    complaining that only women were there at the time?

19         If you watch the interview that he participated in the

20    evening after January 6th, you see that he describes the

21    initial breach of the line, the Peace Circle assault, and then

22    the third line of bike racks that they reach, the one that's

23    more heavily manned by officers and where fighting breaks out.

24    He describes being aware of that.

25         And then you also see Government's Exhibit -- I

1    apologize, the third-party video showing him on the outskirts

2    of the West Plaza, up on the small stone wall, commanding

3    people to pick their feet up, to get on the front lines, he's

4    getting them to that spot where he knows violence is occurring.

5          And I think it's really remarkable what he does after

6    that, and Ms. Rosen argues that this somehow mitigates his

7    culpability.  He doesn't go into the Capitol.  He instead walks

8    out to the West Plaza area and attempts to engage people who

9    are just standing around.  He antagonizes them.  He says, They

10   just stole it.  Are you angry now?  He's riling them up.  He's

11   trying to lead them to surround the building in a show of

12   force.

13         He's talking about how -- he's talking about how they

14   need to get on the front lines, to confront the police.  This

15   is far more than just making their voice known.  He talks about

16   how that they're scared in there, referring clearly to what's

17   happening inside the building.

18         Even if you look back at the Peace Circle, he's saying

19   that none of this matters unless they get to the Capitol.  He

20   criticized the Proud Boys for just standing there chanting,

21   Fuck Antifa.  He's saying that's not going far enough.  We need

22   to get to the Capitol building.

23         Again, I'll speak more about the 1512 corruptness

24   prong later, but if there's any question about whether his

25   motives are purely just limited to speaking, creating a loud

1    protest, whether or not he contemplated any violence, the fact

2    that he, himself, was violent surely earlier I think heavily

3    indicates that his intentions aren't just exercising First

4    Amendment activity.

5         Ms. Rosen also argues, back at the Peace Circle

6    assault with respect to the 111(b) counts, that perhaps

7    Mr. Johnson is guilty of the assault against Officer Cruz but

8    not against Sergeant Edwards because of the alleged direction

9    that Johnson appears to be pushing in.

10        Your Honor, I would refer to Government's Exhibit 302

11   and 308, together with 309, which captures that Peace Circle

12   assault from the left side, which shows, I think, an important

13   movement of the bike rack that I think really indicates what

14   exactly the five defendants, including Mr. Johnson, who I

15   believe was the middle of the five were doing at that moment.

16        You can see on the left side as it's lifted and

17   started being moved, you see several members of the crowd who

18   are standing straight against the bike rack who have their

19   hands on it, appear to be pushing it a bit but they're not

20   putting their body weight into it.  And then you see the right

21   side of the bike rack significantly move forward much farther.

22   And if you watch 302 and 308, you'll see the manner that the

23   five defendants are pushing.  They're putting all their body

24   weight into that, unlike the members on the left, at least most

25   of them.

```
 1              So it's moving to the right.  It's creating this sort
 2     of bulge on the right side because of the manner that these
 3     five defendants are pushing on it with more force than the left
 4     side.  That pushes Officer Cruz back a little bit to Officer
 5     Cruz's right, as he moves backwards, but it's also worth noting
 6     that Mr. Johnson is pushing on the bike rack that Officer
 7     Edwards is defending.  He's making direct contact with that
 8     bike rack.  So it's not an attenuated argument in any way that
 9     he's pushing against both Officer Cruz and Sergeant Edwards in
10     that moment.
11              Finally, Ms. Rosen and a few other defense counsel
12     made the argument that it's not clear that the bike racks were
13     linked together when they were taking this action.  And I think
14     this is most clearly contradicted again by the videos.  If you
15     look at the bike rack in 302, as it's lifted off the ground and
16     especially Johnson on one side of the bike rack, Grant on the
17     other, are lifting it in the air and putting their body weight
18     into it.
19              Officer Cruz on the other side holding on to the two
20     bike racks.  He can very clearly see that these are linked
21     together in that moment.  He can see it before that, too, if
22     you watch the beginning of 302, when Johnson first approaches
23     with his megaphone, shouting at the officers to back the fuck
24     off.  Defendant Samsel is standing right at the connection
25     point of two bike racks.  So clearly Mr. Samsel can see that
```

1    they're connected there.

