**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-537 (JMC)** |
| **JAMES TATE GRANT** | |
| **Defendant.** | |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence James Tate Grant to 108 months of incarceration, three years of supervised release, $2,000 in restitution, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction. This reflects an upward departure or variance of 30 months from the top of the guidelines range as calculated by the government.

## I.     INTRODUCTION

The defendant, James Tate Grant, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

Grant participated in the first breach of the restricted perimeter on January 6, 2021, and in the first violent assault of officers defending the Capitol building that day. After passing the first barrier at the Peace Circle separating the crowd from restricted Capitol grounds, Grant was out in front of the crowd with his co-defendant, Ryan Samsel, and waved the crowd forward towards a line of Capitol Police officers on the Pennsylvania Avenue Walkway defending the second barrier. Grant and his co-defendants lifted the linked metal bike-rack barricades at the second barrier above the officers' faces and pushed the barricades into the line of police, driving them backwards. Grant then assisted a fellow rioter who had lunged at and grappled with one of the Capitol Police officers. Once Grant and his co-defendants overwhelmed officers on the Pennsylvania Avenue Walkway, the floodgates opened, and thousands of rioters penetrated the Capitol's restricted perimeter, poured across the Walkway and the Capitol lawn, and massed at the West Front and other restricted areas of the Capitol grounds. Grant stayed for hours, during which he pushed up against another police line, climbed through a broken window by the Senate Wing Door and entered a sensitive area – a Senator's office.

The government recommends that the Court sentence Grant to 108 months' incarceration for his convictions on Count One, Obstructing, Impeding, or Interfering with Law Enforcement

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("Capitol Police" and "USCP"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

During a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b); Count Eight, Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F); Count Fourteen, Entering and Remaining in Certain Rooms in the Capitol Building, 40 U.S.C. § 5104(e)(2)(C); and Count Fifteen, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G).   This reflects an upward departure or variance of 30 months from the top of the guidelines as calculated by the government.

## II.     FACTUAL BACKGROUND

### A.     The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case with the Complaint (ECF 1 - September 29, 2021) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.     Statements Prior to January 6, 2021

James Tate Grant travelled to Washington, D.C. intent on blocking the certification of the 2020 Presidential election. On January 1, 2021, Grant emailed two Georgia state legislators with the subject line, "We Saw the Fraud." The body of one email read "Do something, or this country is over. We will not be ruled by a China plant in an obvious fix." Gov. Ex. 1102B. Even more ominously, the second email read, "Decertify, or the nation is over and the rule of law will break down." Gov. Ex. 1102A.

### C.      Grant's Conduct at The Peace Circle

*The Peace Circle*

The Capitol building and its surrounding grounds were closed to visitors on January 6, 2021 and a restricted perimeter had been established around its grounds in anticipation of the Vice President's visit and the certification of the 2020 election.[2] The restricted perimeter was made clear to the public through linked, metal bike-rack barriers and snow fencing, much of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs"). Bike-rack barriers were placed on the sidewalk next to the road at the Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds to mark the western boundary of the restricted area. The weight of each bike rack is approximately 25 to 50 pounds.

Additional barriers were established within the outer perimeter to further restrict access to the building. One such barrier was a barricade of bike-racks, reinforced with snow fencing and zip ties, with several Area Closed signs attached, that barred the way up the Pennsylvania Avenue Walkway towards the Capitol building. The Pennsylvania Avenue Walkway is a footpath that runs from the West Plaza of the Capitol building to the sidewalk at the road by the Peace Circle.

---

[2] The Court's Findings of Fact set out the facts elicited at trial in great detail and accurately reference the Government's exhibits. ECF 345 at 4-13. The intent of this memorandum is to highlight Grant's conduct, which underlies the guilty verdict for the counts identified above.



***Government Exhibit 12: Layout of the Peace Circle and the Pennsylvania Avenue Walkway barriers***

*Grant and Co-Defendants at Peace Circle*

Between approximately 12:40 and 12:50 p.m., defendants James Grant, Ryan Samsel, Paul Johnson, Stephen Randolph, and Jason Blythe each joined a crowd on the roadway near the Peace Circle, just outside the outer perimeter barricades at the sidewalk. During that time, five USCP officers, including Officers David Cruz and Caroline Edwards, were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Avenue Walkway. USCP Sergeant Timothy Lively, who led their unit that day, was nearby on the West lawn.

