**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **UNITED STATES OF AMERICA** | |
| **v.** | **Case No. 21-cr-537 (JMC)** |
| **PAUL RUSSELL JOHNSON,** | |
| **Defendant.** | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Paul Russell Johnson to 108 months of incarceration, three years of supervised release, $2,000 restitution, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction. This recommendation reflects an upward departure or variance of 30 months from the top of the guidelines as calculated by the government.

## I.    INTRODUCTION

The defendant, Paul Russell Johnson, participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Johnson played a uniquely consequential role in the unprecedented events of January 6, 2021. When a crowd gathered along the western edge of the U.S. Capitol's restricted perimeter shortly before 1 p.m., while former President Trump was still speaking near the White house, Johnson shouted at the crowd through a megaphone, pressing them to storm the Capitol and mocking the men in the crowd for not being on the "front lines." After co-defendant Ryan Samsel moved a barrier aside, Johnson and others then breached the outer perimeter. Johnson and his four co-defendants then confronted officers manning a second barricade and spearheaded the first violent assault on Capitol Police defending the building that day by lifting two linked, metal bike racks into the air and driving it into officers, seriously injuring at least one and clearing the way for the thousands of rioters that would flood into Capitol grounds along the walkway the officers were defending. Johnson joined the crowd pouring onto the West Front of Capitol grounds, where he continued to use his megaphone not only to encourage rioters to force Congress' certification of the election to a halt but also to coordinate rioters' assault of the building. Both in his words and his actions, Johnson helped lead the chaos and destruction that took place at the Capitol that day.

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police ("USCP" or "Capitol Police"). The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

The government recommends that the Court sentence Johnson to 108 months' incarceration for his convictions on Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b); Count Eight, Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D), and Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F). A 108-month sentence reflects the gravity of Johnson's conduct and the role he played in beginning the attack on the Capitol.

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the court to the Statement of Facts filed in this case with the Complaint (ECF No. 1-1 (Sept. 29, 2021) at 1-2) for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.  Johnson's Preparation for the January 6 Attack[2]

On January 5, 2021, Johnson and his wife traveled from their home in eastern Virginia to Washington, D.C., staying at the Hilton Garden Inn in downtown Washington, D.C. When reserving their hotel room for the nights of January 5 and 6, Johnson's wife texted Johnson asking, "Are you planning to roam thevstreets [sic] after the protest? Or both nights?" Johnson replied:

---

[2] The Court's Findings of Fact set out the facts elicited at trial in great detail and accurately reference the Government's exhibits. ECF 345 at 4-13. The intent of this memorandum is to highlight Johnson's conduct, which underlies the guilty verdict for the counts identified above.

"Shit prob both."

On January 6, 2021, Johnson wore a black hooded jacket with a large white skull printed on the back, a black Harley Davidson shirt, a black straight-billed baseball cap, green camouflage pants, grey converse, and black, reinforced gloves.



***Image # 1: Johnson at the Peace Circle on January 6, 2021 with reinforced gloves visible***

Johnson also equipped himself with a black megaphone, a walkie talkie, and a black backpack. On the morning of January 6, 2021, Johnson attended former President Donald Trump's "Save America" rally at the Ellipse area near the White House.[3] While the rally was ongoing, Johnson left to march toward the Capitol with members of a group called the "New Jersey Sons of Liberty."

---

[3]   facebook.com/vickie.barrknox/videos/10225529332005008 (at timestamp 11:09).



*Image # 2: Johnson walking with New Jersey Sons of Liberty members near the National Mall on January 6, 2021*

Shortly before 1 p.m., while former President Trump continued to speak near the White House, Johnson arrived at the Peace Circle.

### C.  The Peace Circle

The Capitol building and its surrounding grounds were closed to visitors on January 6, 2021 and a restricted perimeter had been established around its grounds in anticipation of the Vice President's visit for the certification of the 2020 election. The restricted perimeter was made clear to the public through linked, metal bike-rack barriers and snow fencing, much of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs"). Bike-rack barriers were placed on the sidewalk next to the road at the Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds to mark the

western boundary of the restricted area. The weight of each bike rack is approximately 25 to 50 pounds.

Additional barriers were established within the outer perimeter to further restrict access to the building. One such barrier was a barricade of bike-racks, reinforced with snow fencing and zip ties, with several Area Closed signs attached, that barred the way up the Pennsylvania Avenue Walkway towards the Capitol building. The Pennsylvania Avenue Walkway is a footpath that runs from the West Plaza of the Capitol building to the sidewalk at the road in the Peace Circle.



***Image # 3: Layout of the Peace Circle and Pennsylvania Avenue Walkway barriers***
***(Gov't Ex. 12)***

Between approximately 12:40 and 12:50 p.m., defendants Paul Johnson, Ryan Samsel, James Grant, Stephen Randolph, and Jason Blythe joined with other rioters on the roadway by the Peace Circle, just outside the outer perimeter barricades at the sidewalk. During that time, five

USCP officers, including Officers David Cruz and Caroline Edwards, were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Avenue Walkway. USCP Sergeant Timothy Lively, who led their unit that day, was nearby on the West lawn.

While on the roadway, Johnson used his megaphone to encourage and incite the crowd—including his codefendants—to descend on the Capitol building. Gov. Exs. 304 and 340. While pointing at the Capitol building Johnson yelled "we can shout about Antifa all day long, but unless we get in there, it means nothing." Gov Ex. 340 at 00:55 - 1:01. Johnson yelled at the crowd to "Get on the front lines," and to "1776 this fence right here." Gov. Ex. 304. He rhetorically asked the crowd, "Do you think George Washington would be standing behind this motherfucker?" Gov. Ex. 304.