2            And Johnson approaches just to his left.  He would

3    have been, let's say, less than a foot from that connection.

4    They would have been both seen it move back and forth, as the

5    first scuffle where it's pushed and pulled.  There's no

6    question they would have known that they were linked together.

7            So with respect to defendant Randolph, just one point

8    of correction.  Ms. Halim stated that the Joint Session wasn't

9    gaveled in before the attack.  The House first gaveled in at

10   exactly noon.  The Senate gaveled in at 12:30.  If you look at

11   1202F, that's the Congressional montage that has that timing.

12           Ms. Halim first noted that with respect to Randolph's

13   intent, that he was really just pushing and pulling at the bike

14   racks.  308 shows that, sure, maybe while at first he was

15   pushing and pulling, once the crowd, and he again was part of

16   the impetus of this, began lifting and pulling, that changed

17   very clearly from pushing and pulling to lifting and putting

18   all one's body weight behind it and driving it forward.

19           And this, I guess, causation argument that the

20   rightmost bike rack got wedged and stuck, and that the only

21   reason -- the real but-for cause was this aider and abettor who

22   unhooked it, I guess got it unstuck from that stone area.  I

23   think this certainly provides some good argument that this

24   other individual's culpability for doing that act could support

25   some aiding and abetting theory of liability.  But I don't

1    expected it to be, I don't think mitigates his liability there.

2    I mean, his act was clearly intentional.  I think that's what

3    matters.  The fact that he felt bad about the results does not

4    undermine his liability in that moment.  That crime was

5    completed by the time that he went and assisted Officer

6    Edwards.

7            Also, just to clarify, I think, the legal standard for

8    "inflict," Mr. Brennwald stated one must intend to cause the

9    bodily injury through the resulting, resisting or impeding.

10   But that's not what's required under "inflict" in the legal

11   instructions, and that's from the Jackson case out of the

12   7th Circuit that is cited in those instructions.

13           And Mr. Blythe, like several others, have raised the

14   argument that he was not aware of or involved in the attack on

15   Caroline Edwards.  And I would again look at Government's

16   Exhibit 302 at 57 seconds, which is shortly before he joins the

17   attack, which shows how he was several feet back and had a very

18   clear vantage point of the other members of the crowd on that

19   line and then the officers on the other side of that line.

20   Then he grabs hold of two bike racks when he approaches the

21   line.  The one on his right hand is the one that is eventually

22   driven into Officer Edwards.  And then he's holding both the

23   bike racks, which on the other side Officer Cruz is also

24   holding both those bike racks.  So he was well aware of exactly

25   what was happening when he joined that.

1          My final point on defendant Blythe.  Mr. Brennwald

2     talks about Mr. Blythe outside on the Upper West Terrace doing,

3     quote, nothing.  That he should not be convicted for what's

4     essentially a sit-in.  I think part of the relevance here is

5     that he remained on Capitol grounds unlawfully for hours after

6     that Peace Circle attack.  He didn't leave willingly.  He had

7     to be thrown out of that area, and I think that speaks to his

8     intent.  And the fact that the police defenses were effective

9     in keeping him out of the building does not absolve the fact

10    that he didn't go into that building.

11         While many others may have been nonviolent that day

12    and there purely to protest the election results, Mr. Blythe

13    very clearly was not in that category.  He was, in fact,

14    violent at a very significant moment that did real significant

15    harm.

16         So Your Honor, before I conclude I want to make a few

17    remarks about 111(b), some of the issues that have been

18    discussed, and then 1512.  So first on 111(b), the question of

19    whether or not this bike rack barricade was a dangerous or

20    deadly weapon.

21         First, I would argue that we know this bike rack

22    barricade was used in a manner capable of causing serious

23    bodily injury because it did, in fact, cause serious bodily

24    injury.  I think that's established by Caroline Edwards's

25    testimony.