While on the roadway, Johnson used his megaphone to encourage and incite the crowd—including his codefendants—to descend on the Capitol building. Gov. Exs. 304 and 340. While Johnson yelled to "get on the front lines," Samsel made his way towards the bike-racks at the curb

of the Peace Circle.   Gov. Exs. 304 and 340 at 1:25 – 2:00. At approximately 12:53 p.m., Samsel

opened a section of the first metal bike rack barricade, which demarcated the restricted area, at the

sidewalk next to the road at the Peace Circle. Gov. Exs. 201 at 13:14-13:21; 204 at 13:12-13:18;

309 at 00:10-:0030; 340 at 2:38 -2:59. Samsel tore down the fencing at the curb and walked onto

the restricted grounds and toward the officers on the Pennsylvania Avenue Walkway, marking the

first breach of the restricted perimeter. Grant followed closely behind Samsel, excitedly jumping

up and down and waving the crowd towards the second barrier on the Pennsylvania Avenue

Walkway. *Id.; see also* 302 at 00:00 -00:07. Hundreds of protesters followed Samsel's and Grant's

lead, stepping past the first barricade and walking towards the second barricade manned by five

USCP officers.



***Government Exhibit 302 at 4 seconds: Grant (blue circle) waves the crowd
forward to the second barricade while Samsel (red circle) approaches the police line***

In response to the breach, the officers descended the stairs to man the barricade on the Pennsylvania Avenue Walkway. ECF 317 at 113:10–19; Gov. Ex. 201 at 13:00–13:20. Sergeant Lively joined Officers Edwards and Cruz and the three other officers on the Pennsylvania Avenue Walkway barricade. ECF 315 at 78:23–80:1; *see also* Gov. Ex. 302 at 00:05. As Samsel and Grant approached the officers at the second barricade, Johnson now directed his taunts at the officers yelling through the megaphone "We pay your bills!" and "You back the fuck off!" Gov. Ex. 302 at 0:00 – 00:15.

Once they reached the second barricade on the Pennsylvania Avenue Walkway, Grant and Samsel shouted at the officers, including Officer Cruz, and then began to forcibly push and pull on the barricade. Gov. Ex. 302 at 00:15 – 00:40. The officers held onto the barricade and Officer Cruz gave oral commands to stop. Gov. Ex. 302 at 00:29 – 00:35.



***Government Exhibit 302 at 42 seconds: Grant (blue circle)
and Samsel (red circle) yell at Officer Cruz***

While Grant and Samsel confronted the officers, Randolph began to forcibly push and pull on the fence directly across from Officer[3] Edwards. Gov. Exhs. 302 at 00:51 – 00:57, 308 at 00:37. As Samsel and Randolph lifted the portion of the bike rack barricade directly across from Officer Edwards off the ground, Grant and Johnson lifted the portion across from Sergeant Lively and Officer Cruz. Gov. Exs. 302 at 00:55-1:00, 308 at 00:39-00:45. Blythe moved forward and grabbed the bike racks in between Johnson and Grant, and the five defendants together drove the metal bike rack barricades into the officers. Gov. Exs. 302 at 00:55-1:02; 308 at 00:37-00:47; 309 at 1:25-1:31.



***Government Exhibit 302 at 00:56: Grant (blue circle), Blythe (green circle), Johnson (yellow circle), Samsel (red circle) and Randolph (purple circle) pushing the barricade at the police line***

---

[3] On January 6, 2021, Caroline Edwards's USCP rank was Officer. She has since been promoted to the rank of Sergeant. For purposes of this memorandum, she is referred to by her rank at the time of January 6, 2021.

As a result of Grant's efforts, along with his co-defendants, Officer Cruz and Sergeant Lively were driven several feet backwards by the bike-rack barricade until their backs hit the stairwell behind them. Gov. Exs. 302 at 1:01; 309 at 1:26-1:29. Officer Cruz feared being trampled by the crowd during this time. ECF 345 at 28 (citing ECF 317 at 120:13–121:7).   Additionally, as all five defendants drove the bike-rack barricade towards the police line, Samsel and Randolph's bike rack struck Sergeant Edwards in the face. ECF 345 at 9 (citing ECF 317 at 42:7–43:12; *see also* Gov. Ex. 308A 0:25–37). The force threw her back and caused her to slam her head twice: first against a metal handrail, then against the steps. *Id*. (citing Gov. Ex. 308 at 0:44–46; ECF 317 at 44:12– 45:10).