*Image # 4 (left): Johnson in yellow circle, Samsel in red (Gov't Ex. 304 at four seconds); Image # 5 (right): Johnson in yellow circle, Blythe in green (Gov't Ex. 340 at one minute)*

At approximately 12:52 p.m., Johnson yelled "get on the front lines" and "why are women on the front lines, we need our men." Samsel and then moved toward the bike racks at the curb of the Peace Circle marking the outermost layer of the restricted perimeter. Gov. Exs. 304 and 340 at 1:25 – 2:00. On April 13, 2021, when Randolph spoke to an undercover FBI agent prior to his arrest, Randolph described Johnson's entreaty to the crowd as what prompted the breach that

occurred just one minute later. Randolph said that when a man with the megaphone yelled to the Peace Circle crowd, "Why are women on the front lines, we need our men," rioters responded by moving quickly to the bike-rack barricades marking the restricted perimeter. Gov. Ex. 523 at 18:55 – 19:25.

At approximately 12:53 p.m., Samsel opened a section of the first metal bike-rack barricade, which demarcated the restricted area, at the sidewalk next to the road at the Peace Circle. Gov. Exs. 201 at 13:14-13:21; 204 at 13:12-13:18; 309 at 00:10-:0030; 340 at 2:38 -2:59. Samsel defiantly tore down the fencing at the curb and walked onto the restricted grounds and toward the officers on the Pennsylvania Avenue Walkway, marking the very first breach of the restricted perimeter on January 6. Grant followed closely behind Samsel, excitedly jumping up and down and waving the crowd towards the second barrier on the Pennsylvania Avenue Walkway. *Id.;* 302 at 00:00-00:07.

The officers descended the stairs to man the barricade on the Pennsylvania Avenue Walkway. ECF 317 at 113:10–19; Gov. Ex. 201 at 13:00–13:20. Sergeant Lively joined Officers Edwards and Cruz and the three other officers on the Pennsylvania Avenue Walkway barricade. ECF 315 at 78:23–80:1; *see also* Gov. Ex. 302 at 00:05. As Samsel and Grant approached the officers at the second barricade, Johnson now directed his chants at the officers yelling through the megaphone "We pay your bills!" and "You back the fuck off!" Gov. Ex. 302 at 0:00 – 00:15. A large crowd moved toward the second barricade on the Pennsylvania Avenue Walkway. Gov. Ex. 340 at 3:10.

Once they reached the second barricade on the Pennsylvania Avenue Walkway, Johnson

worked his way to the front of the crowd immediately in front of the barricade manned by officers. Johnson pointed his megaphone into the faces of officers just two to three feet away and shouted aggressively at them through the megaphone. Samsel and Grant also shouted at the officers, including Officer Cruz, and then began to forcibly push and pull on the barricade. Gov. Ex. 302 at 00:15 – 00:40. The officers held onto the barricade and gave verbal warnings. Gov. Ex. 302 at 00:29 – 00:35. Johnson turned and handed his backpack to his wife, appearing to prepare for violence.

Samsel joined Randolph in lifting the portion of the bike-rack barricade off the ground across from Sergeant Edwards while Grant and Johnson lifted the portion across from Sergeant Lively and Officer Cruz. Gov. Exs. 302 at 00:55-1:00, 308 at 00:39-00:45. Blythe moved forward and grabbed the bike racks in between Johnson and Grant, and the five defendants together drove the metal bike-rack barricades into the officers. Gov. Exs. 302 at 00:55-1:02; 308 at 00:37-00:47; 309 at 1:25-1:31.



***Image # 6: Defendants pushing the barricade at the police line (Johnson circled in yellow, also Grant circled in blue, Blythe circled in green, Samsel circled in red, and Randolph circled in purple) (Gov't Ex. 302 at 56 seconds)***

As all five defendants drove the barricade of linked bike racks at the police line, the bike-rack section that Samsel and Randolph propelled struck Sergeant Edwards in the face. ECF 345 at 9 (citing ECF 317 at 42:7–43:12; *see also* Gov. Ex. 308A 0:25–37). The force threw her back and caused her to slam her head twice: first against a metal handrail, then against the steps. *Id.* (citing Gov. Ex. 308 at 0:44–46; ECF 317 at 44:12– 45:10). She lost consciousness and suffered a concussion. ECF 345 at 22. Sergeant Edwards was later transported to the hospital by ambulance after appearing groggy and incoherent and then passing out a second time in front of a coworker. ECF 345 at 22. At the hospital, Sergeant Edwards described the pain she felt as "excruciating." ECF 345 at 22. This pain would last several weeks and require her to undergo physical therapy. ECF 345 at 22-23.

The barricade section that Johnson, Grant, and Blythe pushed forward drove Officer Cruz and Sergeant Lively several feet backwards, until the officers' backs hit the stairwell behind them. Gov. Exs. 302 at 1:01; 309 at 1:26-1:29. Officer Cruz feared being trampled by the crowd during this time. ECF 345 at 28 (citing ECF 317 at 120:13–121:7).

After the five defendants forced the metal bike-rack barricade into the police line, Randolph jumped over the barricade and grabbed Officer Cruz. Gov. Exs. 302 1:02 – 1:15, 308 at 00:49. Sergeant Lively fought to separate Randolph from Officer Cruz, but Grant and Blythe then joined in the assault on Cruz and tried to pull Officer Cruz towards the rioters. Only another officer's intervention, by punching Grant until he released Officer Cruz, allowed Officer Cruz to escape from Randolph's grasp. Gov Ex. 302 at 1:15.

As this second assault occurred, Johnson hurriedly attempted to dismantle the bike-rack barricade still linked together by snow fencing and the bike racks' interlocking mechanism. Having encouraged the crowd forward to this breach point, Johnson now worked to clear their path.