1        And the impact of this bike rack barricade, you know,

2   whether or not it actually, in fact, made defendant's actions

3   at that time more serious, whether or not it made a difference

4   than just the crowd rushing at officers, I think was

5   established again by the video evidence and the officer

6   testimony.

7        This is a -- these bike racks were 150 to 250 pounds

8   of metal.  They were raised into the air and they were driven

9   into a small group of officers who had a hard staircase

10  immediately behind them.  And because of the way they were

11  linked together, the defendants and the other rioters were able

12  to use these bike racks to combine their strength in a way that

13  wouldn't have happened without them.  It allowed them to

14  aggregate that together and focus it in the bike racks.

15       So the force they're driving into the bike racks, the

16  body weight they're putting into it, is combined with the

17  weight of the bike racks.  And that's, really, I think, what

18  allows them to so brutally overrun those officers on the other

19  side, and that's done I think much more violently and

20  effectively than if they had just pushed up against the

21  officers without it.

22       I think that's why you see in Government's

23  Exhibit 302, why Officer Cruz talked about why he thought this

24  was such an incredibly dangerous situation for him.  I think at

25  the end of 302, you see that after his second attack by

1    Randolph, him and the other officers realize they're overrun.

2    They see the crowd coming into them, pushing past them.

3    There's still some altercations.  But they're able to turn and

4    run.

5            I think at that moment in 302 where you see the bike

6    racks lifted against Cruz, and he talks in his testimony about

7    how he was very afraid of being trampled and very seriously

8    injured in that moment, it's because the crowd on the other

9    side is able to focus their strength into that bike rack and

10   drive it against them so effectively that it can overwhelm

11   those officers so quickly.

12           Obviously, this is shown in Sergeant Edwards as well,

13   where she's driven back with such force that she looses her

14   footing and her feet completely leave the ground.  I think

15   that's a far more dramatic consequence than had the members of

16   the crowd directly across from her, Samsel and Randolph, merely

17   just pushed up against her.

18           You also heard testimony from Officer Cruz about the

19   unusual manner that defendants used the bike rack barricade

20   here.  Instead of pulling the bike racks away from the

21   officers, as he had seen done in other contexts, the defendants

22   had lifted it into the air, over the heads of some of the

23   officers, who were crouching and attempting to fight back

24   against it, and drove it into them.  I think this was a much

25   more just offensive way to use these bike racks.

1              And the Government isn't contending that in every

2      context of a civil disorder situation where members of a crowd

3      are pushing and pulling bike racks against officers, that that

4      constitutes a dangerous weapon and that this is some sort of

5      across the board ruling.  But in this case, given that small

6      number of officers, given the staircase behind them, given the

7      numbers of the crowd, the way they drove it into them and

8      lifted it into the air, in this particular context that was a

9      dangerous weapon.

10             To use the Court's analogy from earlier this week,

11     this wasn't five people with baseball bats attacking officers.

12     This was a bat so large that it took several people to swing it

13     at once, and I don't think that absolves any one of them of

14     culpability.

15             I want to also address the standard for infliction of

16     bodily injury.  The jury instruction states this requires to

17     directly cause the injury through the application of physical

18     force.  I would note that there are three cases cited for this

19     proposition, and I would note here that, as the instructions

20     correctly state, they require --

21             MR. FEITEL:  Objection, Your Honor.  I think that

22     legally has been decided.  This is summation rebuttal, not

23     legal argument anew.

24             THE COURT:  Overruled.

25             MR. MARSHALL:  What's required here is physical force,

1   directly applied, that results in the officer's injury.  That's
2   a direct cause of that injury.  I think none of these cases
3   stand for or mention or address the proposition that if
4   multiple defendants act together to achieve a result, that that
5   somehow renders all of them free from liability under 111(b).
6        If you look of the facts of each case, they actually
7   stand for the proposition that it's unclear whether or not the
8   defendant's actions or the victim themselves or some other
9   non-culpable party, whether that's the cause, whether it's a
10  drug overdose or cardiac episode, whether or not it's -- I
11  believe it was whether the officer injured himself when he head
12  butted the defendant rather than whether it was the defendant
13  during the fight that attacked the officer.
14       That's not the situation we have here.  I don't think
15  there's any allegation that there was just some accident that
16  occurred later in the day that could have caused this.  I think
17  as Officer Edwards established through her testimony, this was
18  the head injury she suffered that day.  And she suffered very
19  real and severe consequences from those three strikes to the
20  head that she felt during that attack.
21       And Your Honor, with respect to the level of
22  granularity that I think we saw from the defendants in terms of
23  causation, who was pushing on what, I think the analogy that
24  was used in the decision in Jackson is particularly applicable
25  here.  That's where he talks about how "inflict" carries the