After the five defendants pushed the metal bike rack barricade into the police line, Randolph jumped over the barricade and grabbed Officer Cruz. Gov. Exs. 302 1:02 – 1:15, 308 at 00:49. Sergeant Lively fought to separate Randolph from Officer Cruz, but Grant and Blythe then joined in and tried to pull Randolph towards the rioters. Only another officer's intervention, in the form of punching Grant until he released Randolph, allowed Officer Cruz to escape from Randolph's grasp. Gov Ex. 302 at 1:15.



***Government Exhibit 308 at 49 seconds: Grant (blue circle) beginning to assist Randolph (purple circle) while Blythe (green circle) observes and Johnson (yellow circle) attempts to separate the barrier***



*Government Exhibit 302 at 1:12: Grant (blue circle) and Blythe (green circle) pulling Randolph (purple circle) towards the crowd*

By this point, the barricades were down and the officers outmanned. Grant and the rest of the rioters quickly overwhelmed the police line, and the USCP officers retreated up the Pennsylvania Avenue Walkway towards the Capitol building. The rioters, including Grant and his codefendants, charged towards the Capitol building on the Pennsylvania Avenue Walkway. Gov Exs. 302, 305, 306, 308, 309, 310, 311, 331.

11



*Government Exhibit 308 at 2:08: Grant (circled in blue) advancing towards the Capitol building on the Pennsylvania Avenue Walkway*

### D.     Grant's Conduct on The West Plaza

At the top of the Pennsylvania Walkway, the Capitol Police officers formed another line in an effort to hold back the rioters. The mob quickly overran the officers while ripping down permanent fencing at the entrance to the West Plaza and advancing closer to the building. Gov. Ex. 312.

Grant took advantage of the rioters' breakthrough to push forward to the southern side of the West Plaza. There, rioters battled fiercely with Capitol Police officers. As rioters pushed, shoved, grabbed, and punched officers on the line, rioters behind them, including Grant, surged forward towards the officers. Grant applied his body weight in his push through the mob to reach the police line, eventually struggling to the front line of rioters interfering and impeding the officers.



*Government Exhibit 208 at 00:33: Grant (circled in blue) pushing towards the police line*

While in this area, Grant physically resisted and impeded officers, pressing his back into an officer's riot shield and helping to remove a police barrier. He also yelled at officers on the line and experienced the effects of tear gas that had been deployed.



*Image #1: Still from open-source video of Grant (circled in blue) yelling at police officer with Samsel (circled in red) nearby*

13



***Government Exhibit 321 at 00:05: Grant (blue circle) pressing his body weight into an officer's riot shield as Samsel (red circle) prepares to rip a shield from an officer's hands***



***Image # 2: Open-source still image of Grant (blue circle) reacting to tear gas***



*Image # 3: Open-source image of Grant (blue circle) moving a bike-rack with other rioters on the West front*

Eventually the mob of rioters overwhelmed the officers on the West Front, despite reinforcement from MPD officers. A group of rioters advanced towards the Capitol building, up the Northwest stairs, and to the Senate Wing Door where they smashed windows on either side to gain entry to the Capitol building. Grant made his way from the West Plaza through the mob to the Northwest stairs area where he once again felt the effects of tear gas in the air, but failed to turn around or leave Capitol grounds.



***Image # 4: Open-source video of Grant (blue circle) reacting to tear gas near the Northwest stairs***

Despite police efforts to disperse the crowd and defend the Capitol, Grant made his way past officers in riot gear and up the Northwest stairs to the Upper West Terrace.

### E.  Grant's Conduct Inside the Capitol Building

At approximately 2:50 p.m., Grant climbed through one of the broken windows next to the Senate Wing Door and into the Capitol building. A loud alarm blared at this location throughout the afternoon.



*Government Exhibit 206 at 00:52: Grant climbing into the Capitol building*

Grant then stormed down the hallway, toward the Crypt, and away from the Senate Wing Door with other rioters. Grant entered a conference room where he laughed in response as a rioter near him yelled "Occupy the Capitol! Let's go! We ain't leaving this bitch! I am sleeping in this chair! Patriots are in control!"



*Image # 5: Still from third-party video of Grant inside conference room*

17

While inside the conference room, Grant posed for a photograph taken by another person's phone or camera and that he later saved on his cell phone as a memento.