***Image # 7: Randolph (circled in purple) after jumping over the barricade and grabbing onto Officer Cruz while Johnson (yellow circle) continues to pull away the barrier (Gov't Ex. 308 at 49 seconds)***

The defendants and the rest of the rioters quickly overwhelmed the police line, and the USCP officers retreated up the Pennsylvania Avenue Walkway towards the Capitol building. The rioters, including Johnson, charged towards the Capitol building on the Pennsylvania Avenue Walkway and onto the West Front. Gov Exs. 302, 305, 306, 308, 309, 310, 311, 331.

**D. Johnson's Conduct on Capitol grounds after the Peace Circle Assault**

From the Peace Circle, Johnson walked up the Pennsylvania Avenue Walkway toward the Capitol building, and he continued to clear the way for the crowd behind him as he did so. As Johnson passed an additional layer of metal bike-rack fencing knocked over by rioters, Johnson picked multiple sections up and threw them over a small retaining wall abutting the Pennsylvania Avenue Walkway.



*Image # 8: Johnson throwing metal bike-rack barricade over retaining wall (Gov't Ex. 308 at two minutes and 50 seconds)*

Johnson then proceeded onto the West Plaza, where rioters crowded against a police line preventing rioters from encroaching further toward the Capitol building. As rioters flooded into the Lower West Terrace, Johnson found an elevated position on a stone retaining wall and used his megaphone to command the crowd further from the Lower West Terrace to press forward. He shouted: "Let's go! Let's go, America! Pick your feet up! … Let's go! On the front line everybody!"



*Image # 9: Johnson using a megaphone to rally and direct the crowd (Gov't Ex. 339 at 11 seconds)*

13

Johnson then remained on the West Front of Capitol grounds for at least an hour as he alternated between the center of the crowd, near the police line, and the crowd's outskirts, where he used his megaphone to incite passive members of the crowd and urge them forward, yelling at various points:

- "They got the vote guys. Are you pissed off now? Check your phones. Everybody check your social media. Don't stand around and watch, we need to push this shit down." (Gov't Ex. 320 at 24 seconds).

- "Hey just so you know they certified the vote. They certified the vote. You gonna stand around and watch now? What are you gonna do? They already stole it. They just stole it." (Gov't Ex. 334 at 20 seconds).

- "Stop the steal? They just stole it fellas." (Gov't Ex. 334 at timestamp 1:50).

- "Raise your voices. They're debating in there because they're scared now." (Gov't Ex. 319 at 22 seconds).

At approximately 1:30 p.m., Johnson moved toward the South Lawn, where he began attempting to recruit other rioters to wrap around to the east side of the Capitol to "flank" the building.



***Image # 10: Johnson speaking to others about recruiting a group to move to the east side of building (Gov't Ex. 335 one hour, one minute, and 42 seconds)***

Still shouting through the megaphone, Johnson then walked through the crowd on the Southwest Lawn for the next 30 minutes calling for "all able bodies" to move to the east side of the building to "flank them"—referring to either the elected officials inside the Capitol building or the police defending it. He criticized the members of the crowd that were "just standing around." Several members of the crowd can be seen moving toward the South Lawn leading to the east side of the building after Johnson encouraged them to move in that direction.



***Image # 11: Johnson on the Southwest Lawn yelling that "all able bodies" should join him in "flanking" the east side of the Capitol building (Gov't Ex. 335 at one hour, 20 minutes, and 56 seconds)***

Johnson is last visible in open-source footage at approximately 2:05 p.m. on the Southwest Lawn, adjacent to the walkway leading to the east side of the Capitol building. At approximately 3:30 p.m., Johnson sent a text message stating, "Fucking the capital [sic] up yea" followed by "Just took over the capitol" at 3:43 p.m. At this time, the government does not have video evidence that Johnson entered the Capitol building.

### E.  Johnson's Conduct after Leaving the Capitol

On the evening of January 6, 2021, open-source footage captured Johnson standing in a small group outside his hotel while boasting about the violent actions he took at the Capitol that day:

> We get to the Capitol and when we get to the street, you know where that uh statue is? … I looked. I'm sitting at the gate … there's five cops standing up the way a

16

little bit. Beyond them is a lot of cops … So me and [another individual] look at each other, we already knew what time it was. … We started pulling the gates apart and we start bum rushing. Cops start hightailing to the fucking Capitol right? We get to the next gate. There's three sets of gates before you get to the stairs of the Capitol, alright? We get to the next gate. There's probably...there's a shit load of cops up there then. Second wing - we breached - pulled up – start throwing shit. I mean we're fu-, we're...we're fighting cops and shit. I have video where I'm spinning one around dude. The third gate, they're all hightailing to the top of the Capitol. We get up on the steps. It's bolted down to the ground. The gate was a black gate. So we grab it and we start doing this number here and the next thing you know, bear mace. The whole front row dude." (Gov't Ex. 526).

## III.    THE CHARGES AND CONVICTION

On February 15, 2023, a federal grand jury returned the fourth superseding indictment charging Johnson with nine counts. On February 2, 2024, Johnson was convicted of Count One, Obstructing Officers during a Civil Disorder, 18 U.S.C. § 231(a)(3); Count Three, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon, 18 U.S.C. §§ 111(a)(1) and (b)) (assault of Officer Cruz with a metal crowd control barrier); Count Eight, Disorderly Conduct in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(D); Count Nine, Act of Physical Violence in a Capitol Building or Grounds, 40 U.S.C. § 5104(e)(2)(F); and Count Ten, Obstruction of an Official Proceeding, 18 U.S.C. § 1512(c)(2).[4] On August 23, 2024, the

---

[4] Johnson was acquitted of Count Two, Assaulting, Resisting, or Impeding Certain Officers Using a Dangerous Weapon, Inflicting Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C.§§ 111(a)(l) and (b), 2 (the assault of Sergeant Edwards with a metal crowd control barrier); Count Five, Entering and Remaining in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C.§§ 1752(a)(2) and (b)(1)(A)); Count Six, Disorderly and Disruptive Conduct in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, in violation of 18 U.S.C.§§ 1 752(a)(2) and (b)(l)(A)) and Count Seven, Engaging in Physical Violence in a Restricted Building or Grounds with a Deadly or Dangerous Weapon, Resulting in Significant Bodily Injury, and Aiding and Abetting, in violation of 18 U.S.C.§§ 1752(a)(4), (b)(l)(A), (b)(l)(B), and 2. *See* ECF 339 (Court Verdict).

government moved to dismiss Count Ten from the Fourth Superseding Indictment. ECF No. 392.