1   same meaning as when we would say something like the hurricane

2   inflicted 100 million in damage.

3         Hurricane is made up of several different forces, very

4   chaotically combined.  These forces intertwine and cause damage

5   in a lot of different ways.  When you see the aftermath of

6   that, you can see the damage these storms inflict, just as we

7   can see the injuries that these five defendants and others

8   caused by driving that bike rack barricade into officers.

9         I think there's no question that they all participated

10  in this attack.  We all know that this storm the five

11  defendants all participated in inflicted injuries on Sergeant

12  Edwards, and the defendants want you to count which raindrop in

13  the hurricane caused which injuries to her.  And I think that's

14  a level of granularity that is just totally unsupported by the

15  cases and is unjustified here and creates, to be honest, an

16  absurd loophole to liability in these cases.

17        I think, again, the inquiry into 111(b) is very

18  straightforward:  Did these defendants directly cause her

19  injuries through the application of physical force?

20        And just to briefly comment on aiding, abetting

21  liability within 111(b), which was challenged by several of the

22  defendants, I think the inquiry here isn't whether or not a

23  conspiracy charge could have been brought or sustained here.  I

24  think the bottom line here is each of the five defendants could

25  and did see what the others were doing here, and they joined

1    with them for the purpose of attacking or the purpose of aiding

2    it.

3            And so in that sense, I think the Government's

4    conception of this is that each of these five defendants were

5    principals and each of them were aiders and abettors.  I think

6    the clearest example of this is with defendant Blythe.  You can

7    see this again to reference back to Government's Exhibit 302,

8    where he can be seen standing back and watching as the other

9    four have begun lifting and pushing into the bike racks.  And

10   you can see him join that fight.  I think he's doing two things

11   there.  He's joining that attack himself, he's participating in

12   that attack, and he's also aiding the others in that.

13           Finally, I just want to come back briefly to

14   Mr. Grant's awareness of the actions of others for the purpose

15   of aiding and abetting.  And I think this goes for a few of the

16   defendants.  And, of course, he wants to inject this

17   requirement that there's some sort of prior plan or

18   coordination that needs to happen within that, which I don't

19   think is justified under aiding and abetting.

20           And in terms of his awareness and his kind of

21   intentional joining together with the other defendants, I would

22   point again to Government's Exhibit 302.  Him and Mr. Samsel,

23   again, are the first two to approach those bike racks.  And

24   this, I think, also relates to Ms. Rosen's theory of aiding and

25   abetting liability, which is addressed in Government's

1    Exhibit 308.

2          And I think it shows sort of the loophole and

3    liability that's being created or being attempted to being

4    created, this kind of awkward gap between direct liability and

5    aiding and abetting liability, where they note that the person

6    who, again, unwedged the bike rack on the right side could be

7    liable under an aiding and abetting theory, but someone like

8    Mr. Johnson would not be.

9          And I think that goes, again, to your example you

10   talked about on Tuesday, in terms of the three people striking

11   someone with the bike rack versus two people holding someone

12   down while the third person strikes them.  The idea that in the

13   first situation, that somehow they wouldn't be liable, this

14   creates this gap in liability for inflicting the injuries that

15   result from that.

16         The Court's indulgence, Your Honor, sorry.

17         THE COURT:  Sure.

18         MR. MARSHALL:  So, Your Honor, I want to mention

19   briefly on the civil disorder charge there's some question or

20   there's some argument about when the civil disorder exactly

21   began.  Here I would first refer to the definition the Court

22   adopted of "civil disorder" on Page 2 of the instructions.  I

23   won't take the time to read the whole thing out loud.