***Image # 6: Photograph recovered from Grant's phone of him inside conference room***

Grant then also joined with other rioters occupying Senator Merkley's office.[4]  Grant was

---

[4]  At 11:36 p.m. on January 6, Senator Merkley posted a three-minute-long video to Twitter showing the damage that his office incurred during the riot. The government has provided a copy of the video through USAFX to the Court and counsel. Senator Merkley explained that rioters appear to have "smashed the door virtually off its hinges," even though the door was unlocked. He said that the rioters "left a Trump flag here to mark their presence." The senator narrated how the rioters "stole the laptop that was sitting on the table," and panned across his conference table to show the damage and disarray. He then zoomed in on ashes on a table to discuss how the rioters appear to have been "smoking something" in the office. In Senator Merkley's words, one can

inside Senator Merkley's Office with several other rioters, including one who sat with his feet up

on a table. Grant also posed for a second photograph which was recovered from his phone right

outside Senator Merkley's office.



*Image # 7: Still from third-party video of Grant in Senator Merkley's office*

---

"count this office trashed."



***Image # 8: Photograph recovered from Grant's phone of him outside Senator Merkley's Office***

Grant returned to the Senate Wing Door and exited the Capitol building through the door shortly after 3:18 p.m., having spent just over 28 minutes inside the building.

### F. Grant's Post-Arrest Statements and Conduct

Grant was arrested in October 2021. Though he spoke with law enforcement, he expressed no remorse for his actions and claimed that on January 6, 2021 he merely exercised his First Amendment rights. Grant referred to the FBI as "the biggest threat to Americans." When confronted with the fact that he pushed the bike-racks at the police line, Grant lied and claimed it was in self-defense because "a cop swung at [him]." Grant further stated that the prosecution of rioters for their conduct on January 6 was "a big witch hunt."

## III.   THE CHARGES AND CONVICTION

On February 15, 2023, a federal grand jury returned the fourth superseding indictment

charging Grant with eleven counts. On October 23, 2023, Grant pleaded guilty to two counts: Count Fourteen, Entering and Remaining in Certain Rooms in the Capitol Building, 40 U.S.C. § 5104(e)(2)(C); and Count Fifteen, Parading, Demonstrating, or Picketing in a Capitol Building, 40 U.S.C. § 5104(e)(2)(G). On February 2, 2024, following a bench trial, Grant was convicted of five additional counts: Count One, Obstructing Officers during a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b); Count Eight, Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F); and Count Ten, Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2).[5] On August 23, 2024, the government moved to dismiss Count Ten. He now faces sentencing on the remaining six counts above.

## IV.   STATUTORY PENALTIES

As noted by the Presentence Report ("PSR") issued by the U.S. Probation Office, the defendant faces up to 5 years of imprisonment for Count One, 20 years of imprisonment for Count

---

[5] Grant was found not guilty of four counts:

- Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 111(a)(l) and (b), 2 (for the assault of Officer Edwards);
- Count Five, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ 1752(a)(l) and (b)(1)(A);
- Count Six, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C. §§ l752(a)(2) and (b)(l)(A); and
- Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C. §§ 1752(a)(4), (b)(l)(A), (b)(l)(B), and 2.

ECF 338 (Court Verdict).

Two, and a term of supervised release of not more than three years, a fine up to $250,000, restitution, and mandatory special assessments of $100.00 for each felony conviction. The defendant also faces up to 6 months imprisonment for each of Counts Eight, Nine, Fourteen, and Fifteen.

## V.     THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the offense level (26) and Guidelines range (63-78 months' imprisonment) in the draft PSR.  However, the draft PSR mistakenly groups Counts One and Three pursuant to U.S.S.G. § 3D1.2(b), based on the counts having the same victim.   PSR ¶ 86. The counts involve different victims: Officer Cruz is the sole victim in Count Three, but as identified in the Fourth Superseding Indictment and the Court's Findings of Fact and Conclusions of Law, Grant's victims for Count One—the officers whom Grant obstructed, impeded, or interfered with when overrunning the police line near the Peace Circle—included Sgt. Lively,[6] Officer Edwards, and "other officers who formed the police line at the second barricade." ECF No. 345 at 15. Nevertheless, Counts One and Three do group pursuant to U.S.S.G. § 3D1.2(c) because Count Three (the assault of Officer Cruz with a metal crowd control barrier) embodies conduct that is treated as a specific offense characteristic in the guideline applicable to Count One

---

[6] As noted above, Johnson and Grant lifted the portion of the metal bike rack barricade (which weighed 25-50 pounds) off the ground across from Sergeant Lively and Officer Cruz and used the barricade to drive both of the officers back several feet until the officers' backs hit the stairwell.