## IV.    STATUTORY PENALTIES

Johnson now faces sentencing for the counts of conviction listed above. As noted by the Presentence Report issued by the U.S. Probation Office, Johnson faces up to 5 years of imprisonment for Count One, 20 years of imprisonment under Count Two, and a term of supervised release of not more than three years, a fine up to $250,000, restitution, and mandatory special assessments of $100 for each felony conviction. He also faces up to 6 months of imprisonment for each of Counts Eight and Nine.

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49 (2007).

The Government agrees with the offense level (26) and Guidelines range (63-78 months' imprisonment) in the Presentence Investigation Report ("PSR"). However, the draft PSR mistakenly groups Counts One and Three pursuant to U.S.S.G. § 3D1.2(b), based on the counts having the same victim. PSR ¶ 86. The counts involve different victims: Officer Cruz is the sole victim in Count Three, but as identified in the Fourth Superseding Indictment and the Court's Findings of Fact and Conclusions of Law, Johnson's victims for Count One—the officers who Johnson obstructed, impeded, or interfered with when overrunning the police line near the Peace Circle—included Sgt. Lively,[5] Officer Cruz, and "other officers who formed the police line at the

---

[5] As noted above, Johnson and Grant lifted the portion of the metal bike-rack barricade (which

18

second barricade." ECF No. 345 at 15. Nevertheless, Counts One and Three do group pursuant to U.S.S.G. § 3D1.2(c) because Count Three (the assault of Officer Cruz with a metal crowd control barrier) embodies conduct that is treated as a specific offense characteristic in the guideline applicable to Count One (specifically, the four-level enhancement for use of a dangerous weapon in U.S.S.G. § 2A2.2(b)(1)(B)).

The Government's Guideline Calculation is as follows:

Count One: 18 U.S.C. § 231(a)(3)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[6] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **24** |

Count Three: 18 U.S.C. § 111(b)

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[7] | Base Offense Level | 14 |

---

weighed 25-50 pounds) off the ground across from Sergeant Lively and Officer Cruz and used the barricade to drive both of the officers back several feet until the officers' backs hit the stairwell.

[6] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used. U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers." The cross-reference in U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon…or (D) an intent to commit another felony." U.S.S.G. § 2A2.2, cmt., n.1. Here, the conduct includes the felonious (punishable by up to 20 years' incarceration pursuant to 18 U.S.C. § 111(b)) assault of Officer Cruz, which involved a dangerous weapon with intent to cause bodily injury (here, a heavy, metal bike-rack barricade that seriously injured another officer in a similar, simultaneous attack); and an intent to commit another felony aside from the assault (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

[7] As discussed above, the cross-reference from U.S.S.G. § 2A2.4(c)(1) (directs that § 2A2.2

| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **26** |

Because Counts One and Three group pursuant to U.S.S.G. § 3D1.2(c), there is one group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to the group is the offense level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." Here, Count Three, the assault of Officer Cruz with a dangerous weapon, has the highest offense level: 26. Thus, the offense level for the group is 26.

*Inapplicability of U.S.S.G. § 4C1.1*

Recent amendments to the Sentencing Guidelines for 2023 include a new guideline, U.S.S.G. § 4C1.1, which provides for a two-level decrease in the offense level for offenders who have no criminal history points and who meet certain additional criteria. Section 4C1.1 does not apply in this case because (1) Johnson used violence and credible threats of violence in connection with the offenses, in contravention of § 4C1.1(a)(3); and (3) Johnson possessed a dangerous weapon (the heavy metal barricade) in connection with the offenses, in contravention of § 4C1.1(a)(7).

---

(Aggravated Assault) be applied if the conduct constituted aggravated assault and the assault of Officer Cruz here qualifies as aggravated assault. *See also United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where defendant acted "with intent to commit civil disorder under Section 231(a)(3).").

*Guidelines Range*

The U.S. Probation Office calculated the defendant's criminal history as category I, which is not disputed. PSR ¶ 111. Accordingly, based on Probation and the government's calculation of the defendant's total adjusted offense level, 26, Johnson's Guidelines imprisonment range is 63-78 months of imprisonment.

*Departures and Variances*

After determining the defendant's Guidelines range, a court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Because Johnson's Guidelines range does not capture the unprecedented and uniquely harmful nature of his crimes—in which he helped lead an attack that struck at the heart of our democracy and the rule of law—the government respectfully requests that the Court depart or vary upwards from the top of the Guidelines range.