24         But looking at that instruction, looking at

25   Government's Exhibit 302 at the one-minute mark, I'm thinking

1    of the moment where several members of the crowd are shaking

2    back and forth that bike rack.  The officers have gone down and

3    they've manned the bike rack.  Officer Cruz has shown that that

4    threat of force, to slam his hand down onto Mr. Samsel's hand

5    to get him to release it.  At that point, at the very latest,

6    that's a civil disorder.  And that civil disorder, that

7    continues for hours and it impacts multiple federally protected

8    functions and it certainly impacts interstate commerce.

9           Your Honor, just briefly on the 1752 charge with

10   respect to the restricted grounds.  There's no requirement that

11   the restricted perimeter be established solely for the purposes

12   of a Secret Service protectee.  We can imagine where restricted

13   perimeter might have been established on a different day, where

14   it wasn't during the COVID-19 pandemic, there wasn't

15   construction on the west side of the building.

16          But that's not the situation that day.  That day it

17   was very clearly demarcated where exactly it was.  The area

18   might have been established on a different day under different

19   circumstances seems totally immaterial here.

20          And finally, Your Honor, I promise I'm wrapping up,

21   I'll just remark on the 1512.  And, first, just a few notes on

22   the individual defendants.  The ones -- I think there's only

23   two I haven't addressed here.

24          With respect to Mr. Grant, I want to talk about

25   Mr. Grant's emails to the Georgia state legislatures, which

1    Mr. Feitel described as, quote, not eloquent.  First, these may

2    be First Amendment protected statements but that, of course,

3    does not afford them protection from being used as evidence

4    against Mr. Grant in a criminal prosecution to establish, for

5    instance, his intent.

6           And we aren't necessarily saying that these emails are

7    part of his actus reus for the 1512 charge, but they

8    corroborate his awareness of the certification proceedings, his

9    motivation for stopping them.  And even if you don't read those

10   emails to see that implied threat that the Government sees,

11   they still show how important he thought preventing the

12   certification was.

13          With respect to Mr. Randolph, I'll just note that

14   Ms. Halim said that we have no evidence as to what he expected

15   that day.  Well, we do have a good indication of that from the

16   undercover recording, where he said that the atmosphere shifted

17   dramatically after he left the Trump speech to go to the

18   Capitol building.  That it went from a celebratory atmosphere

19   to an attitude of, quote, burn this motherfucker down.  That it

20   was a war zone.

21          How did he react?  How did this person who may have

22   just been there to see President Trump speak?  He didn't go

23   back to that speech.  He didn't walk away.  He joined the

24   violence and he helped lead that violence.

25          This leads me to the final point about 1512 intent and

1   what sort of intent can be inferred about defendants from the
2   circumstances that day.
3          Your Honor, I just want to pull up -- I won't --
4          Can you pull up Government's Exhibit 003.
5          Your Honor, this is what --
6          Can we pull up Government's Exhibit 201 now.  Just the
7   beginning of it.  You can pause it there.
8          This clearing behind them, those officers, that's what
9   the defendants saw that day when they first approached the
10  officers.  We know that the House first convened at noon and
11  the Senate convened at 12:30, and you heard from the officers
12  that when the crowd began amassing there at the Peace Circle,
13  which occurred around 12:40, shortly after this moment, those
14  officers were aware of no breaches at all of the restricted
15  perimeter.
16         And we know that the five defendants were part of that
17  crowd that amassed there.  You heard Mr. Randolph describe how
18  former President Trump's speech was still going on at the time,
19  but they left anyway to go to the Capitol, where Congress was
20  meeting to certify the results of that election.
21         You heard Mr. Johnson say that the crowd needed to get
22  to the Capitol, past those officers, that none of what they
23  were doing mattered unless they did.  You heard the crowd chant
24  "Stop the Steal," the phrase they chanted on the day of the
25  certification proceeding.