(specifically, the four-level enhancement for use of a dangerous weapon in U.S.S.G. § 2A2.2(b)(1)(B)).

The Government's Guideline Calculation is as follows:

Count One: 18 U.S.C. § 231(a)(3)

| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |

Count Three: 18 U.S.C. § 111(b)

| U.S.S.G. § 2A2.2(a)[8] | Base Offense Level | 14 |
|---|---|---|
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | § 111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |

---

[7] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used. U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." The cross-reference in U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt., n.1. Here, the conduct includes the felonious (punishable by up to 20 years' incarceration pursuant to 18 U.S.C. § 111(b)) assault of Officer Cruz, which involved a dangerous weapon with intent to cause bodily injury (here, a heavy, metal bike rack barricade that seriously injured another officer in a similar, simultaneous attack); and an intent to commit another felony aside from the assault (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

[8] As discussed above, the cross-reference from U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault and the assault of Officer Cruz here qualifies as aggravated assault. *See also United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where defendant acted "with intent to commit civil disorder under Section 231(a)(3).").

|                | **Total** | **26** |

As explained above, Counts One and Three group pursuant to U.S.S.G. § 3D1.2(c). Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." Here, Count Three, the assault of Officer Cruz with a dangerous weapon has the highest offense level: 26. Thus, the offense level for the group is 26.

*Inapplicability of U.S.S.G. § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because (1) Grant received one criminal history point, in contravention of § 4C1.1(a)(1); (2) Grant used violence and credible threats of violence in connection with the offenses, in contravention of § 4C1.1(a)(3); and (3) Grant possessed a dangerous weapon (the heavy metal barricade) in connection with the offenses, in contravention of § 4C1.1(a)(7).

*Guidelines Range*

The U.S. Probation Office calculated the defendant's criminal history as category I which is not disputed. PSR ¶ 112. Accordingly, based on the government's calculation of the defendant's total adjusted offense level, 26, Grant's Guidelines imprisonment range is 63 to 78 months of imprisonment.

*Departures and Variances*

After determining the defendant's Guidelines range, a court then considers any departures

or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Grant's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law, the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Grant was an avid and willing participant in an unprecedented crime. He helped to start a riot that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in an estimated 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential government function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Grant "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Grant would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[9]   There is no specific offense characteristic in the Guidelines

---

[9] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot

for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85.  So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that a departure is warranted when an offense results in "a significant disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[10]  In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power. "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent.

---

when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S.Ct. 2176 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

[10]  This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence."   *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.[11]

Indeed, several judges of this Court have upwardly departed in January 6 cases precisely because the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the

---

[11] "The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part." *United States v. Languerand*, 21-CR-353-JDB, Sent. Tr., at 33-34.

"The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86.

"But what a dangerous precedent the attack on January 6 set. What a Pandora's Box it opened. We still don't [know] how corrosive it will prove to be to our constitutional order, at least until we have reestablished the practice of a peaceful transfer of power. *United States v. Sparks*, 21-CR-87-TJK, Sent. Tr. at 94.

legitimate business of Congress for hours"); *United States v. Black*, 21-CR127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id*. at 94-95. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of

imprisonment, approximately 150% above the high end of the advisory guideline range.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment, approximately 56% above the high end of the advisory guideline range.

Because the seriousness of defendant's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate.

However, if the Court declines to depart, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would

require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

Unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[12]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Cleveland*, 21-CR-159-ABJ,

---

[12] Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[13]

---

[13] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence

In this case, the government submits that an upward variance or departure of 30 months is warranted to reach an appropriate sentence. Grant stands alone with his codefendants in leading the first breach of the restricted grounds and first attack on law enforcement.   When Grant gathered with the crowd near the Peace Circle, no barrier marking the restricted perimeter had been breached.   As soon as Ryan Samsel moved the outmost barricade and breached the perimeter, Grant did not hesitate to follow, becoming only the second rioter to breach the Capitol grounds.   Unlike Samsel, Grant turned to the crowd standing behind him to waive them forward. He then confronted uniformed officers who, in that moment, did nothing more than stand behind the next barrier preventing deeper entry into the Capitol grounds.   Grant quickly became violent, and was among the very first of all rioters on that day to assault officers and begin the hours-long siege of the Capitol that halted the constitutionally mandated certification of the Electoral College vote.   His case warrants a departure or variance.   As discussed below, similarly situated defendants have received sentences of around 90-96 months.