Johnson was an avid and willing participant in an unprecedented crime. He helped to incite a mob that threatened the lives of legislators and their staff, interrupted of the certification of the 2020 Electoral College vote count, injured more than one hundred police officers and resulted in more than 2.9 million dollars in losses. His offense targeted the peaceful transfer of power, an essential democratic function, and one of the fundamental and foundational principles of our democracy. Like every member of the mob, Johnson "endanger[ed] our democratic processes and temporarily derail[ed] Congress's constitutional work." *United States v. Brock*, 94 F.4th 39, 59 (D.C. Cir. 2024). As Judge McFadden put it to another rioter, "[Y]ou and your fellow rioters were responsible for substantially interfering with the certification, causing a multiple-hour delay,

numerous law enforcement injuries and the expenditure of extensive resources." *United States v. Hale-Cusanelli*, 21-cr-37 (TNM), Sent'g Tr. 9/22/22 at 86-87.

But nothing in this defendant's Guidelines calculation reflects these facts. Johnson would face the same offense level if his crimes had not endangered the democratic process or interfered with the peaceful transfer of power.[8] There is no specific offense characteristic in the Guidelines for attacking democracy or abandoning the rule of law. "And simply saying, yeah, I know I trespassed, I trespassed, that's not really capturing the impact of what that day meant when all of those members of Congress met there to fulfill their constitutional duty." *United States v. Calhoun*, 21-CR-116-DLF, Sent. Tr. at 85. So a sentence within the defendant's Guidelines range here would not "reflect the seriousness of the offense," "promote respect for the law," or "provide just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

The Guidelines expressly state that an upward departure is warranted where a case presents a circumstance that "may not have been adequately taken into consideration in determining the applicable guideline range" or that "the Commission has not identified in the guidelines but that nevertheless is relevant to determining the appropriate sentence." U.S.S.G. § 5K2.0(a)(2). The Guidelines also provide that a departure is warranted when an offense results in "a significant

---

[8] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, 144 S.Ct. 2176 (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, 144 S. Ct. at 2195 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

disruption of a governmental function" and the Guidelines do not reflect the appropriate punishment for the offense. U.S.S.G. § 5K2.7.[9] In such circumstances, "the court may increase the sentence above the authorized guideline range to [1] reflect the nature and extent of the disruption and [2] the importance of the governmental function affected."

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges in this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducting the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.[10]

---

[9] This guideline does not require the government to establish a direct link between the defendant's misconduct and the alleged disruption, nor does it "require that the disruption be of any particular type or consequence." *See United States v. Saani*, 650 F.3d 761, 765–66, 771 (D.C. Cir. 2011).

[10] "The effort undertaken by those who stormed the Capitol on January 6 and those who entered the Capitol or who, like the defendant, sought to, but didn't ultimately enter the Capitol, that effort was to stop the peaceful transfer of power following the legitimate outcome of our presidential election. That's a process that has been a hallmark of American democracy for 200 years. And that effort to reject the outcome of the 2020 presidential election involved an unprecedented and, quite frankly, deplorable attack on our democratic institutions, on the sacred ground of the United States Capitol building, and on the law enforcement officers who were bravely defending the Capitol and those democratic values against the mob of which the defendant was a part." *United States v.*

Indeed, several judges of this Court have upwardly departed in January 6 cases precisely because the advisory guideline range did not adequately take into account all of the relevant circumstances. *See United States v. Eicher*, 22-cr-38 (BAH), Sent. Tr. 9/15/23 at 50 (applying § 5K2.7 because the defendant "join[ed] a mob, in the center of the melee, and through the sheer numbers and aggressive conduct towards police, breached the Capitol resulting in stopping the legitimate business of Congress for hours"); *United States v. Black*, 21-CR127-ABJ, Sent. Tr. 5/16/23 at 27 (applying an upward departure pursuant to § 5K2.7 for a January 6 rioter).

Recently, in *United States v. Sparks*, 21-CR-87-TJK, Judge Kelly sentenced a defendant convicted of violating both 18 U.S.C. § 1512(c)(2) and 18 U.S.C. § 231. Prior to sentencing, in light of the Supreme Court's *Fischer* decision, the government moved to dismiss the § 1512(c)(2) count, and at sentencing, Sparks faced an advisory guideline range of 15-21 months. Judge Kelly found it important that despite the dismissal of the § 1512(c)(2) count, the defendant's conduct still included "an intent to obstruct or interfere with that proceeding, that important constitutional proceeding" which the court found to be "pretty dark behavior" which "posted a threat to whether our constitutional process will proceed or whether a mob would interfere with that process." *Sparks* Sentencing Tr., at 87-88. The court found that the "typical person convicted of [18 U.S.C. § 231] engaged in nothing at all like the attack on the Capitol and the certification." *Id.* at 94-95. Because

---

*Languerand*, 21-CR-353-JDB, Sent. Tr., at 33-34.

"The security breach forced lawmakers to hide inside the House gallery until they could be evacuated to undisclosed locations. In short, the rioters' actions threatened the peaceful transfer of power, a direct attack on our nation's democracy." *United States v. Fitzsimons*, 21-CR-158-RC, Sent. Tr., at 85-86.

Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94. Accordingly, the court found a significant upward departure was warranted under both U.S.S.G. §§ 5K2.7 and § 5K2.21, and in the alternative a variance of equal amount was warranted under the § 3553(a) factors, and sentenced Sparks to 53 months of imprisonment, approximately 150% above the high end of the advisory guideline range.

Similarly, in *United States v. Robertson*, 21-CR-34-CRC, Judge Cooper resentenced a defendant after dismissal of a § 1512(c)(2) conviction post-*Fischer*. Without that conviction, the court determined that a new advisory guideline range of 37 to 46 months applied. *See Robertson* Sent. Tr., at 59. But the court also found that an upward departure was appropriate pursuant to U.S.S.G. § 5K2.7, because Robertson's conduct "resulted in a significant disruption of a governmental function, namely halting of the certification . . . and that is so regardless of whether Section 1512(c) applies." *Id*. at 61. The court also found an upward departure appropriate under U.S.S.G. § 5K2.0 because Robertson's conduct was "more harmful or egregious than the typical case represented by the otherwise applicable guideline range." *Id*. After considering the § 3553(a) factors, Judge Cooper sentenced Robertson to 72 months of imprisonment, approximately 56% above the high end of the advisory guideline range.