1          You saw Mr. Samsel and Mr. Grant lead the crowd past
2     that first set of barriers, and you saw the five defendants
3     bowl over the officers at the second set of barriers, which
4     allowed the crowd that would grow to the thousands to begin
5     pouring into the Capitol grounds.  The breach of the first
6     building would occur on that side of the building just a little
7     over an hour later.
8          Your Honor, I think it can't be that a person can take
9     action as brazen and obvious as that to interfere with what
10    Congress was doing that day, and then to credibly claim that
11    they did not intend what is so clearly said through their
12    actions.  It can't be that so long as you minimize the amount
13    of emails or texts or social media posts that you send on the
14    subject, that you can take an action as obvious as that and
15    evade liability for it.
16         These five men knew what they were doing that day when
17    they attacked the Capitol during that certification proceeding.
18    And, Your Honor, they should be held accountable for those
19    actions.  Thank you.
20         THE COURT:  Thank you.
21         All right.  One thing -- two things before we adjourn.
22    I did -- Mr. Woodward, I have your notice regarding exhibits
23    that was filed at some point today.  I thought that DS1 was in.
24    Am I wrong about that?
25         MR. WOODWARD:  Are you asking me, Your Honor?

1          THE COURT:  I guess I'm asking everyone.

2          MR. WOODWARD:  I had also thought it was in.  There

3    was apparently a colloquy with Ms. Franklin after I left on

4    Tuesday.  And so out of an abundance of caution, we filed the

5    notice.

6          THE COURT:  Is there any objection to me considering

7    DS1, which is Government's Exhibit 311, the complete video?  I

8    remember the back and forth about this.

9          MR. MIRABELLI:  No objection.  I think that video is

10   in through our exhibits as well.  But if they want it too,

11   that's fine.

12         THE COURT:  All right.  I think -- did you have

13   something you wanted to say?

14         MR. RICHMAN:  I can do it in writing or I can do it

15   now.  But the Government did -- I know that was rebuttal and

16   they're supposed to get the last word, but they moved in a

17   legal argument that we didn't have a chance to respond to, and

18   I think there were some pretty clear misstatements of the law.

19   But we can respond in writing if -- I know it's late.  If the

20   Court would prefer for us to --

21         THE COURT:  Yeah, if you have something you want to

22   file, let's do it in writing.

23         MR. RICHMAN:  We'll do that.  Thank you, Your Honor.

24         THE COURT:  Okay.  Along those lines, I want to just

25   kind of look over everything and figure out what's a good date

1    for us to come back.  So we will reach out by email tomorrow to

2    coordinate with you-all a mutually convenient time to come back

3    for the verdict.

4            Okay.  Go ahead.

5            MR. BRENNWALD:  Your Honor, some of us have discussed

6    that issue, and I guess in certain circumstances, depending on

7    what the Court's verdicts are, people would need to be here,

8    because I believe that certain crimes require step back.  But

9    in the event -- the Court will obviously know what its verdicts

10   are.  I'm just wondering if it's possible do some of this by

11   Zoom and then set sentencing dates after that.  Or if they need

12   to come back, and they obviously do, then they will.

13           THE COURT:  I actually don't know the answer to that

14   question about whether, given the charges, I can do any portion

15   of the trial by Zoom.  I don't think I can.

16           MR. BRENNWALD:  Okay.

17           THE COURT:  I know I could when the CARES Act was

18   enforced but I don't think I can.  Does anyone disagree with

19   that?

20           MR. MIRABELLI:  That's our understanding.

21           MR. BRENNWALD:  Just wanted to check.  Thanks.

22           THE COURT:  Yes.

23           MS. ROSEN:  On behalf of Mr. Johnson, on behalf of

24   Rule 23(c), we are going to be requesting special findings from

25   the Court to support any verdict.

1           THE COURT:  I intended to do so anyways.

2           MS. ROSEN:  Thank you, Your Honor.

3           THE COURT:  All right.  Well, thanks, everyone.  I

4   will be in touch about a date to come back.

5       (Proceedings concluded at 5:11 PM)

C E R T I F I C A T E

I, Stacy Johns, certify that the foregoing is an accurate transcription of the proceedings in the above-entitled matter.

/s/ Stacy Johns            Date: November 9, 2023

Stacy Johns, RPR
Official Court Reporter