## VI.   SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a).   Under the facts of this specific case, as described below, the Section 3553(a) factors all weigh in favor of a sentence well above

---

above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

the top of the guidelines range calculated by the government because the defendant's Guidelines range does not adequately capture the unprecedented and uniquely harmful nature of his crimes, which struck at the heart of our democracy and the rule of law.[14]  While the government has chosen not to proceed with litigating the scope of §1512(c)(2) in this case, it is appropriate to note that the defendant nonetheless possessed corrupt intent to interfere with a congressional proceeding, let alone a proceeding designed – by the Constitution and federal law – to ensure the peaceful transfer of power between one administration to the next.

### A.      Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Grant's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Grant participated in the first breach of the restricted perimeter and first act of violence against Capitol Police, opening the floodgates for thousands of rioters that followed. Grant stayed at the Capitol for hours, physically resisting and impeding officers by pressing his back into an officer's riot shield and helping remove a police barrier. Grant then climbed through a broken window into the Capitol building itself and entered a sensitive area – a

---

[14] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024) finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S. Ct. 2176 (2024) demonstrates that the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

Senator's office. The nature and circumstances of Grant's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 108 months of incarceration.

### B.  The History and Characteristics of the Defendant

Grant is a 31-year-old graduate of North Carolina State University. Grant reported a history of illegal and prescription substance abuse to probation including marijuana, heavy cocaine use, experimentation with Ecstasy, abuse of Adderall, Vyvanse, and Ritalin, and prescription opioid addiction. There is no indication that his substance abuse had anything to do with his behavior on January 6, 2021, and as noted in the PSR, the Bureau of Prisons has substance abuse treatment programs that may be available to Grant while he is incarcerated. PSR ¶¶ 174-176.

The events of January 6, 2021, are hardly the first—or last—run-ins Grant has had with the criminal justice system. In 2018, he was sentenced to 30 days in jail and 12 months of probation for Tampering with a Vehicle in Wake County, North Carolina. Approximately a month before Grant was arrested for the instant case, he was charged with Driving While Intoxicated ("DWI") on September 4, 2021. At the time of that arrest, he had a 9mm handgun in his possession with 30 rounds of ammunition and drug paraphernalia.

After Grant was arrested in the instant case and released on conditions, he was arrested once more for DWI on December 7, 2021, and this time, in violation of his bond conditions, he possessed an AR-15 assault rifle with two loaded magazines. PSR ¶ 116. On April 10, 2024, Grant pleaded guilty to the December 2021 DWI arrest charges and was previously scheduled to be sentenced. It appears Grant has since withdrawn his plea and is now scheduled for a disposition hearing on October 7, 2024. PSR ¶ 116. The September, 2021 DWI charges were dismissed on the

34

same day Grant originally pleaded guilty in the other DWI case. Given Grant's withdrawn guilty plea, his criminal history score has reduced from II to I.

In addition to the December 2021 DWI arrest and weapons possession, Grant also violated his bond conditions by testing positive for amphetamine use on October 21, 2021 and November 30, 2021. PSR ¶ 138. Grant's DWI arrest and continued drug use while released on conditions ultimately led to his pre-trial detention in this case.

In sum, Grant's past criminal conduct, which includes carrying dangerous weapons and driving while intoxicated, as well as his repeated violations of this Court's bond conditions, demonstrates that Grant has little respect for the law and even less concern for the safety of others.