Because the seriousness of Johnson's crime is not adequately captured by the applicable Guideline, an upward departure is appropriate.

However, if the Court declines to depart here, an upward variance is warranted. An upward variance is appropriate when "the defendant's conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range." *United States v. Murray*, 897 F.3d 298, 308–09 (D.C. Cir. 2018) (cleaned up). While one count of conviction against Johnson has been dismissed following the Supreme Court's decision in *Fischer*, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95; *see also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense.")

26

Unprecedented is the need for January 6 sentences to promote respect for the law and deter future crime. *See* 18 U.S.C. § 3553(a)(2)(A), (B). The January 6 rioters went far beyond merely breaking the law. "There is a difference between breaking the law and rejecting the rule of law." *See* Opening Remarks, January 6 Select Committee (Rep. Kinzinger).[11]

And the risk of another attack on the Capitol remains. "The heated and inflammatory rhetoric that brought the defendant to the District has not subsided. The lie that the election was stolen and illegitimate is still being perpetrated." *United States v. Cleveland*, 21-CR-159-ABJ, Sent. Tr. at 94-95. If we are to prevent another January 6 and restore respect for the rule of law, sentences in these cases must send a message, and that message will not be conveyed by treating the January 6 riot as a run-of-the-mill offense.

In addition to departing upwards, other courts have varied upward from the advisory guideline range specifically because of the unique and serious nature of the crimes committed that day; this Court should do no less. *See United States v. Reffitt,* 21-CR-87-DLF, Mem. Op. and Order 4/10/24 at 10-11 (upward variance would be justified because "as other judges in this district have noted, the proceedings at issue on January 6, 2021 were of much greater significance than run-of-the-mill 'judicial, quasi-judicial, and adjunct investigative proceedings'"); *United States v. Fonticoba*, 21-CR-368-TJK, Sent'g Tr. 1/11/24 at 66–67 (stating that, even if the defendant's § 1512 conviction were invalidated, a significant upward variance was warranted to account for the defendant's intent "to obstruct the proceeding and the nature of the proceeding itself"); *United*

---

[11]  Available at https://www.cnn.com/2021/07/27/politics/read-kinzinger-remarks-0727/index.html

*States v. Secor*, 21-CR-157-TNM, Sent. Tr. 10/19/22 at 53 ("I believe both the seriousness of the event — you obstructed the certification of an official proceeding — and your particular role in it . . . require a significant upward variance"); *United States v. Hale-Cusanelli*, 21-CR-37-TNM, Sent. Tr. 9/22/22 at 87 ("I also believe the extensive damage and injuries caused on January 6th with your fellow rioters require additional punishment beyond what my [guideline] calculation allows.").[12]

In this case, the government submits that an upward variance or departure of 30 months (to a sentence of 108 months' incarceration) is warranted to reach an appropriate sentence. As discussed below, similarly situated defendants have received sentences of 84-170 months of incarceration. But Johnson's conduct is remarkable—and all the more deserving of an upward variance or departure—because in several respects no comparator fully captures the culpability of Johnson's conduct that day. On January 6, 2021, Johnson stood near Proud Boys leaders Joe Biggs and Ethan Nordean—individuals sentenced to lengthy terms of incarceration for seditious

---

[12] The D.C. Circuit has made clear that it "ordinarily presume[s] a district court imposing an alternative non-guidelines sentence took into account all the factors listed in § 3553(a) and accorded them the appropriate significance." *United States v. Warren*, 700 F.3d 528, 533 (D.C. Cir. 2012) (quoting *United States v. Ayers*, 428 F.3d 312, 315 (D.C. Cir. 2005)). But as recently discussed in *United States v. Iracks*, 2024 WL 3308241 (D.C. Cir. July 5, 2024), for a sentence above the applicable Guidelines range, the Sentencing Reform Act provides that the district court must state "the specific reason for the imposition of a sentence different from that described [in the Guidelines,]" both orally during the sentencing and on a written form appended to the judgment. 18 U.S.C. § 3553(c)(2) (emphasis added). Accordingly, the government requests that the Court make specific findings that this defendant's "conduct was more harmful or egregious than the typical case represented by the relevant Sentencing Guidelines range" and "explain why the otherwise applicable Guidelines calculation 'does not fully account for the described criminal conduct.'" *United States v. Brown*, 892 F.3d 385, 404–05 (D.C. Cir. 2018) (quoting *Brown*, 808 F.3d at 867, 872 (D.C. Cir. 2015)).

conspiracy for their role in the Jan. 6 attack—and Johnson *mocked* these men for not being aggressive enough as he shouted through his megaphone that if the crowd just "shouted about Antifa" and did not reach to the Capitol, it would do "nothing." Johnson was single-minded that day in encouraging and facilitating the riotous mob's breach of the Capitol, and as the video evidence and co-defendant Randolph's own statements demonstrated, Johnson's directives to the crowd encouraged the first breach of the restricted perimeter. His various statements show that he went to the Capitol with the intent to stop the certification, and his intentions were serious: he came prepared with a megaphone and walkie talkies, ready to organize rioters to help breach the Capitol, as he ultimately did, and prepared with reinforced gloves, ready to move fencing and barricades, as he ultimately did. He directed violence, encouraged violence, and participated in violence himself as he cleared the path for the crowd of rioters to overrun the Capitol in multiple ways. Johnson's Guideline's calculation does not reflect the severity of his conduct, and so the Court should use its authority to depart or vary upward to impose a sentence that appropriately reflects the severity of Johnson's conduct.