### C. The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Grant's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D. The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving

domestic terrorism, which the breach of the Capitol certainly was.[15] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

### *Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, despite pleading guilty to two misdemeanors before trial, Grant has expressed no remorse for his conduct. At the time of Grant's arrest, he expressed the exact opposite, claiming he had done nothing wrong and criticizing the FBI for being, in his view, "the biggest threat to Americans." Accordingly, any last-minute expressions of remorse by Grant should be viewed with great skepticism. *See United States v. Matthew Mazzocco*, 1:21-cr-00054 (TSC), Tr. 10/4/2021 at 29-30 ("[The defendant's] remorse didn't come when he left that Capitol. It didn't come when he went home. It came when he realized he was in trouble. It came when he realized that large numbers of Americans and people worldwide were horrified at what happened that day. It came when he realized that he could go to jail for what he did. And that is when he felt remorse, and that is when he took responsibility for his actions.") (statement of Judge Chutkan). Additionally, Grant has a criminal history, including additional criminal history post-January 6, indicating that he needs a sentence that can provide sufficient deterrence.  Furthermore, he stayed on restricted Capitol grounds for hours and continued to physically interact with police (pushing against their shields), and he went into the Capitol building including a Senator's office, making not just one

---

[15] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

poor decision but a series of poor decisions that he needs to be deterred from making in the future. Finally, Grant's behavior on January 6, 2021 was unique in that he was among the first to breach and one of the very first to assault officers, combined with the evidence of his intention to obstruct the certification, this suggests he was not simply swept up by the crowd but instead gave thought and made conscious decisions that he needs to be deterred from making in the future.

### E.       The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.       Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s]

and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id.* at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[16]

---

[16] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the

Additionally, pre-*Fischer* 1512(c)(2) cases remain reliable comparators because a review of sentences given by district judges in pre-*Fischer* Capitol Siege cases involving 1512(c)(2) convictions confirms that district judges were already appropriately considering and weighing the 18 U.S.C. § 3553(a) factors in their decision-making, instead of being beholden to the Guidelines. In a majority of pre-*Fischer* Capitol Siege cases involving 1512(c)(2) convictions, judges sentenced outside of the then-applicable Guidelines range and gave variances based on the § 3553(a) factors.   At least 19 of the district judges who have sentenced Capitol Siege cases have varied in at least one of their cases involving a 1512(c)(2) conviction.   And when varying, judges considered the importance of the context and the attempts to obstruct the certification.   *See, e.g., United States v. Lucas Denney*, 22-cr-70 (RDM), Sent. Tr. at 83 ("I will say that under other circumstances, I might have varied further downward. But I had to temper any basis for varying further downward by the fact that the attacks occurred in the context of an assault on our democracy, an assault on the Capitol, an assault on one of the most sacred events in our nation, and that resulted in injuries, not just to the psychic well being of the officers who were -- endured that assault, but to the nation as a whole."); *United States v. Hunter Seefried*, 21-cr-287 (TNM), Sent. Tr. at 54 ("I have no doubt that the Commission would have intended for this to be applied to a substantial interference with an official proceeding, which is itself more significant than almost any proceeding. And you and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay, numerous law enforcement injuries and the

---

seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

expenditure of extensive resources. Therefore, I intend to vary upwards from the guideline range I've calculated to reflect the substantial interference you and others caused."); *United States v. Gilbert Fonticoba*, 21-cr-638 (TJK), Sent. Tr. at 66-67   ("I'm varying downward given the posture we're in. But I would vary upward significantly to get to 48 months if I only had Count 2, because I think there, again, given the evidence here of the intent the defendant's conceded, the intent to obstruct the proceeding and the nature of the proceeding itself is so important and so critical in terms of deterrence and all the rest and in terms of the specific fact pattern here that that would be my sentence.").

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[17] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Craig Bingert* 21-cr-91 (RCL), the defendant was found guilty after a bench trial of several counts including 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1512(c)(2), and 18 U.S.C. § 231(a)(3). Judge Lamberth sentenced the defendant to 96 months of incarceration. Bingert, along with others, charged up the stairs on the West front of the Capitol as the officers retreated. Once the defendant reached the top, he chanted "let us in!" with other rioters. After

---

[17] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

spending several minutes near the police line and filming another rioter spray the officers with a fire extinguisher, Bingert joined with others to forcibly push bike racks into the line of police officers for at least 15 seconds. One of the officers was struck in the leg causing pain. The defendant remained on the Upper West Terrace for hours watching the violence in the Lower West Terrace tunnel and had to be forced off the terrace by police.