## VI.     SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.     Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Johnson's felonious conduct on January 6, 2021 began a massive riot that almost succeeded in preventing the certification of the Electoral College vote, frustrating the peaceful transition of Presidential power, and throwing the United

States into a Constitutional crisis. But even when viewed outside the aggregate harm caused by the riot, Johnson's individual conduct was singularly culpable and consequential. Johnson was one of only a few defendants who started the riot. When Johnson urged the crowd gathered at the Peace Circle to breach the restricted perimeter and violently confront the officers stationed on the Walkway, no one had breached the restricted perimeter, confronted police, or physically injured any officer. And once inside the restricted perimeter, Johnson faced officers who did no more than stand behind bike racks. Johnson imitated no one when he and his codefendants violently rocked those barricades, lifted them, and shoved them into officers guarding the Capitol's perimeter. Instead, he and his codefendants became the example that numerous rioters chose to follow. After helping to lead the violent first attack against police on January 6, Johnson continued to rally rioters at strategically significant points: he beckoned rioters forward to the West Front as the crowd overwhelmed the police line established there, and he later rallied individuals on the Southwest Lawn to "flank" the building as part of his larger effort to disrupt the Congressional proceedings inside. Johnson not only dictated orders akin to a military commander, he also engaged in combat against officers. The nature of Johnson's criminal conduct was egregious, and examining the broader circumstances and consequences of his actions show the great harm they caused.

### B.  The History and Characteristics of the Defendant

Johnson is 39 years old and resides in eastern Virginia, where he owns and operates a tree removal business. Although he has no criminal record counting toward his Criminal History Score under the Sentencing Guidelines, Johnson was arrested and charged with assault in July 2013, and he was arrested for marijuana possession in November 2013 after being pulled over for driving at

a high rate of speed and observed to be under the effects of marijuana.[13] Johnson has no mitigating physical, mental, or substance abuse issues. *See* PSR ¶¶132-139.

### C.    The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law

As with the nature and circumstances of the offense, this factor supports a sentence of incarceration. Johnson's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.")

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### *General Deterrence*

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C.§ 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[14] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

---

[13] Johnson reported to Probation that he does not own any firearms. However, when FBI searched Johnson's home on April 13, 2021, the FBI photographed several long rifles, handguns, a large gun safe, green, military-style ammunition boxes, plate armor carrier vests, large mace cannisters, and walkie talkies.

[14] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

*Specific Deterrence*

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration. Johnson has not expressed a scintilla of remorse for his violent conduct on January 6. On the evening of January 6, 2021, when Johnson was recorded reflecting on his actions that day, it was not contrition, but pride that he expressed. He bragged about the police lines he broke and the violence he engaged in, even though he would have by then formed an understanding of the destruction caused.

Lastly, the severity and duration of Johnson's conduct on January 6, 2021 indicates that a lengthy term of incarceration is necessary to deter him from such behavior in the future. Evidence indicates that Johnson's conduct was not spur-of-the-moment and he was not merely swept along with the crowd. For instance, Johnson brought the items with him that he used in his criminal activities: he brought a megaphone with him to the Capitol and immediately used it to direct rioters and incite breaches and violence, and he also wore reinforced gloves to the Capitol and moved bike racks and fencing in multiple locations. Also, Johnson did not leave after the first incident of violence or after seeing Sergeant Edwards seriously injured. Instead, he stayed at the Capitol for a prolonged period—from approximately 12:40 p.m. to at least 2:05 p.m. Johnson also took on a leadership role and strategized while at the Capitol for that prolonged period, beckoning rioters forward to the Lower West Terrace as the crowd overwhelmed the police line established there, and rallying individuals on the Southwest Lawn to "flank" the building to help disrupt the Congressional proceedings inside. This series of calculated and deliberate decisions suggests that Johnson needs additional deterrence to keep him from repeating similar offenses. Accordingly, a

significant sentence of incarceration is necessary to prevent and deter Johnson from repeating such conduct in the future.

### E.     The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.     Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[15]

---

[15] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[16] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

In *United States v. Craig Bingert* 21-cr-91 (RCL), the defendant was found guilty after a bench trial of several counts including 18 U.S.C. § 111(a)(1), 18 U.S.C. § 1512(c)(2), and 18 U.S.C. § 231(a)(3). Judge Lamberth sentenced the defendant to 96 months of incarceration. Bingert, along with others, charged up the stairs on the West front of the Capitol as the officers retreated. Once the defendant reached the top, he chanted "let us in!" with other rioters. After spending several minutes near the police line and filming another rioter spray the officers with a fire extinguisher, Bingert joined with others to forcibly push bike racks into the line of police officers for at least 15 seconds. One of the officers was struck in the leg causing pain. Bingert remained on the Upper West Terrace for hours watching the violence in the Lower West Terrace tunnel and had to be forced off the terrace by police.[17] Johnson's conduct was similarly violent,

---

[16] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

[17] Additionally, Judge Lamberth has indicated in at least one post-*Fischer* Capitol Siege case that he already carefully considered the 18 U.S.C. § 3553(a) factors in fashioning the defendant's sentence and did not intend to reduce the defendant's sentence to a post-*Fischer* guidelines sentence, despite the potentially drastic change to the defendant's guidelines range. *United States v. Hostetter,* 21-CR-392-RCL, ECF 507, at 4-5 ("Mr. Hostetter too hastily presumes that this Court would necessarily give a Guidelines sentence on remand. In crafting its original sentence, the Court

and Johnson's role in starting the violence of January 6 was far more consequential than Bingert's. Further, Johnson did more than engage in such violence; he directed, encouraged and facilitated it. This is a significant aggravating factor that justifies a more serious sentence of incarceration against Johnson.