Much like the defendant in *Bingert*, Grant joined with others to use a metal bike rack barricade to assault a line of police officers and facilitate his advance on the Capitol building. Grant's conduct is more aggravated because he lifted the bike rack off the ground with his co-defendants, causing it to be used in a deadly and dangerous manner. Also, Grant and his co-defendants led the first attack on police that day, so Grant's behavior served as the model for other rioters, like Bingert, to follow. Grant not only stayed on the grounds for hours, he actually entered the building by climbing through a broken window next to the Senate Wing Door where he traversed the halls and entered a Senator's office. Accordingly, the additional aggravators mean that Grant is deserving of a harsher sentence and the government's recommended sentence for Grant would not create a sentencing disparity.[18]

---

[18] Additionally, Judge Lamberth has indicated in at least one post-*Fischer* Capitol Siege case that he already carefully considered the 18 U.S.C. § 3553(a) factors in fashioning the defendant's sentence and did not intend to reduce the defendant's sentence to a post-Fischer guidelines sentence, despite the potentially drastic change to the defendant's guidelines range. *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 ("Mr. Hostetter too hastily presumes that this Court would necessarily give a Guidelines sentence on remand. In crafting its original sentence, the Court considered the Sentencing Guidelines, but also made its own assessment-as it must, according to 18 U.S.C. § 3553(a)-of the factual, personal, and historical circumstances surrounding Mr. Hostetter's offense. While the Supreme Court's decision in Fischer may ultimately change the Guidelines recommendation for Mr. Hostetter, Fischer does not dictate the Court's application of the 18 U.S.C. § 3553(a) factors to Mr. Hostetter's remaining convictions. The Court may still

In *United States v. Patrick McCaughey*, 21-cr-40-1 (TNM), the defendant was found guilty after a bench trial of nine counts including two counts of violating 18 U.S.C. § 111(a)(1), one count each of violating 18 U.S.C. § 111(a)(1) and (b), 18 U.S.C. § 1512(c)(2), 18 U.S.C. § 231(a)(3), 18 U.S.C. § 1752(a)(2) and (b)(1)(A), 18 U.S.C. § 1752(a)(4) and (b)(1)(A), and two petty offenses. *McCaughey*, 21-cr-40-1 (TNM), ECF 474. McCaughey entered Capitol grounds and confronted police officers on the Lower West Terrace of the Capitol. *McCaughey*, 21-cr-40-1 (TNM), Gov. Sent. Memo., ECF 611 at 1-2. He then joined the mob at the Lower West Terrace Tunnel and participated in a "heave-ho" push with dozens of rioters for approximately 24 minutes. *Id.* During this time, McCaughey gained control of a police riot shield and used it to push against a police officer for two minutes and he then swiped at another officer using the riot shied. *Id.* McCaughey never entered the Capitol building. *Id.* Judge McFadden sentenced McCaughey to 90 months' incarceration. *McCaughey*, 21-cr-40-1 (TNM), ECF 618.

Like McCaughey, Grant attacked multiple police officers who were securing the Capitol grounds. While McCaughey used a riot shield as a deadly and dangerous weapon, Grant and his co-defendants used another object that was present for the police's protection – large, metal bike-rack barricades. Similar to McCaughey, Grant has expressed no remorse. And unlike McCaughey, Grant actually entered the Capitol building. This case, too, demonstrates that the government's recommended sentence would not create a sentencing disparity.

---

consider Mr. Hostetter's serious conduct on January 6th, 2021 in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512.").

42

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Grant was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

43

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[19]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v.*

---

[19] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Grant to pay $2,000 in restitution for his convictions on Counts One and Three. This amount fairly reflects Grant's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.  FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 each for Counts One and Three, and $5000 each for Counts Eight, Nine, Fourteen and Fifteen. *See* 18 U.S.C. § 3571(b).  In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See*

U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $25,000 – $250,000. U.S.S.G. § 5E1.2(c).

There is a GiveSendGo campaign on behalf of Grant that has raised over $10,425 to date. PSR ¶ 156. While the campaign was not initiated by Grant, based on the title "James Grant Freedom Fund" and the language used on the website, it is clear the money raised will go to Grant. Grant acknowledged the campaign during his presentence interview. PSR ¶ 156.  Accordingly, this money is available to Grant for payment of a fine. The campaign appears to have since been taken down. PSR ¶ 156a.

## IX.   CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 108 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     *s/ Kyle R. Mirabelli*
        Kyle R. Mirabelli
        Assistant United States Attorney
        NY Bar No. 5663166
        Capitol Siege Section
        U.S. Attorney's Office
        District of Columbia
        Telephone No: (212) 252-7884
        Email Address: kyle.mirabelli@usdoj.gov