Another comparator is *United States v. Peter Schwartz*, 21-CR-178 (APM). Schwartz played a significant role in escalating the violence on that day. Schwartz threw a chair at the police line on the West Front, creating an opening in the police line for rioters to flood through. Schwartz then used two separate canisters of the pepper spray left behind by the fleeing officers to spray, and assist co-defendants in spraying, officers both at the West Front and again in the Lower West Terrace Tunnel. Like Johnson, Schwartz expressed pride, not remorse, following that day: Schwartz bragged about his role in the January 6th riot first by texting his friends that he had started a riot, and then by doing interviews with bloggers chronicling his alleged exploits. For his actions, Schwartz was found guilty of four Section 111(b) assault counts, along with obstruction under Section 1512(c)(2), civil disorder, Section 1752 charges and misdemeanors, after a jury trial.

---

considered the Sentencing Guidelines, but also made its own assessment-as it must, according to 18 U.S.C. § 3553(a)-of the factual, personal, and historical circumstances surrounding Mr. Hostetter's offense. While the Supreme Court's decision in *Fischer* may ultimately change the Guidelines recommendation for Mr. Hostetter, *Fischer* does not dictate the Court's application of the 18 U.S.C. § 3553(a) factors to Mr. Hostetter's remaining convictions. The Court may still consider Mr. Hostetter's serious conduct on January 6th, 2021 in its entirety, even if the court of appeals concludes that this conduct no longer constitutes a crime under 18 U.S.C. § 1512."); *see also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)").

The Government recommended 294 months, which in part reflected the serious criminal history that distinguishes Schwartz from Johnson, and Judge Mehta sentenced him to 170 months.

In *United States v. Christopher Alberts*, Case No. 21-cr-26, Judge Cooper sentenced Alberts to 84 months of incarceration and three years of supervised release for violations of 18 U.S.C. §§ 231(a)(3), 111(a)(1), and related offenses under Sections 1752 and 5104, based on the Court's calculated Guidelines range of 78 to 97 months. Like Johnson, Alberts left the "Stop the Steal" rally early to head to the Capitol, and yelled similarly aggressive language as he approached the Capitol that made his intent clear: "taking over the Capitol." Similar to Johnson's antagonistic language directed at officers and Congress, Alberts stated the crowd needed to "make them know who they work for, they work for us, not the other way around." As with Johnson, Alberts also helped lead key breaches of police defenses; Alberts was the first rioter to ascend and reach a staircase landing and the first one to place his hands on a U.S. Capitol Police ("USCP") officer on those stairs. He also repurposed a large, heavy object (a wooden pallet) into a weapon, just as Johnson did. Alberts and Johnson each distinguished themselves from many other violent rioters that day not just by the significance of their violence but by their words spurring others to engage in violence. However, a more serious sentence of incarceration is warranted for Johnson because he, unlike Alberts, provoked and engaged in the violence that kickstarted the breach of the restricted perimeter that day, and while Alberts used similar rhetoric, Johnson sought to use this violent rhetoric to guide rioters in overrunning police defenses, making him more culpable. Johnson also specifically intended to use the violence he was coordinating to obstruct the certification of the 2020 presidential election.

## VII.   RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). But Johnson was convicted of a violation of an offense under Title 18, the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

38

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full restitution without respect to a defendant's ability to pay.[18]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v.*

---

[18] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

*Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Johnson to pay $2,000 in restitution for his convictions on Counts One and Three. This amount fairly reflects Johnson's role in the offense and the damages resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, two thousand dollars has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VIII.   FINE

The defendant's convictions subject him to a statutory maximum fine of $250,000 each for Counts One and Three, and $5000 each for Counts Eight and Nine. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider the defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. §

5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where the defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023).

The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994).

Here, the defendant has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $25,000 to $250,000. U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. As of the date of this filing, the defendant has raised $15,371 in an online campaign created by his wife.[19] Although the page was ostensibly created by his wife, the page offers certain rewards for large donation amounts provided by Johnson himself. For example, for those who give $100, the page states that "Paul will make you a set of 12 rough cut wooden coasters as a way of saying thank you." For donations exceeding $1,000, "Paul will make you a beautiful live edge slab, floating shelf, or cutting board as a way of saying thank you." The page states that "[e]very dollar helps keep Paul free and his family from destitution," and that "ALL unused money raised will be donated to help another person charged as a result of Jan. 6th."

The fundraising page glorifies Johnson's conduct on January 6 and disclaims any wrongdoing entirely, stating "Paul's home was raided April 13th before dawn for attending the

---

[19] fundly.com/stand-4-paul (last visited Sept. 12, 2024).

protest on Jan. 6 … Paul was present that day to stand for all of our freedom" and "We need help to keep this Patriotic American Father free!" The page references a hashtag, #Stand4paul, and links to an Etsy online store titled "Stand4Paul"[20] that appears to have previously sold branded hats and t-shirts reading "Stand with Paul." Johnson should not be able to use his own notoriety gained in the commission of his crimes to capitalize on his participation in the Capitol breach in this way.

## IX.    CONCLUSION

For the reasons set forth above, the government recommends that the Court sentence Johnson to 108 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction.

Respectfully submitted,

MATTHEW M. GRAVES
UNITED STATES ATTORNEY

BY:     /s/ Hutton Marshall
J. HUTTON MARSHALL
KYLE R. MIRABELLI
ALEXANDRA S. FOSTER
Assistant U.S. Attorneys
U.S. Attorney's Office for the
District of Columbia
DC Bar No. 1721890
601 D Street N.W.
Washington, D.C. 20579
(202) 809-2166
Joseph.hutton.marshall@usdoj.gov

---

[20] etsy.com/shop/WoodWomanCrafts (last visited Sept. 12, 2024).