UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | |
| **v.** | Case No. 21-cr-537 (JMC) |
| RYAN SAMSEL, | |
| Defendant. | |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by and through its attorney, the United States Attorney for the District of Columbia, respectfully submits this sentencing memorandum in connection with the above-captioned matter. For the reasons set forth herein, the government requests that this Court sentence Ryan Samsel to 240 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction (totaling $520). The recommended sentence is at the midpoint of the Guidelines range (of 210-262 months' imprisonment), as calculated by both Probation and the government.

I.      INTRODUCTION

Ryan Samsel participated in the January 6, 2021 attack on the United States Capitol—a violent attack that forced an interruption of the certification of the 2020 Electoral College vote count, threatened the peaceful transfer of power after the 2020 Presidential election, injured more than one hundred police officers, and resulted in more than 2.9 million dollars in losses.[1]

---

[1] As of July 7, 2023, the approximate losses suffered as a result of the siege at the United States

1

Samsel was *the* first rioter to breach the restricted perimeter on January 6, 2021. He unilaterally opened a section of fencing at the curb of the Peace Circle – the first barricade separating crowds from the restricted U.S. Capitol grounds – and walked onto the restricted Capitol grounds, paving the way for thousands of other rioters to follow him. Samsel then made his way to a second barrier guarded by U.S. Capitol Police (USCP) officers. He verbally abused officers, and then joined his co-defendant Stephen Randolph (Randolph) in forcibly pushing and pulling on this second barrier – a linked metal, bike-rack barricade. Samsel then participated in the first violent assault of officers defending the Capitol building that day. Samsel and Randolph, along with three other codefendants, lifted the metal barricade above the officers' faces and pushed it into the line of police officers. Samsel and Randolph struck Officer C.E. in the face with their section of the metal barricade with such force that they caused her to stumble backwards and hit her head twice – first on a metal handrail and then again on the steps behind her.

Once the second barricade fell and police were overwhelmed on the Pennsylvania Avenue Walkway, the floodgates opened, and thousands of rioters poured onto the West Front of the U.S. Capitol grounds. Samsel spent the next hour and a half terrorizing the police on the West Front. He assaulted the police with his flag, grabbed another officer's shield, tore at scaffolding, flashed

---

Capitol was $2,923,080.05. That amount reflects, among other things, damage to the United States Capitol building and grounds and certain costs borne by the United States Capitol Police. The Metropolitan Police Department ("MPD") also suffered losses as a result of January 6, 2021, and is also a victim. MPD recently submitted a total of approximately $629,056 in restitution amounts, but the government has not yet included this number in our overall restitution summary ($2.9 million) as reflected in this memorandum. However, in consultation with individual MPD victim officers, the government has sought restitution based on a case-by-case evaluation.

officers, grabbed a 2x4 plank and hurled it at the police line, and threw a pole at a different police line.

Samsel was proud of his actions on that day, taking the time to record a selfie video during the riot and announce with a smile that he had breached the Capitol. Samsel was still proud of his actions years later when he told an interviewer that his actions on January 6th were justified, because "sometimes civil disorder is needed."

The government recommends that the Court sentence Samsel to 240 months' incarceration for his convictions on:

- Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3) (Obstruction of USCP Officers);
- Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b) (Assault of USCP Officer C.E. with a metal crowd control barrier);
- Count Eight, 40 U.S.C. § 5104(e)(2)(D), Disorderly or Disruptive Conduct in the Capitol Building or Grounds;
- Count Nine, 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence in a Capitol Building or Grounds,
- Count Eleven, 18 U.S.C. § 231(a)(3), Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder (Conduct on the West Front against police);
- Count Twelve, 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers (Grabbing USCP Officer's Shield); and
- Count Thirteen, 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon (Throwing Plank of Wood at Officers).

A sentence of 240 months of incarceration reflects the gravity of Samsel's conduct and provides sufficient deterrence given Samsel's continued lack of remorse, active and public rehashing of false narratives, violent criminal history, and interest in assaulting the Capitol again.

//

//

3

## II.    FACTUAL BACKGROUND

### A.    The January 6, 2021 Attack on the Capitol

The government refers the Court to the Statement of Facts (ECF 1-1 at 1-2) filed in this case for a short summary of the January 6, 2021 attack on the United States Capitol by hundreds of rioters, in an effort to disrupt the peaceful transfer of power after the November 3, 2020 presidential election.

### B.    Samsel's Role in the January 6, 2021 Attack on the Capitol[2]

On the morning of January 6, 2021, Samsel traveled from Pennsylvania to Washington, D.C. That same morning, he sent a text to a friend: "Fucking demarcates won Georgia." This text reflected that Samsel was upset about Congress' certification of Georgia's electoral college votes for the 2020 presidential election. That day, Samsel wore a black Trump T-shirt over a light-colored, long-sleeved hoodie, a red "Make America Great Again" hat, light-colored sweatpants, and initially a jeans jacket. At times, he also toted a "Rambo" Trump flag. Samsel and his girlfriend Raechel Genco[3] attended the "Stop the Steal" Rally at the Ellipse and then walked toward the Capitol with a large crowd. Samsel, Genco, and the crowd arrived at the Peace Circle, which is located at the end of Pennsylvania Avenue and at the foot of the U.S. Capitol grounds.

//

---

[2] The Court's Findings of Fact set out the facts elicited at trial in great detail and accurately reference the Government's exhibits. ECF 345 at 4-13. The intent of this memorandum is not to detail all of the facts proven at trial but solely to highlight Samsel's conduct, which underlies the guilty verdict for the counts identified above.

[3] Genco was charged separately in 22-cr-0062-JMC and pled guilty to disorderly or disruptive conduct on Capitol grounds, in violation of 40 U.S.C. § 5104(e)(2)(D).

**The Peace Circle**

The Capitol building and its surrounding grounds were closed to visitors on January 6, 2021, and a restricted perimeter had been established around its grounds in anticipation of the Vice President's visit and the certification of the 2020 election. The restricted perimeter was made clear to the public through linked, metal bike-rack barriers and snow fencing, much of which bore signs that read "Area Closed By Order of the United States Capitol Police Board" ("Area Closed signs"). Bike-rack barriers were placed on the sidewalk next to the road at the Peace Circle, a traffic circle at the end of Pennsylvania Avenue on the northwest side of the Capitol grounds, to mark the western boundary of the restricted area. Each bike rack weighs approximately 25 to 50 pounds.

Additional barriers were established within the outer perimeter to further restrict access to the building. One such barrier was a barricade of bike-racks, reinforced with snow fencing and zip ties, with several Area Closed signs attached, that barred the way up the Pennsylvania Avenue Walkway towards the Capitol building. The Pennsylvania Avenue Walkway is a footpath that runs from the West Plaza of the Capitol building to the sidewalk at the road in the Peace Circle.



***Government Exhibit 12 - Layout of the Peace Circle and Pennsylvania Avenue Walkway barriers***

Between approximately 12:40 and 12:50 p.m., Samsel and his co-defendants, Randolph, James Grant (Grant), Paul Johnson (Johnson), and Jason Blythe (Blythe), joined with other rioters on the roadway at the Peace Circle, just outside the outer perimeter barricades at the sidewalk. During that time, five USCP officers, including Officers D.C. and C.E., were positioned at the top of a staircase and behind the second barricade on the Pennsylvania Avenue Walkway. USCP Sergeant T.L., who led their unit that day, was nearby on the West lawn.

While on the roadway, Johnson used his megaphone to encourage and incite the crowd – including his codefendants – to descend on the Capitol building. Gov. Exs. 304 and 340. While pointing at the Capitol building, Johnson yelled "we can shout about Antifa all day long, but unless we get in there, it means nothing." Gov Exh. 340 at 00:55 - 1:01. Johnson yelled at the crowd to

"Get on the front lines," and to "1776 this fence right here." Gov. Exh. 304. He rhetorically asked the crowd, "Do you think George Washington would be standing behind this motherfucker?" Gov. Exh. 304, and complained about women, instead of men, being on the "front lines" at the Peace Circle, Gov. Exh. 340 at 1:24–1:31.



*Government Exhibit 304 at 4 seconds*
*Johnson in yellow circle, Samsel in red*

While Johnson yelled to "get on the front lines" and "where my men at?" Samsel made his way towards the bike-racks at the curb of the Peace Circle. Gov. Exs. 304 and 340 at 1:25 – 2:00.

At approximately 12:53 p.m., Samsel opened a section of the first metal bike rack barricade, which demarcated the restricted area, at the sidewalk next to the road at the Peace Circle. Gov. Exs. 201 at 13:14-13:21; 204 at 13:12-13:18; 309 at 00:10-:0030; 340 at 2:38 – 2:59. Undeterred by uniformed police officers, "Area Closed" signs, and physical barricades, Samsel defiantly tore down the fencing at the curb and walked onto the restricted grounds and toward the officers on the Pennsylvania Avenue Walkway, marking the very first breach of the restricted

perimeter on January 6.[4] Grant followed closely behind Samsel, excitedly jumping up and down and waving the crowd towards the second barrier on the Pennsylvania Avenue Walkway. *Id.; see also* 302 at 00:00-00:07. Hundreds of protesters followed Samsel's and Grant's lead, stepping past the first barricade and walking towards the second barricade.

Once they saw the breach, five USCP officers descended the stairs to man the second barricade. ECF 317 at 113:10–19; Gov. Exh. 201 at 13:00–13:20. Sergeant T.L. joined Officers C.E. and D.C. and three other officers on that Pennsylvania Avenue Walkway barricade. ECF 315 at 78:23–80:1; *see also* Gov. Exh. 302 at 00:05. As Samsel and Grant approached the officers at the second barricade, Johnson now directed his chants at the officers, yelling through the megaphone "We pay your bills!" and "You back the fuck off!" Gov. Exh. 302 at 0:00 – 00:15.

Samsel was amongst the first to reach the second line of fencing. He positioned himself at the front, up against the fencing, and began shouting at the officers manning the barricade. Samsel falsely told Officer D.C. that he (Samsel) was a Marine and should be allowed to pass.[5] After Officer D.C. responded that the area was closed and that Samsel could not enter, Samsel forcibly pushed and pulled the fencing back and forth. Gov. Exh. 302 at 00:15 – 00:40. The officers held onto the barricade, and Officer D.C. gave verbal warnings. Gov. Exh. 302 at 00:29 – 00:35. Samsel stopped pushing long enough to remove his denim jacket and hand it to someone off-camera and turn his red "Make America Great Again" hat around backwards, as though preparing for a fight.

---

[4] Samsel understood the import of the moment. He crowed about his achievement to his friends when he texted them on January 6th and 7th: "Dude no shit I started it" (Gov. Exh. 1103R); "I was first one over the fence bro everybody followed me we went nuts lol[.]" (Gov. Exh. 1103W).
[5] Samsel is not, nor has he ever been, a Marine. The FBI confirmed that Samsel had not served in the U.S. military, and Samsel conceded as much when he was interviewed by the FBI post-arrest.

Gov. Exh. 302 at 00:35 – 00:45.



*Government Exhibit 302 at 42 seconds Samsel (red circle) and*
*Grant (blue circle) with Officer D.C. on the inside of the barricade.*

Randolph began to forcibly push and pull on the fence directly across from Officer C.E. Gov. Exs. 302 at 00:51 – 00:57, 308 at 00:37. Samsel joined Randolph in lifting the portion of the bike rack barricade off the ground across from Officer C.E., while Grant and Johnson lifted the portion across from Sergeant T.L. and Officer D.C. Gov. Exs. 302 at 00:55-1:00, 308 at 00:39-00:45. Blythe moved forward and grabbed the bike racks in between Johnson and Grant, and the five defendants together drove the metal bike rack barricade up and into the officers. Gov. Exs. 302 at 00:55-1:02; 308 at 00:37-00:47; 309 at 1:25-1:31.



*Government Exhibit 302 at 56 seconds: All five defendants pushing the barricade at the police line (Samsel circled in red)*



*Government Exhibit 308A at 19 seconds: Samsel (circled in red) and Randolph (circled in purple) pushing the barricade against Officer C.E. (orange arrow)*

As the defendants drove the metal bike-rack barricade at the police line, Samsel and Randolph struck Officer C.E. in the face with the bike rack. ECF 345 at 9 (citing ECF 317 at 42:7–43:12; *see also* Gov. Exh. 308A 0:25–37).



*Government Exhibit 308A at 36 seconds: Samsel and Randolph (both circled in red) pushing into the barricade as Officer C.E.'s head hits the handrail (orange arrow)*

The force threw Officer C.E. back and caused her to slam her head twice: first against a metal handrail, then against the steps. *Id.* (citing Gov. Exh. 308 at 0:44–46; ECF 317 at 44:12–45:10). She lost consciousness and suffered a concussion. ECF 345 at 22.[6] Someone picked her up from the stairs and put her on her feet.[7] Once on her feet, Officer C.E. testified that she was

---

[6] Officer C.E. testified, "the last thing that I really remember at that time was hearing that loud clang of my jaw hitting the metal handrail." Trial Tr. 10/25/23 (pm) at 42. Officer C.E. lost consciousness when her jaw hit the handrail, so she did not remember her head hitting the stairs. *Id*.

[7] Thereafter, Samsel texted and told others that he helped Officer C.E. up. Video evidence shows that Samsel's version of events is, at best, incomplete. Although Samsel did walk around the barricade towards Officer C.E., it was another rioter who initially checked on Officer C.E. and

"incredibly confused," "dazed" and could not focus. Trial Tr. 10/25/23 (pm) at 44-45. *See also id.* at 47 ("The lights were on but no one was home…."). The next thing she remembered was her fellow officer telling her that they had to go, and "adrenaline, survival" kicked in. *Id*. at 45.

Officer C.E. was later transported to the hospital by ambulance after appearing groggy and incoherent, and then passing out a second time in front of a coworker. ECF 345 at 22. At the hospital, Officer C.E. described the pain she felt as "excruciating." ECF 345 at 22.[8] This pain lasted several weeks and required Officer C.E. to undergo physical therapy. ECF 345 at 22-23.

It took until April 2021 for Officer C.E. to regain her balance and drive a car. Trial Tr. 10/25/23 (pm) at 60. From January through April, she could only get up for 30 minutes or less before succumbing to bouts of vertigo and vomit. *Id*. at 61. She was on desk duty starting in May 2021, and stayed on desk duty for a year and a half. *Id.* at 63-64. She described it as "demoralizing," because desk duty was "not being a police officer." *Id.* at 64. In November 2021, she suffered another episode where she lost consciousness and again taken by ambulance to the hospital. *Id.* She returned to full duty in July 2022. *Id.* at 64. She remains on medication for her head injury,

---

started to help her up; Samsel merely joined in. Gov. Exh. 309 at 1:29 to 1:36. Additionally, Samsel lied and texted others that he returned Officer C.E.'s hat when he met up with her again on the West Front. The same protester who helped Officer C.E. up also returned her hat. *See* Gov. Exh. 308A at 1:25 to 1:30 (other rioter trying to give Officer C.E. her blue ski hat), 1:59 (Officer C.E. has her hat in her hand at the steps, before she sees Samsel again on the West Front); Gov. Exh. 309 at 1:36 to 1:39 (other rioter leans down, retrieves hat from the ground, and returns it to Officer C.E.).

[8] Officer C.E. described the pain as "absolutely excruciating…. I had to clamp my mouth shut to try to keep from … either screaming, throwing up or crying. It was just horrible. It felt like somebody was taking my head and trying to, like, tear it apart. I can't describe to you the pain that was … emanating from the back of my head." Trial Tr. 10/25/23 (pm) at 58. She explained that the pain was coming from the spot where her head had hit the stairs. *Id.* at 58-59.

but she still gets migraines. *Id.* at 64-65 ("I would say a bad month I would have about one [migraine] a week and on a good month, I'd have one a month.") The migraines last from four hours to two days. *Id.* at 65.

Samsel's codefendants Grant, Johnson, and Blythe used their portion of the bike-rack barricade to drive Officer D.C. and Sergeant T.L. several feet backwards until their backs hit the stairwell behind them. Gov. Exs. 302 at 1:01; 309 at 1:26-1:29. At the time, Officer D.C. feared being trampled by the crowd. ECF 345 at 28 (citing ECF 317 at 120:13–121:7).

Once over the barricades, Samsel continued to flout the USCP officers' attempts to put the barricade back up and their orders to "get back." Instead of stepping back, Samsel stepped around the barricade, grabbed an officer's arm and shoved it down, and told the officer, "I saved you'all," (Gov. Exh. 308 at 1:14 to 1:18), presumably referencing the fact that he was the second person to assist Officer C.E. off the ground after he shoved a barricade into her face.

By this point, the barricade was down, and the officers outmanned. The defendants and the rest of the rioters quickly overwhelmed the police line, and the USCP officers retreated up the Pennsylvania Avenue Walkway towards the Capitol building. The rioters, including the five defendants, charged towards the Capitol building on the Pennsylvania Avenue Walkway and onto the West Front. Gov Exs. 302, 305, 306, 308, 309, 310, 311, 331.

**Civil Disorder on the West Front**

At approximately 12:59 p.m., just minutes after the Peace Circle assault, Samsel and other rioters overran the West Front, where they were stopped by a thin line of USCP officers positioned against temporary staging constructed for the inauguration. MPD officers later arrived to assist the

USCP and helped establish a defensive bike rack barricade on the West Plaza. Over the next hour and a half, Samsel prowled up and down the West Front, aggressively taunting, pushing and throwing objects at police officers.

*Grabbing a Police Shield and Pushing into an Officer*

On third party video, Samsel can be seen at the front of the mob, standing directly across from and yelling at an officer in riot gear on the south side of the West Front:



*Government Exhibit 314 at 2:53: Samsel yelling at officer*

He then grabbed onto another USCP officer's shield, and pulled the shield so hard that the hard plastic folded:



*Government Exhibit 314 at 3:06: Samsel grabbing and pulling on the police shield*

Samsel also got into a scuffle with a third USCP police officer, where Samsel used his body weight to push into the officer and, when the officer pushed back, Samsel shoved the officer's hands away.



*Government Exhibit 313 at 20 seconds: Samsel after pushing into the police officer*

*Exposing Himself to Police*

At approximately 1:07 p.m., while still at the front of the crowd held back by a thin line of USCP. officers, Samsel stepped toward the officers, turned away, and lowered his sweatpants and underwear, exposing himself to the officers just feet away from them.



***Government Exhibit 1301: Samsel exposing himself to police***

*Assaulting the Police with his Flag*

By approximately 1:37 p.m., Samsel was waving his Rambo Trump flag at officers on the police line, yelling at them that he was a Marine, and berating the police. (Again, Samsel has never been a Marine.) Oddly, as Samsel was repeatedly assaulting officers, he yelled at the officers that they should be ashamed of themselves for treating him (Samsel) so poorly after he fought for them as a Marine. Samsel repeatedly lowered his flag onto the officers, so that it covered the officers' helmets and impeded their view.



***Government Exhibit 307 at 52 seconds: Samsel's Rambo Trump flag on the police***



***Gov. Exhibit 407 at 4:22: Samsel berating police***



***Government Exhibit 408 at 18 seconds: Samsel again berating the police with his flag in hand***

At several points, Samsel choked up on the flagpole and made as if he were about to swing it at the police officers:



***Government Exhibit 411 at 5:30: Samsel choking up on the flagpole
as if to swing it at the police***



***Government Exhibit 408 at 1:03: Samsel again acting as if to swing his flag at the police***

*Tearing Scaffolding and Throwing a Wood Plank at the Police*

Samsel continued moving north on the West Front and tore the white protective tarp

covering the scaffolding on one of the grandstands.



*Government Exhibit 325 at 5 seconds: Samsel pulling down the tarp covering the scaffolding*

Samsel then walked under the scaffolding and picked up a 2x4 plank from the ground.



*Government Exhibit 324 at 20 seconds: Samsel under the scaffolding with the plank in his hand*

Armed with the plank, Samsel walked back into the crowd on the West Front, across from the police line. *Id.* Once arrived, Samsel hurled the plank at MPD officers, causing one to duck. Gov. Exs. 412, 202, 902.

An MPD Captain testified at trial that objects, such as the plank, flying through the air at police caused him grave concern for the safety of his officers. He testified that these objects "could cause severe injury, such as lacerations, concussions. It could end somebody's career. It could kill somebody." 10/26/23 Trial Tr. at 163.

*Throwing a Pole at the Police*

Samsel also threw what appears to be a curved metal pole at the police line, which was a

few feet away. *See* Gov. Exh. 318.

Samsel                                    Pole

      

*Government Exhibit 318 at 4 seconds: Samsel preparing to throw the pole*     *Government Exhibit 318 at 5 seconds: Samsel throwing the pole*

Samsel told the FBI --and subsequently bloggers-- that he left the U.S. Capitol grounds at around 2:30 p.m., Gov. Exh. 504 at 26:50, which meant that Samsel was wreaking havoc on restricted Capitol grounds for over an hour and a half.

*Celebrating Breaching the Capitol*

Samsel took a selfie video of himself and Genco, smiling and announcing that they had "breached the Capitol." Gov. Exh, 1103B.



***Government Exhibit 1103B at 4 seconds:***
***Samsel celebrating the breach***

On January 6th, Samsel sent the below picture (Exh. 1103D) to his friend with the text "me and my marine boys" (Exh. 1103E):



***Government Exhibit 1103D: Samsel (second from left)***
***on restricted Capitol grounds***

Samsel was proud of his assaultive behavior. He texted, "Me on news braking [sic] through the line" (Gov. Exh. 1103I) and attached the following image:



*Government Exhibits 1103F and 1103G*

Later on January 6th, he texted a contact, "Dude no shit I started it[;]" and "I broke through got hit with gas a few times but worth it lol." Gov. Exhs. 1103R and 1103S.

Samsel continued his boasting over the next few days. On January 7, 2021, he sent the same two images and texted, "Me with the red hat braking through the lines joe me and my marines

made it inside capital bro fuckem the two on my left are my big gay marines lol really tho on my way home I'll show you some vedios [sic] bro I'll be at work tomorrow have a good night I was first ones to brake [sic] door down lol[.]" Gov. Exh. 1103T.

He texted others:

- "I'm on cover of time mag I was first one over the fence bro everybody followed me we went nuts lol" on January 7, 2021. Gov. Exh. 1103W.

- "This is all over internet" on January 23, 2021. Gov. Exh. 1103X.

### *Defendant's Statements After January 6th*

*Statements Advocating Another Violent Assault on the U.S. Capitol*

At 2:33 p.m. on November 5, 2024, as the election results were coming in, Samsel contacted Genco, discussed the election and threatened renewed violence "[u]ntil we get what we want." Gov. Exh. 1302. Genco reported that there were power outages in Pennsylvania. She added that "he [Trump] is up in the polls and they're … gettin' frantic. They're trying to do everything possible to stop people from voting." Samsel responded, "*You need to buy a gun man*. I mean you're still allowed to buy a gun. Buy a gun. You're allowed. *'Cuz I need to use it when I get out. I'll just use yours.* Better buy a gun while you can, 'cuz they're going to try to take that away from us.... You need to buy a nice one. Gonna get like two or three AR-15s…. I should write down what I, what you, should get. I mean you can go in there and get'em. *I want a silencer. My shit's gonna be nice. I wanna fucking pick people off from far, real far.*" Gov. Exh. 1302 at 01:25 – 03:00 (emphasis added).[9]

---

[9] Making a misrepresentation in connection with the acquisition or attempted acquisition of a

Later in the call, Genco noted that Trump was ahead in the polls. She added, " I just hope

people … if something does go down, and Trump doesn't win. I just hope people don't like back

down." To which Samsel answered, "*No, you gotta rush the Capitol. I mean, honestly. Do it again.*

*I don't give a fuck.* I'd say it. Go back. Do it again. Who gives a fuck? Who cares? *Do it every*

*time. Until we get what we want.* I mean, I don't give a fuck. I mean, if they can do what they want

and get away with it, beat me up and fuckin' stick me in fucking broom closets. Fuck 'em. Stick

them the fuck in a broom closet. Put Judge Cobb … in a broom closet. That bitch. Play that in

court, too. I don't give a fuck." Gov. Exh. 1302 at 11:50 – 12:40 (emphasis added). [10]

*Additional Statements Advocating Violence*

Samsel's statements on November 5th were not said in a vacuum. Samsel has made

countless statements, which reflect his continued support for and advocacy of violence, even after

he was incarcerated for his actions on January 6th. For example, in a May 24, 2022 jail call with

Genco, in the context of her interacting with the Court and whether to remove her ankle bracelet

while on pretrial release for her criminal case, Samsel called her "you little dumb fuck" and told

her that, "You're like the rest of these little pussy fucks …. If you had any balls, you'd go in there

and start stabbing motherfuckers." Gov. Exh. 502 at 7:55-7:57, 8:40 to 8:56. When Genco declined

---

firearm from a licensed dealer is a separate federal felony. *See* 18 U.S.C. §§ 922(a)(6), 924(a)(2).
[10] In a subsequent letter, Samsel identified himself as a victim. He told his reader that he was "in the hole," because Trump won. *See* Gov. Exh. 1303. "They say I'm a threat to the transfer of power, I told [Genco] joking around we gotta go to DC every year on J6. I also told her she is allowed to buy AR-15 and we are allowed. I should be restored back to normal …. Get the message out that I was charged the day Trump won, and they took my phone, they punished me with new charges because Trump won…. [T]his abuse of power has to end." *Id.* He told Genco, "Please post somthing [sic] asking people to tell Trump the FBI just gave Ryan Samsel charges the day he got elected because I spoke about protecting Trump and our elections." *Id.*

to do that, Samsel responded, "Well, that's how I am. That's how I work. I don't give a fuck. Next time I see an FBI agent, I'll punch'em directly in their goddamn face. I outta call'em up just for an interview just so I can [unintelligible]" *Id*. at 8:56 to 9:10. When Genco again pushed back at this level of aggression, Samsel responded, "That's the problem. People like you out there exist. They're not aggressive enough …." *Id*. at 10:05 to 10:12.

In a June, 2022 letter from jail, Samsel wrote: "Our country is dying do [sic] to lies, greed, power. All these poltions [sic] in office need to go. A woodchiper [sic] sounds good. They need to fear us! We do not need to fear the government! I hope only my Dad is proud of me. I'm in books even the <u>World</u> <u>Almanac</u> <u>Book</u>. I also believe when I get on the news I'll tell people get your wepons [sic] ready kiss your kidds [sic] goodbye and let's fucking go! I have some news media people People who wanna Talk And they like me, I will die happy now After all this government has done to me hell pay backs. " Gov. Exh. 1304 at p.2.

*Statements Painting Himself as Hero and Victim*

In addition to advocating for violence, Samsel's post-January 6th statements also reflect a complete lack of remorse and instead a focus on painting himself as a hero or a victim. While incarcerated, Samsel has given a series of interviews to bloggers, who then posted those interviews on-line. In one interview, Samsel explained that he was "at the front gate … because I was a pissed-off American." Gov. Exh. 503 at 1:10 to 1:13. He added that he had "never heard of a non-violent patriot. Sometimes civil disorder is needed. And I'm sorry I pushed on a gate and that's all I did." *Id*. at 1:17 to 1:30. Much like his false narrative of being a mistreated Marine, Samsel continued to push this fallen hero/patriot narrative, repeatedly alleging that he was the injured party. In

interviews with bloggers, Samsel compared himself to a World War II prisoner of war (Gov. Exh. 504 at 10:20), a "combat soldier who was left behind" (Gov. Exh. 505 at 12:50), and Vietnam War protesters (Gov. Exh. 509 at 26:40 to 26:51).

In the previously referenced letter from jail, Samsel wrote his friend, "As you know I'm accused of starting Jan 6 …. I hope one day people look back and say that was awsom [sic]! Ha Ha That day was so good. A bunch of crazy people I lay in bed a smile when I think of how scared those politons [sic] were. Good motherfucker. I wish more people there were like me …. I'm going to write a book or have somebody eles [sic] write it. I made only 600 dollers [sic] others made 100's of thousands …." Gov. Exh. 1304 at p.1-2.

Samsel lied and told bloggers that he had never been convicted of felonies; he just "got a few misdemeanors when I was a kid for getting in fights." *Id*. at 15:33-16:05. *See also* Gov. Exh. 505 at 9:20-9:30 ("I'm not a convicted felon. I had a few misdemeanors when I was a kid."); Gov. Exh. 506 at 7:45 to 10:40 (lied and said his criminal history was over 15 years old, minimized his criminal history, and lied about "never hurt[ing] nobody"); Gov. Exh. 508 at 6:40 (asserted he only had minor misdemeanors from when he was a kid).

Samsel lied and told bloggers that he lost his eyesight owing to a fight in jail (Gov. Exh. 505 at 8:18 to 8:22; Gov. Exh. 507 at 15:31 to 15:39); lost sight in his right eye (Gov. Exh. 506 at 27:37 to 27:41); lost his eye (Gov. Exh. 514 at 8:32-8:35); and lost use of his left arm (Gov. Exh. 507 at 15:39; Gov. Exh. 514 at 8:33 to 8:36). All of these interviews occurred before trial. At trial, Samsel was clearly able to see through both eyes and had the use of both arms.

Samsel falsely claimed to the public that the Court was denying him necessary medical

treatment. Gov. Exh. 507 ("Judge Cobb refuses to give me any medical."); Gov. Exh. 506 at 30:30 ("Judge keeps denying my medical treatment."); Gov. Exh. 506 at 31:55 ("I hope I'm suffering for a reason.").

Samsel repeatedly provided images of himself in a broom closet with a yoga mat and told bloggers that the jail was punishing him. *See, e.g.,* ECF Dkt. 264 at 5. Even after these images were shown to be manufactured, Samsel used the same images in a civil lawsuit, which he filed in the Eastern District of New York. *See* 24-CV-05026-RPK, Federal Respondents' Memorandum of Law in Opposition to Petitioner's Motion for a Preliminary Injunction, ECF Dkt. 9, at 24 ("Finally, Federal Respondents note that, unrelated to Samsel's unfounded claims concerning inadequate medical treatment, the habeas petition includes, without explanation, photographs seemingly intended to trigger disgust or invoke sympathy concerning his conditions of confinement at the MDC.") (citing Dkt. 1 at 13).





These images, which have appeared not only in motions mentioned above, but also in national media and online, are fabrications. Samsel included the photographs in his August 27, 2023 motion for reconsideration of his detention order in his criminal case (Crim Dkt. Doc. #264). As the Government's response to that motion pointed out, they are staged photographs taken with a contraband cellphone showing Samsel on a yoga mat (not his bed) in a broom closet (not his cell) sitting next to a mop bucket available for use by inmates on his floor (not a toilet), while wearing his BOP issued boxer shorts (having apparently removed his BOP-issued clothing). Crim. Dkt. Doc. #266 at 4-7.).

*Samsel Also Lied About What Occurred on January 6*

In addition to advocating for violence, and trying to paint himself as a patriot, hero and victim,

Samsel's post-January 6th statements consist of a series of lies about what occurred on January 6:

- In one interview, Samsel falsely asserted that "…I pushed on a gate and that's all I did." Gov. Exh. 503 at 1:17 to 1:30. As detailed above, Samsel did much more than just push on a gate, and in fact committed multiple assaults/attacks against police officers, including with dangerous weapons.

- Samsel told bloggers that Ray Epps told him to push the fence into the USCP Officers. Gov. Exh. 504 at 23:23 to 23:40; Gov. Exh. 506 at 13:25-13:40; Gov. Exh. 508 at 18:36 to 19:07. Gov. Exh. 509 at 27:30 to 28:00. However, Samsel told the FBI that Epps told him (Samsel) to calm down, and that Epps tried to defuse the situation. Gov. Exh. 501 at 30:17 – 30:30 ("He [Epps] came up to me and he says, "Dude… relax… the cops are doing their job.' That's exactly what he says to me …."")

Samsel also pushed a false narrative that he actually helped the police at the Capitol on January 6th:

- Samsel lied and told one blogger about a "gentleman" dressed all in black with a face mask who went over to Officer C.E. "I didn't know what he ['gentleman'] was going to do, but I wasn't going to let him put his hands on that female cop." Gov. Exh. 506 at 13:59-14:14. This falsely implies that Samsel was not part of the assault on Officer C.E. and/or that he tried to stop the assault against her.

- Samsel similarly lied to another blogger when he told the blogger that he (Samsel) "pushed that guy out of my way," so he could "go help the female cop," who later vouched for him and told others, "he [Samsel] did nothing." *Id*. Officer C.E. did

not vouch for Samsel or indicate that he did nothing while at the Capitol. Every piece of video evidence reflects that he was an active participate in her assault.

- o Samsel lied and said that he noticed that "the lady cop" had dropped her radio and hat, and he returned them to her. *Id*. at 14:30-14:40. *See also* Gov. Exh. 508 at 20:30 to 20:57 (Samsel alleges that he picked up a radio and hat and returned it to a female officer.) As noted above, another rioter returned Officer C.E.'s hat, and Officer C.E. did not lose her radio.

Samsel falsely told a blogger that the "guy on my right" pushed the gate into the female. Gov. Exh. 509 at 27:54 to 28:01. This statement misleadingly suggests that Samsel played no role in the assault on Officer C.E.

- Samsel also lied and asserted to a different blogger, "I never used a weapon or attacked a cop. Ever." Gov. Exh. 506 at 14:55 to 15:05. He also told bloggers that he and others just wanted to "go on the lawn." *Id*. at 26:00. *See also* Gov. Exh. 508.

- Samsel lied and told another interviewer that the Capitol "wasn't closed that day. It really wasn't." Gov. Exh. 509 at 26:50 to 27:00. As detailed above, the Capitol was closed to the public on January 6, as indicated by the restricted perimeter (signified by bike racks and fencing with Area Closed signs) that Samsel had to disassemble and attack officers with in order to enter restricted Capitol grounds.[11]

//

---

[11] The Government has attached additional recent jail calls where Samsel continues to threaten violence, tell lies and evince complete disrespect for the judicial process. *See* Gov. Exh, 1305.

*Samsel's Additional Criminal Conduct*

On January 30, 2021, Agents seized electronic devices pursuant to a warrant in this case. In downloading one of the devices, which belonged to Genco, agents found multiple images and videos of Samsel possessing and shooting a gun, despite his status as a felon and being on parole:

 

Gov. Exhibit 1306 – Samsel posing with a gun

Gov. Exh. 1307 – Samsel shooting a gun

## III.    THE CHARGES AND CONVICTION

On February 15, 2023, a federal grand jury returned the fourth superseding indictment charging Samsel with 12 counts, Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3) (Conduct at the Peace Circle); Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b) (Off. C.E.); Count Three, Assaulting,

Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b) (Off. D.C.); Counts Five through Seven, 18 U.S.C. §§ 1752(a)(1), 1752(a)(2), 1752(a)(4), 1752(b)(1)(A), 1752(b)(1)(B), and 2, Entering and Remaining, Disorderly and Disruptive Conduct, and Engaging in Physical Violence on Restricted Grounds with a Deadly or Dangerous Weapon; Count Eight, Disorderly or Disruptive Conduct on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(D); Count Nine, Act of Physical Violence on Capitol Grounds, 40 U.S.C. § 5104(e)(2)(F); Count Ten, Obstruction of an Official Proceeding Before Congress, and Aiding and Abetting, 18 U.S.C. §§ 1512(c)(2), 2; Count Eleven, Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder, 18 U.S.C. § 231(a)(3) (Conduct on the West Front against USCP); Count Twelve, Assaulting, Resisting, or Impeding Certain Officers, 18 U.S.C. § 111(a)(1) (Grabbing USCP Officer's Shield); and Count Thirteen, 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon (Throwing Plank of Wood at Metropolitan Police Department Officers). On, February 2, 2024, Samsel was convicted of Counts One, Two, Eight, Nine, Ten, Eleven, Twelve, and Thirteen after a bench trial.[12]

## IV.    STATUTORY PENALTIES

Samsel now faces sentencing on:

---

[12] Samsel was found not guilty of Count Three (the assault of Officer D.C. with a dangerous weapon); three counts related to Samsel's conduct being on restricted grounds: Count Five (entering and remaining in a restricted building or grounds with a dangerous weapon); Count Six (disorderly and disruptive conduct in a restricted building or grounds with a deadly or dangerous weapon); and Count Seven (engaging in physical violence in a restricted building or grounds with a deadly or dangerous weapon, resulting in significant bodily injury, and aiding and abetting). *See* ECF 337 (Court Verdict).

- Count One, Obstructing, Impeding, or Interfering with Law Enforcement During a Civil Disorder, 18 U.S.C. § 231(a)(3) (Obstruction of Officers C.E. and D.C. and other USCP officers);
- Count Two, Assaulting, Resisting or Impeding Certain Officers Using a Deadly or Dangerous Weapon and Inflicting Bodily Injury, 18 U.S.C. §§ 111(a)(1) and (b), (Assault of Officer C.E. with a metal crowd control barrier);
- Count Eight, 40 U.S.C. § 5104(e)(2)(D), disorderly or disruptive conduct in the Capitol building or grounds;
- Count Nine, 40 U.S.C. § 5104(e)(2)(F), Act of Physical Violence in a Capitol Building or Grounds;
- Count Eleven, 18 U.S.C. § 231(a)(3), Obstructing, Impeding, or Interfering with a Law Enforcement Officer During a Civil Disorder (Conduct on the West Front against USCP);
- Count Twelve, 18 U.S.C. § 111(a)(1), Assaulting, Resisting, or Impeding Certain Officers (Grabbing USCP Capitol Police Officer's Shield); and
- Count Thirteen, 18 U.S.C. §§ 111(a)(1) and (b), Assaulting, Resisting or Impeding Certain Officers Using a Dangerous Weapon (Throwing Plank of Wood at MPD Officers).[13]

Samsel faces up to 5 years of imprisonment for Counts One and Eleven, 20 years of imprisonment under Counts Two and Thirteen, and 8 years of imprisonment under Count Twelve, and a term of supervised release of not more than three years, a fine up to $250,000, restitution, and mandatory special assessments of $100 for each felony conviction and $10 for each Class B misdemeanor. Samsel also faces up to 6 months of imprisonment for Counts Eight and Nine. ECF Dkt 451 (PSR at ¶¶ 163-166).

## V.    THE SENTENCING GUIDELINES AND GUIDELINES ANALYSIS

As the Supreme Court has instructed, the Court "should begin all sentencing proceedings by correctly calculating the applicable Guidelines range." *United States v. Gall*, 552 U.S. 38, 49

---

[13] On August 23, 2024, the Government moved to dismiss Samsel's 18 U.S.C. § 1512(c)(2) conviction. *See* ECF 392. On September 3, 2024, the Court granted the Government's motion to dismiss the Section 1512(c)(2) conviction.

(2007). Aside from a minor disagreement on grouping detailed in a footnote below, the Government agrees with the PSR calculations. The Government's Guideline Calculation is as follows:

Count One: 18 U.S.C. § 231(a)(3) (Obstructing USCP Officers at the Peace Circle)[14]

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[15] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(3) | Serious Bodily Injury | +5 |

_____

[14] As detailed above, Samsel obstructed, impeded, and interfered with USCP officers at the Peace Circle in multiple ways. For instance, he was the first rioter to open a section of the first metal bike rack barricade, creating the very first breach of the restricted perimeter on January 6 and allowing thousands of protestors to flood in behind him, then outnumbering and overwhelming the five officers who were manning the second barricade. Samsel also shouted at officers and began to forcibly push and pull on the second barricade, while Officer D.C. held onto the barricade and gave verbal warnings. Samsel then joined Randolph in lifting the metal barricade (a dangerous weapon) off the ground, and striking Officer C.E. in the face with it, causing her to hit her head on the metal handrail and steps and get knocked unconscious and suffer long-term, adverse health consequences (serious bodily injury as explained further below). Once over the second set of barricades, Samsel continued to ignore USCP officers' attempts to put the barricade back up and their orders to "get back," and instead Samsel stepped around the barricade and grabbed an officer's arm, shoved it down, and told the officer, "I saved you'all." Samsel then proceeded to charge towards the Capitol building on the Pennsylvania Walkway to the West Front.

[15] Because no applicable Chapter Two Guideline exists in the Statutory Appendix for this offense, "the most analogous guideline" should be used.  U.S.S.G. § 2X5.1. Here, the most analogous guideline for 18 U.S.C. § 231(a)(3), Obstructing Officers During a Civil Disorder, is U.S.S.G. §2A2.4, "Obstructing or Impeding Officers."  The cross-reference in U.S.S.G. § 2A2.4(c)(1), directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. The commentary to § 2A2.2 defines aggravated assault as "a felonious assault that involved (A) a dangerous weapon with intent to cause bodily injury (i.e., not merely to frighten) with that weapon; (B) serious bodily injury; …or (D) an intent to commit another felony."  U.S.S.G. § 2A2.2, cmt., n.1. Here, the conduct includes the felonious (punishable by up to 20 years' incarceration pursuant to 18 U.S.C. § 111(b)) assault of Officer C.E., which involved a dangerous weapon with intent to cause bodily injury (Samsel and Randolph striking Officer C.E. in the face with a heavy, metal bike rack barricade); serious bodily injury to Officer C.E., as discussed further below; and an intent to commit another felony aside from the assault (Obstructing Officers During a Civil Disorder, in violation of 18 U.S.C. § 231(a)(3)). Accordingly, the aggravated assault cross reference applies and § 2A2.2 is the correct guideline.

| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **29** |

Count Two: 18 U.S.C. § 111(b) (Assault of Officer C.E. with the Metal Barricade)

| U.S.S.G. § 2A2.2(a)[16] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(3)(B)[17] | Serious Bodily Injury | +5 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | § 111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **31** |

---

[16] As discussed above, the cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault, and the assault of Officer C.E. here qualifies as aggravated assault. *See also United States v. Stevens*, 105 F.4th 473, 474–75, 480–81 (D.C. Cir. 2024) (finding that 18 U.S.C. § 231 is "another felony" for purposes of applying the cross-reference to § 2A2.2 and affirming application of the § 2A2.2 guideline to a rioter's assault where he acted "with intent to commit civil disorder under Section 231(a)(3).").

[17] The commentary to U.S.S.G. § 1B1.1 defines serious bodily injury as any "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation." to U.S.S.G. § 1B1.1, cmt., n.1(M). As detailed above, Samsel joined Randolph in lifting a metal bike rack barricade (weighing between 25 and 50 pounds) off the ground, and together they drove the metal bike rack barricade into Officer C.E., striking her in the face with the bike rack. The force threw her back and caused her to slam her head twice: first against a metal handrail, then against the steps. She lost consciousness and suffered a concussion, and later passed out a second time and was transported by ambulance to the hospital. She then felt "excruciating" pain for several weeks and underwent physical therapy; took over three months to regain her balance and ability to drive a car; was forced to stay on desk duty for a year and a half; suffered another episode in November 2021 where she again lost consciousness and was taken to the hospital by ambulance; and to this day remains on medication for her head injury and gets regular migraines (approximately one to four or five migraines a month).

<u>Count Eleven: 18 U.S.C. § 231(a)(3) (Obstructing USCP Officers at the West Front)</u>[18]

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2(a)[19] | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

<u>Count Twelve: 18 U.S.C. § 111(a)(1) (Grabbing USCP Officer's Shield)</u>[20]

| | | |
|---|---|---|
| U.S.S.G. § 2A2.2 | Base Offense Level | 14 |
| U.S.S.G. § 3A1.2(b) | Official Victim | +6 |
| | **Total** | **20** |

//

//

---

[18] As detailed above, Samsel obstructed, impeded, and interfered with officers on the West Front in multiple ways. For instance, Samsel grabbed one officer's shield, pulling the shield so hard that the hard plastic folded; he then pushed into another officer; he also waved his large Rambo Trump Flag at officers, both lowering the flag so that the cloth part of the flag would cover officers' helmets and impede their view and choking up on the pole part of the flag like a baseball bat acting as though he planned to take a swing at officers and he tore the protective tarp covering the scaffolding erected for the Jan. 20, 2021 inauguration.

[19] As noted for Samsel's conduct on the West Front, the cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. Here, Samsel forcefully grabbing and trying to wrestle away an officer's riot shield – pulling it so hard that the shield's hard plastic folded – is also an aggravated assault. The attack is a felonious assault, punishable by up to 8 years' incarceration, pursuant to 18 U.S.C. § 111(a)(1), because it involved physical contact and the intent to commit another felony (Obstructing Officers During a Civil Disorder, pursuant to 18 U.S.C. § 231(a)(3)). A felonious assault involving an intent to commit another felony aside from the assault is an "aggravated assault" pursuant to U.S.S.G. § 2A2.2, cmt., n.1.

[20] As discussed above, the cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault, and Samsel forcefully grabbing an officer's shield qualifies as aggravated assault. *See also United States v. Sargent*, 103 F.4th 820, 825, 829–30 (D.C. Cir. 2024) (rejecting that defendant's argument that an "aggravated assault" is limited to offenses involving dangerous weapons or bodily injury and applying the cross reference to § 2A2.2 where the rioter smacked an officer and had the intent to commit civil unrest).

<u>Count Thirteen: 18 U.S.C. § 111(b) (Throwing Plank of Wood at Officers)</u>

| U.S.S.G. § 2A2.2(a)[21] | Base Offense Level | 14 |
| U.S.S.G. § 2A2.2(b)(2)(B) | Dangerous Weapon | +4 |
| U.S.S.G. § 2A2.2(b)(7) | §111(b) Conviction | +2 |
| U.S.S.G. § 3A1.2(b) | Official Victim | <u>+6</u> |
| | **Total** | **26** |

<u>Counts Eight and Nine: 40 U.S.C. §§ 5104(e)(2)(D) and 5104(e)(2)(F)</u>

Because these offenses are Class B misdemeanors, the Guidelines do not apply to them. *See* 18 U.S.C. § 3559; U.S.S.G. §1B1.9.

*Grouping Analysis*

Pursuant to U.S.S.G. § 3D1.2, closely related counts group:

Group One consists of Count One (obstructing USCP Officers at the Peace Circle, including Sgt. T.L. and Officers C.E and D.C.) and Count Two (the assault of Officer C.E. with a metal bike rack barricade). Counts One and Two do not group under either U.S.S.G. § 3D1.2(a) or § 3D1.2(b) because Counts One and Two do not involve "the same victim," as required for either provision to apply;[22] however, pursuant to U.S.S.G. § 3D1.2(c), the Count Two assault with

---

[21] As noted above, the cross-reference in U.S.S.G. § 2A2.4(c)(1) directs that § 2A2.2 (Aggravated Assault) be applied if the conduct constituted aggravated assault. Here, Samsel hurling a wooden plank at a lone of MPD officers, causing one to duck, is also an aggravated assault. The attack is a felonious assault, punishable by up to 20 years' incarceration, pursuant to 18 U.S.C. § 111(b), because it involved a dangerous weapon (a wooden 2x4 plank, thrown to hurt the MPD officers). Additionally, the assault involved the intent to commit another felony (Obstructing Officers During a Civil Disorder, pursuant to 18 U.S.C. § 231(a)(3)). As previously noted, a felonious assault involving either a dangerous weapon with intent to cause bodily injury or an intent to commit another felony is an "aggravated assault" pursuant to U.S.S.G. § 2A2.2, cmt., n.1.

[22] Officer C.E. is the sole victim in Count Two, but as identified in the Fourth Superseding Indictment and the Court's Findings of Fact and Conclusions of Law, Samsel's victims for Count One—the officers that Samsel obstructed, impeded, or interfered with in overrunning the police line near the Peace Circle—included Sgt. T.L., Officer D.C., and "other officers who formed the

a dangerous weapon/causing serious bodily injury "embodies conduct that is treated as a specific offense characteristic" applicable to the Count One obstruction offense, specifically, the enhancements for use of a dangerous weapon and causing serious bodily injury. Accordingly, Counts One and Two group. Pursuant to U.S.S.G. § 3D1.3(a), the offense level applicable to Group 1 is the offense level "for the most serious of the counts comprising the Group, i.e., the highest offense level of the counts in the Group." The highest offense level for this group is the offense level for Count Two: **31**.

Group Two consists of Count Eleven, which has a unique victim (various U.S. Capitol Police Officers on the West Front, including the officer with the riot shield Samsel attempted to grab and the other officer that he pushed into) and no specific offense characteristics or other adjustments based on the conduct in another count. The offense level for this group is **20**.

Group Three consist of Count Twelve, which similarly has a unique victim (only the officer with the riot shield Samsel attempted to grab) and no specific offense characteristics or other adjustments based on the conduct in another count. The offense level for this group is also **20**.[23]

Group Four consists of Count Thirteen because it involves another unique victim—officers from MPD, and no specific offense characteristics or other adjustments based on the conduct in another count. The offense level for this group is **26**.

---

police line at the second barricade." ECF No. 345 at 15; ECF No. 245 at 2.
[23] The PSR groups Counts 11 and 12 "because they involve the same victim [USCP Officers guarding the West Plaza] and two or more acts or transactions connected by a common criminal objective or constituting part of a common scheme or plan" under USSG § 3D1.2(b). ECF 451 (PSR at ¶ 82). Although the Government groups these two offenses separately, this difference drops out after the grouping analysis, as detailed below.

Counts Eight and Nine are not grouped, because the Guidelines do not apply to them.

Accordingly, there are four Groups:

*Group 1* (Offense Level 31):
- Count One: 18 U.S.C. § 231(a)(3) (Obstructing USCP Officers at the Peace Circle, including Officers C.E. and D.C.) :                    Offense Level (OL) 29
- Count Two: 18 U.S.C. § 111(b) (Assault of Ofc. C.E. with Metal Bike Rack): OL 31

*Group 2* (Offense Level 20):
- Count Eleven: 18 U.S.C. § 231(a)(3) (Obstructing West Front USCP Officers):    OL 20

*Group 3* (Offense Level 20):
- Count Twelve: 18 U.S.C. § 111(a)(1) (Grabbing USCP Officer's Shield):          OL 20

*Group 4* (Offense Level 26):
- Count Thirteen: 18 U.S.C. § 111(b) (Throwing Plank of Wood at MPD Officers):  OL 26

Group One has the highest offense level, 31, and so receives one unit pursuant to U.S.S.G. § 3D1.4(a). Group Four is within five levels of Group One, so it counts as one half unit, pursuant to U.S.S.G. § 3D1.4(b). Groups Two and Three are 11 levels below Group One, so they do not factor into the grouping analysis. *See* U.S.S.G. § 3D1.4(c). One and a half units results in a one-level increase in offense level, pursuant to U.S.S.G. § 3D1.4, and a Combined Offense Level of **32**.

Based upon a total offense level of 32 and a criminal history category of VI, the Guideline imprisonment range is 210 months to 262 months. The maximum sentence which may be imposed on Counts 1 and 11 is 60 months/count (5 years/count). The maximum sentence which may be imposed on Counts 2 and 13 is 240 months/count (20 years/count). The maximum sentence which may be imposed on Count 12 is 96 months (8 years). ECF Dkt. 451 (PSR at ¶ 167).

*Guidelines Range*

The U.S. Probation Office calculated the Samsel's criminal history as category VI, which is not disputed. ECF 451 (PSR ¶ 125). [24] Accordingly, based on the government's and the PSR's calculations of Samsel's combined offense level as 32, Samsel's Guidelines imprisonment range is 210-262 months' imprisonment. The PSR contains the same estimated Guidelines range.  ECF 451 (PSR ¶ 167).

*Other Guidelines Considerations*

After determining Samsel's Guidelines range, the Court then considers any departures or variances. *See* U.S.S.G. § 1B1.1(a)-(c). Samsel's Guidelines range does not capture the unprecedented and uniquely harmful nature of Samsel's crimes, which struck at the heart of our democracy and the rule of law. Moreover, the following information and argument make it clear that – while the government is not advocating for such variance or departure – a Guidelines sentence here is not only reasonable, but fully balances Samsel's conduct and the circumstances in which he committed said conduct. One cannot divorce the gravity of the overall threat to democracy from Samsel's assaultive behavior.

Indeed, as it stands now, nothing in this defendant's guidelines calculation reflects the fact that the defendant was responsible for substantial interference with Congress' work to peacefully transfer power from one administration to the next.[25] There are no specific offense characteristics

---

[24] The zero-point offender reduction does not apply here because (1) Samsel has a significant criminal history, in contravention of 18 U.S.C. § 4C1.1(a)(1); and (2) Samsel used both violence and credible threats of violence in connection with the instant offenses, in contravention of 18 U.S.C. § 4C1.1(a)(3).

[25] The D.C. Circuit's holding in *United States v. Brock*, 94 F.4th 39 (D.C. Cir. 2024), finding that

here for attacking democracy or abandoning the rule of law. Thus, a sentence in the defendant's guidelines range properly ""reflect[s] the seriousness of the offense," "promote[s] respect for the law," and "provide[s] just punishment for the offense." 18 U.S.C. § 3553(a)(2)(A).

It is not hyperbole to call what happened on January 6 a crime of historic magnitude. As judges of this district have repeatedly and clearly stated, January 6 was an unprecedented disruption of the nation's most sacred function—conducing the peaceful transfer of power "The events that occurred at the Capitol on January 6th will be in the history books that our children read, our children's children read and their children's children read. It's part of the history of this nation, and it's a stain on the history of this nation." *United States v. Miller*, 21-CR-75-RDM, Sent. Tr., at 67. But just as the history books will describe the crimes of January 6, so will they tell the story of how this nation responded. Future generations will rightly ask what this generation did to prevent another such attack from occurring. The damage done to this country on January 6 must be reflected in the sentences imposed on those who caused the damage—it must not be treated as just another crime.

Even before *Fischer*, judges of this Court gave significant upward departures and/or variances in January 6 cases when they found the advisory guideline range inadequate. *See, e.g.,*

---

certain sentencing enhancements did not apply to the Congress's counting and certification of the electoral college votes, despite acknowledging that interference with this process "no doubt endanger[ed] our democratic process and temporarily derail[ed] Congress's constitutional work" demonstrates that the Sentencing Commission failed to anticipate anything like the January 6 riot when drafting the Guidelines. And the Supreme Court's recent decision in *United States v. Fischer*, -- S.Ct. -- (2024) demonstrates that even the criminal code lacks the appropriate tools to fully address the crimes of January 6. *See Fischer*, slip op. at 29 (Barrett, J., dissenting) ("Who could blame Congress for [its] failure of imagination?").

42

*United States v. Hale-Cusanelli*, 21-CR-37-TNM, 9/22/22 Sent. Tr.; *United States v. Christian Secor*, 21-CR-157-TNM, 10/19/22 Sent. Tr.; *United States v. Hunter and Kevin Seefried*, 21-CR-287-TNM. 10/24/22 Sent. Tr.; *United States v. William Watson*, 21-CR-513-RBW, 3/9/23 Sent. Tr.; *United States v. Riley Williams*, 21-CR-618-ABJ, 3/23/23 Sent. Tr.; *United States v. Hatchet Speed*, 22-CR-244-TNM, 5/8/23 Sent. Tr.

Since *Fischer*, judges have similarly sentenced defendants to account for the disparity between the guidelines and the actual context. For example, in *United States v. Sparks*, 21-cr-87-TJK, Judge Kelly sentenced a defendant with an advisory guidelines range of 15-21 months to 53 months' imprisonment. In doing so, the Court applied U.S.S.G. §§ 5K2.7 and 5K2.21, and noted that the jury had found that the defendant had the corrupt intent to interfere with Congress. Because Sparks' advisory guideline range was driven by the § 231 conviction, that range did not "account for the defendant's intent to obstruct, not just law enforcement officers doing their duty under that statute, but a proceeding, or for the purposes of [U.S.S.G. §] 5K2.7, a governmental function. Sentencing Tr., at 94-95. And not any proceeding, but one foundational to our country's governance." *Id.* at 93. The court found Sparks' intent to "interfere or obstruct with the electoral college vote certification . . . plays an important role in explaining why" Sparks' advisory guideline range did not fully account for his criminal conduct. *Id.* at 94.

Other judges have recognized this disparity too. *See United States v. Robertson*, 21-cr-34-CRC (imposing an upward departure because the conduct resulted in a significant disruption of government); *United States v. Dunfee*, 23-cr-36-RBW (imposing an upward departure because the guidelines no longer adequately captured the defendant's intent to stop the peaceful transfer of

power). While the Supreme Court's decision in *Fischer* has changed defendant's advisory Guideline range, "*Fischer* does not dictate the Court's application of the 18 U.S.C. 3553(a) factors [because] the Court may still consider [defendant's] serious conduct on January 6th, 2021 in its entirety. To reduce [defendant's] sentence . . . would require this Court to take a drastically different view of [defendant's] conduct." *United States v. Hostetter*, 21-CR-392-RCL, ECF 507, at 4-5 (cleaned up). Indeed, "*Fischer* does not mean that I cannot consider at sentencing evidence that establishes that the defendant intended to obstruct Congress' certification of the electoral vote in determining whether . . . the resulting guideline range fully accounts for the criminal conduct." *Sparks* Sentencing Tr. at 95. *See also United States v. Kelly*, 21-CR-708-RCL, ECF 151, at 5 ("Nothing about *Fischer* or any hypothetical outcome of [defendant's] appeal bears directly on the severity of his conduct on January 6th . . . . Likewise, the outcome in *Fischer* would not dictate the Court's application of the sentencing factors prescribed in 18 U.S.C. § 3553(a)"); *United States v. Jensen*, 21-CR-6-TJK, Sent. Tr. at 16 ("given the importance and the significance of the proceeding of certifying the Electoral College votes, I would vary upward -- even if this [sentencing enhancement] didn't apply, I would vary upward when considering the nature of the offense."); *United States v. Tuck*, 21-CR-378-TJK (Jan. 8, 2025 Sentencing) (upward variance applied where guideline calculation did not fully account for the criminal conduct).

　　　　To be clear, the fact that the government is not seeking a variance or departure does not diminish the gravity of our request and the need to appropriately account for the conduct and the crime.

## VI.    SENTENCING FACTORS UNDER 18 U.S.C. § 3553(A)

In this case, sentencing is guided by 18 U.S.C. § 3553(a). As described below, on balance, the Section 3553(a) factors weigh in favor of a lengthy term of incarceration.

### A.    Nature and Circumstances of the Offense

As shown in Section II(B) of this memorandum, Samsel's felonious conduct on January 6, 2021 was part of a massive riot that almost succeeded in preventing the certification vote from being carried out, frustrating the peaceful transition of Presidential power, and throwing the United States into a Constitutional crisis. Samsel was the first rioter to breach the restricted perimeter, opening the floodgates for the thousands of rioters that followed. Samsel also played a key role in the very first act of violence against the police, seriously injuring a USCP Officer. Samsel wreaked havoc on Capitol Grounds for at least an hour and a half, engaging in multiple acts of violence against USCP officers and the MPD officers called to the Capitol as reinforcements, and bragged about his experience at every opportunity thereafter. The nature and circumstances of Samsel's offenses were of the utmost seriousness, and fully support the government's recommended sentence of 240 months of incarceration.

### B.    The History and Characteristics of the Defendant

Samsel is 41 years old. Before his detention in this case, Samsel lived in the Philadelphia suburbs. He has a sporadic employment history, most recently as a barber, for approximately two years, before his license was suspended. ECF 451 (PSR at ¶ 155).

Samsel has an extensive and ever-escalating criminal history of violence, largely against women. It includes an arrest on October 4, 2003 for possessing an instrument of crime and

disorderly conduct with an offensive weapon after Samsel swung a knife and yelled obscenities at medical staff responding to a medical call, for which he was sentenced to one year of probation. ECF 451 (PSR ¶ 114). That was followed by an arrest on May 9, 2006 for terroristic threats, reckless endangerment of another, and disorderly conduct. *Id*. at ¶ 115. The May 2006 arrest occurred because Samsel tried to run someone off the road over a $60 debt. He forced the victim to pull over, approached her vehicle and punched her windshield, telling her he knew where she lived and would kill her if he didn't get his money. On August 2, 2006, he was sentenced to two years' probation. *Id*.

Before resolving his May 9 arrest, however, on July 25, 2006, Samsel was arrested for possession of marijuana and drug paraphernalia. ECF 451 (PSR ¶ 116). He was convicted for the marijuana offense on February 28, 2007, and sentenced to a year of probation. *Id*.

While apparently still subject to that term of probation, Samsel was arrested on November 16, 2006, for trespass for walking onto a fenced-in area demarcating private property to smoke marijuana. On February 28, 2007, he received a sentence of confinement for 1-18 months with immediate parole, which was revoked on July 29, 2009. ECF 451 (PSR ¶ 117).

On June 29, 2007, Samsel was arrested for simple assault and disorderly conduct. ECF 451 (PSR ¶ 118). In this case, Samsel got into another man's car and began hitting him in the face. Someone called an ambulance for the man, who was badly beaten; the police observed his front teeth were missing and his face was bloody. This assault resulted in a November 15, 2007 sentence to two years of probation.[26]

---

[26] Samsel claimed that he actually assaulted this victim twice, stating that he kicked in the victim's

On February 28, 2009, Samsel was arrested for simple assault and recklessly endangering another person. ECF 451 (PSR ¶ 119). In this case, Samsel convinced the victim (his ex-girlfriend) to come to his residence to receive money for a debt. For approximately four to five hours, Samsel held the victim at his residence where he repeatedly punched, pushed, and choked her, and caused injuries, including chipped teeth and swelling and discoloration to the head, face, hip, neck and thigh. On July 27, 2009, Samsel was sentenced to two years' probation, which was revoked two years later and replaced with a sentence of confinement for 1-2 years.

On July 5, 2010, Samsel was arrested for simple assault, recklessly endangering another person, unlawful restraint/serious bodily injury, disorderly conduct/engaging in fighting and harassment, ECF 451 (PSR ¶ 120), for smashing a hot pizza into his pregnant girlfriend's face, beating her, pouring a beer over her head, and eventually throwing her into a canal, which he then jumped into, so he could hold her head under water. When Samsel finally stopped holding her, the victim ran into the street barefoot and found a police vehicle. She desperately tried to open the door of the vehicle until the officer saw her and unlocked it, so she could get in. According to the victim, if it weren't for the officer, "I might not be alive." On July 5, 2011, Samsel was convicted and sentenced to 1 to 5 years in prison.

A few months later, on October 14, 2010, Samsel was arrested for conspiracy to intimidate a witness/victim false testimony, and terroristic threats with intent to terrorize against the same victim. ECF 451 (PSR ¶ 121). Samsel later attempted to and did interfere with her testimony about

---

front door and punched him in the face. According to the defendant, a scar on his hand is from this victim's teeth.

what had occurred. Specifically, Samsel called the victim's sister multiple times to get the victim not to appear in court, and, if she did appear, minimize his conduct by saying that nothing happened, that she had embellished her story, and that her prior statements were wrong. He was convicted on July 5, 2011, and sentenced to confinement for 4-10 years, followed by parole. Samsel was on parole for this matter when he was arrested in this case.

In December 2015, soon after his release on parole, Samsel was again arrested for assault and harassment. ECF 451 (PSR ¶ 122). This time, the victim reported numerous assaults by Samsel, including one at Samsel's residence where he choked the victim until the victim lost consciousness. Four days before this incident, Samsel had choked the victim from behind with his forearm. On yet another occasion, Samsel punched the victim in the face, causing a black eye, then demanded that she provide a false explanation for the injury. The victim was able to produce a photograph of the injury and a text message from Samsel with the false cover story. Samsel was convicted for simple assault and harassment-subject other to physical contact, and on February 17, 2017 he received a sentence of confinement for 6-12 months with supervision until February 24, 2022. Samsel was also on parole for this matter when he was arrested in this case.[27]

On February 2, 2021, the Pennsylvania Parole Board lodged a detainer against Samsel for violation of Parole for both the 2010 and 2015 convictions. ECF 451 (PSR ¶¶ 121, 122).

---

[27] Samsel also has an outstanding warrant from 2019 for additional felony domestic violence assaults.

**C.     The Need for the Sentence Imposed to Reflect the Seriousness of the Offense and Promote Respect for the Law**

As with the nature and circumstances of the offense, this factor supports a sentence of lengthy incarceration. Samsel's criminal conduct on January 6 was the epitome of disrespect for the law. *United States v. Cronin*, 22-cr-233-ABJ, Tr. 06/09/23 at 20 ("We cannot ever act as if this was simply a political protest, simply an episode of trespassing in a federal building. What this was was an attack on our democracy itself and an attack on the singular aspect of democracy that makes America America, and that's the peaceful transfer of power.") Samsel's role in this attack cannot be overstated. He lit the match when he broke down that first barricade and then shoved into the first line of officers. He and his co-defendants took the first steps to turn the protest into a criminal, violent riot, which eventually halted the certification of the electoral college certification, and injured numerous police officers.

As discussed above, Samsel has repeatedly alleged that his medical needs were not being met while incarcerated. This Court reviewed multiple motions and status reports, held multiple hearings, and ultimately issued multiple orders addressing Samsel's health concerns. Each time, the Court remanded Samsel to the care of the Bureau of Prisons (BOP). *See, e.g.,* ECF Dkt entries on 04/27/22, 05/17/22, 05/18/22, 05/31/22, 07/28/22, 10/03/22, 01/30/23, 10/02/23. This Court is not alone. On September 20, 2022, the Court of Appeals denied Samsel's interlocutory appeal. ECF Dkt. 196. In July 2024, Samsel made similar medical claims in civil filings in the Eastern District of New York. *See* 24-CV-05026-RPK. That Court denied Samsel's motion for a preliminary injunction. ECF Dkt. 14. Every Court to have reviewed Samsel's medical issues has concluded that they could be treated within the BOP.

### D.    The Need for the Sentence to Afford Adequate Deterrence

#### General Deterrence

A significant sentence is needed "to afford adequate deterrence to criminal conduct" by others. 18 U.S.C. § 3553(a)(2)(B). The need to deter others is especially strong in cases involving domestic terrorism, which the breach of the Capitol certainly was.[28] The demands of general deterrence weigh strongly in favor of incarceration, as they will for nearly every case arising out of the violent riot at the Capitol.

#### Specific Deterrence

The need for the sentence to provide specific deterrence to this particular defendant also weighs heavily in favor of a lengthy term of incarceration.

First, Samsel has a criminal history replete with violence, and even a prior attempt at using violence to obstruct proceedings (the witness tampering charge). Samsel has been on an upward trajectory of ever-escalating violence. Further, he appears to have violated every instance of parole by committing a new crime. This pattern of behavior must be deterred with a lengthy sentence.

Second, Samsel has displayed contempt for the Justice System, the BOP, and the Court. For example, in August 2023, a BOP Disciplinary Hearing Officer issued a report finding that Samsel possessed and used an unauthorized cell phone in jail for months, which he was using to make calls to bloggers. ECF Dkt. 266, Exh. 2. Between April 26, 2023, and July 24, 2023, at least one video interview and 12 audio interviews were posted on-line. ECF Dkt. 266, p. 5, n.1 (listing the blog posts). During that time, Samsel also posted on his Twitter/X Account. *Id*. at n.2. Included

---

[28] *See* 18 U.S.C. § 2331(5) (defining "domestic terrorism").

in his posts was this Court's name and Chambers' telephone number. Samsel repeatedly exhorted his readers to flood Chambers with calls. On June 7, 2023, Samsel posted a photo of himself with his head wrapped in a bandage, along with the text, "Please pass this along to everyone you know and email this to judge Jia Cobb as she could have prevented this but due to her strong hatred toward me others have suffered email her her hate has been turned into love [chambers' email address omitted]." On June 25, 2023, responding to a post that was later deleted, Samsel stated, "Please pass this along and i also ask for ppl to show this to judge jia cobb who belives that no violation took place. Rember i have been denied all medical treatment to this date bc of judge jia cobb DC district judge." On July 15, 2023, Samsel posted Chambers' phone number and a link to an unauthorized recording of the Court's January 13, 2023 hearing. Samsel wrote, "I have not received medical yet please help by calling judge jia cob [sic] at [phone number omitted] in support of my pretrial release for medical as Americans we are innocent b4 proven guilty by our peers, Help pass this along J6er Ryan Samsel Speaks At 1-13-23 Hearing." On August 4, 2023, Samsel tweeted:

> PLEASE PASS THIS ALONG
> EVERYBODY RYAN SAMSEL ASK FOR THE PUBLIC TO CALL HIS JUDGE
> IN SUPPORT OF MEDICAL HELP PLEASE CALL JUDGE COBB AND
> LEAVE A MSG EVERYDAY PLEASE WE BEG FOR PUBLICS HELP JUDGE
> JIA COBB [phone number omitted] PASS THIS AROUND WE NEED HELP
> THE MORE THE BETTER OF CHANCE.

Third, Samsel has expressed no remorse for his conduct on January 6, 2021. Instead, expressing solely pride. For instance, on January 6, 2021, Samsel texted a photo of himself "br[e]aking though the line"; and also sent messages noting "Dude no shit I started it" and "I broke through got hit with gas a few times but worth it lol." Gov. Exs. 1103R and 1103S. Furthermore,

since January 6 he has continued to advocate for violence, for instance, telling his girlfriend in May 2022, "…I don't give a fuck. Next time I see an FBI agent, I'll punch'em directly in their goddamn face." and telling her, "That's the problem. People like you out there exist. They're not aggressive enough …." Gov. Exh. 502. *See also* Gov. Exh. 1304 (Samsel threatening to use a woodchipper to kill politicians.)

Fourth, to this day, Samsel denies culpability for his actions on January 6. He has instead doubled down on his false assertions that the Capitol grounds were open; that he is a victim and hero; and that he helped the officers and did not hurt them. Samsel engaged in multiple assaults at the Capitol but continues to falsely assert that he committed no violence on that day. Furthermore, Samsel brutally attacked an officer causing her serious bodily injury and then told the bloggers and the listening public several preposterous versions of the events in which he alleges that he was trying to help her. During this most recent presidential election, Samsel instructed Genco to buy AR-15s and a silencer, so he could "pick people off from far, real far." He exhorted Genco to go back and "rush the Capitol. I mean, honestly. Do it again. I don't give a fuck. I'd say it. Go back. Do it again. Who gives a fuck? Who cares? Do it every time. Until we get what we want." This disturbing behavior indicates that Samsel still believes he is not culpable for his criminal conduct on January, 6 and as such, he may try to repeat it.

Lastly, the severity and unique nature of Samsel's conduct on January 6, 2021 indicates that a lengthy term of incarceration is necessary to deter him from such behavior in the future. Samsel was both the first rioter to breach the perimeter and one of a handful of rioters to engage in the very first assaults against officers. After that, he continued to engage in a series of assaults

and violent conduct over the course of at least an hour and a half. His willingness to be the first to take such drastic steps and the sheer volume of bad decisions and behaviors suggest that Samsel needs additional deterrence to keep him from repeating those same mistakes.

### E.    The Importance of the Guidelines

"The Guidelines as written reflect the fact that the Sentencing Commission examined tens of thousands of sentences and worked with the help of many others in the law enforcement community over a long period of time in an effort to fulfill [its] statutory mandate." *Rita v. United States*, 551 U.S. 338, 349 (2007). As required by Congress, the Commission has "'modif[ied] and adjust[ed] past practice in the interests of greater rationality, avoiding inconsistency, complying with congressional instructions, and the like.'" *Kimbrough v. United States*, 552 U.S. 85, 96 (2007) (quoting *Rita*, 551 U.S. at 349); 28 U.S.C. § 994(m). In so doing, the Commission "has the capacity courts lack to base its determinations on empirical data and national experience, guided by professional staff with appropriate expertise," and "to formulate and constantly refine national sentencing standards." *Kimbrough*, 552 U.S. at 108 (cleaned up). Accordingly, courts must give "respectful consideration to the Guidelines." *Id.* at 101.

### F.    Unwarranted Sentencing Disparities

Section 3553(a)(6) of Title 18 directs a sentencing court to "consider … the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar *conduct*" (emphasis added). So long as the sentencing court "correctly calculate[s] and carefully review[s] the Guidelines range, [it] necessarily [gives] significant weight and consideration to the need to avoid unwarranted disparities" because "avoidance of unwarranted

53

disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges." *Gall v. United States*, 552 U.S. 38, 54 (2007).

Section 3553(a)(6) does not limit the sentencing court's broad discretion "to impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing. 18 U.S.C. § 3553(a). After all, the goal of minimizing unwarranted sentencing disparities in Section 3553(a)(6) is "only one of several factors that must be weighted and balanced," and the degree of weight is "firmly committed to the discretion of the sentencing judge." *United States v. Coppola*, 671 F.3d 220, 254 (2d Cir. 2012). The "open-ended" nature of the Section 3553(a) factors means that "different district courts may have distinct sentencing philosophies and may emphasize and weigh the individual § 3553(a) factors differently; and every sentencing decision involves its own set of facts and circumstances regarding the offense and the offender." *United States v. Gardellini*, 545 F.3d 1089, 1093 (D.C. Cir. 2008). "[D]ifferent district courts can and will sentence differently—differently from the Sentencing Guidelines range, differently from the sentence an appellate court might have imposed, and differently from how other district courts might have sentenced that defendant." *Id*. at 1095. "As the qualifier 'unwarranted' reflects, this provision leaves plenty of room for differences in sentences when warranted under the circumstances." *United States v. Brown*, 732 F.3d 781, 788 (7th Cir. 2013).[29]

---

[29] If anything, the Guidelines ranges in Capitol siege cases are more likely to understate than overstate the severity of the offense conduct. *See United States v. Knutson*, D.D.C. 22-cr-31 (FYP), Aug. 26, 2022 Sent. Hrg. Tr. at 24-25 ("If anything, the guideline range underrepresents the seriousness of [the defendant's] conduct because it does not consider the context of the mob violence that took place on January 6th of 2021.") (statement of Judge Pan).

Although all the other defendants discussed below participated in the Capitol breach on January 6, 2021, many salient differences explain the differing recommendations and sentences.[30] While no previously sentenced case contains the same balance of aggravating and mitigating factors present here, the conduct in the following cases provide suitable comparisons to the relevant sentencing considerations in this case.

David Dempsey was at the U.S. Capitol for over an hour on January 6th, and pled guilty to multiple assaults with deadly and dangerous weapons, which caused serious bodily injuries to two officers in the Lower West Terrace Tunnel. *United States v. David Dempsey*, 21-cr-566-RCL. Like Samsel, he suffered from a significant, violent criminal history. Unlike Samsel, Dempsey pled guilty, accepted responsibility for his violent actions, and did not broadcast lies about January 6th for years thereafter. The government recommended 262 months, and Judge Lamberth sentenced Dempsey to 240 months, three years supervised release, and $2,000 in restitution.

In *United States v. Christopher Quaglin*, 21-cr-00040-TNM, Quaglin was convicted on multiple assault counts (three under 111a and three under 111b), along with burglary, civil disorder, obstruction and 1752 counts, and Judge McFadden sentenced the defendant to 144 months of incarceration followed by two years of supervised release and $2,000 in restitution. The defendant in *Quaglin* was in the initial group of rioters who stormed the Capitol at the Peace Circle and assaulted several officers on the West Front by choking one officer to the ground, and pulling

---

[30] A routinely updated table providing additional information about the sentences imposed on other Capitol breach defendants is available here: https://www.justice.gov/usao-dc/capitol-breach-cases. To reveal that table, click on the link "SEE SENTENCES HANDED DOWN IN CAPITOL BREACH CASES." The table shows that imposition of the government's recommended sentence in this case would not result in an unwarranted sentencing disparity.

a bike rack away from an officer and then ramming it into a line of more than a dozen officers. The defendant also attacked officers in the tunnel by pulling a shield away from one officer and spraying chemical irritants in the officers' faces. The defendant came prepared for the riot, wearing tactical gear, and encouraged others. After January 6, he continued to boast and brag about his conduct, both blaming officers for the riot, while simultaneously taking pride in his actions and conduct. The Government recommended 168 months' incarceration, and the Court sentenced him to 144.

Similar to the defendant in *Quaglin*, Samsel initiated the breach onto Capitol grounds and assaulted USCP officers once arrived at the first manned barricade. Samsel instigated the forcible pushing and pulling of the bike rack barricade directly across from Officer C.E. and then lifted the barricade with his codefendants and pushed it into the police line. This conduct is similar to Quaglin's conduct at the Peace Circle. Unlike Quaglin however, Samsel's conduct resulted in the serious bodily injury of Officer C.E. when he and Randolph forcibly struck her in the face with the bike rack and caused her to fly backward, strike her jaw on the handrail and the back of her head on the steps below. Like Quaglin, Samsel continued his assaultive behavior once arrived at the West Front, yelling at officers, grabbing a riot shield, threatening officers with his flagpole, and throwing both a 2x4 plank and a metal pole at the police. Also similar to the defendant in *Quaglin*, Samsel boasted and bragged about his conduct on January 6 both to his friends over text and to the public on multiple podcasts. Samsel has yet to express any remorse.

Samsel should be facing a higher sentence than Quaglin, because, unlike Samsel, Quaglin had no criminal history and was in Criminal History Category I. Further, Samsel was the first rioter to breach the restricted perimeter on January 6 and caused serious bodily injury.

Another comparator is *United States v. Peter Schwartz*, 21cr00178-APM. Schwartz came to Washington, D,C. on January 6th with a significant violent criminal history. Schwartz escalated the violence on that day. He threw a chair at the police line on the West Front, creating an opening in the police line for rioters to flood through, and then used two separate canisters of pepper spray left behind by fleeing officers to spray, and assist co-defendants in spraying, officers both at the West Front and again in the Lower West Terrace Tunnel. Schwartz bragged about his role in the January 6th riot first texting his friends that he had started a riot and following up with interviews to bloggers about chronicling his alleged exploits. For his actions, Schwartz was found guilty of four 111b assault counts, along with obstruction, civil disorder, 1752 charges and misdemeanors, after a jury trial. The Government recommended 294 months. Judge Mehta sentenced him to 170 months.

Like Schwartz, Samsel has a significant criminal history, escalated the violence by breaking through the first barricade, and assaulted law enforcement officers repeatedly throughout the day with deadly weapons, causing injuries. Also like Schwartz, Samsel has evinced no remorse, instead bragging to his friends that "Dude no shit I started it;" and then --unrepentant-- announcing to a blogger that he had "never heard of a non-violent patriot. Sometimes civil disorder is needed. And I'm sorry I pushed on a gate and that's all I did." Not only has Samsel voiced no remorse, he

has fanned the flames, repeatedly lying to the public about his role and that of the police, feeding the false narrative about what happened on January 6th.

Finally, this Court should consider the sentence it imposed on co-Defendant Stephen Randolph, 21cr537-JMC. This Court imposed a 96-month sentence for Randolph's assault on Officers C.E. and D.C. Samsel's behavior on January 6th and thereafter was undoubtedly more aggravated than Randolph. Randolph was not the first to breach the perimeter and did not continue his violent and aggressive behavior on the West Front. Further, Randolph has not spouted lies and disinformation over the last four years. And, finally, Randolph was in criminal history category I, with a guideline range of 108-135 months, a far cry from Samsel's category VI and guideline range of 210 to 262 months.

### RESTITUTION

Under 18 U.S.C. § 3556, a sentencing court must determine whether and how to impose restitution in a federal criminal case. Because a federal court possesses no "inherent authority to order restitution," *United States v. Fair*, 699 F.3d 508, 512 (D.C. Cir. 2012), it can impose restitution only when authorized by statute, *United States v. Papagno*, 639 F.3d 1093, 1096 (D.C. Cir. 2011). First, the Victim and Witness Protection Act of 1982 ("VWPA"), Pub. L. No. 97-291 § 3579, 96 Stat. 1248 (now codified at 18 U.S.C. § 3663), "provides federal courts with discretionary authority to order restitution to victims of most federal crimes." *Papagno*, 639 F.3d at 1096; *see* 18 U.S.C. § 3663(a)(1)(A) (Title 18 offenses subject to restitution under the VWPA). Second, the Mandatory Victims Restitution Act ("MVRA"), Pub. L. No. 104-132 § 204, 110 Stat. 1214 (codified at 18 U.S.C. § 3663A), "requires restitution in certain federal cases

involving a subset of the crimes covered" in the VWPA. *Papagno*, 639 F.3d at 1096. The MVRA applies to certain offenses including those "in which an identifiable victim or victims has suffered a physical injury or pecuniary loss," 18 U.S.C. § 3663A(c)(1)(B), a "crime of violence," § 3663A(c)(1)(A)(i), or "an offense against property … including any offense committed by fraud or deceit," § 3663A(c)(1)(A)(ii). *See Fair*, 699 F.3d at 512 (citation omitted). Samsel was convicted of a violation of an offense under Title 18, so the VWPA does apply.

The applicable procedures for restitution orders issued and enforced under these two statutes is found in 18 U.S.C. § 3664. *See* 18 U.S.C. § 3556 (directing that sentencing court "shall" impose restitution under the MVRA, "may" impose restitution under the VWPA, and "shall" use the procedures set out in Section 3664).

Both [t]he VWPA and MVRA require identification of a victim, defined in both statutes as "a person directly and proximately harmed as a result of" the offense of conviction. *Hughey v. United States*, 495 U.S. 411, 418 (1990) (interpreting the VWPA). Both statutes identify similar covered costs, including lost property and certain expenses of recovering from bodily injury. *See Papagno*, 639 F.3d at 1097-97; 18 U.S.C. §§ 3663(b), 3663A(b). Finally, under both the statutes, the government bears the burden by a preponderance of the evidence to establish the amount of loss suffered by the victim. *United States v. Bikundi*, 926 F.3d 761, 791 (D.C. Cir. 2019).

In deciding whether to impose restitution under the VWPA, the sentencing court must take account of the victim's losses, the defendant's financial resources, and "such other factors as the court deems appropriate." *United States v. Williams*, 353 F. Supp. 3d 14, 23-24 (D.D.C. 2019) (quoting 18 U.S.C. § 3663(a)(1)(B)(i)). The MVRA, by contrast, requires imposition of full

59

restitution without respect to a defendant's ability to pay.[31]

Because the defendant in this case engaged in criminal conduct in tandem with hundreds of other defendants charged in other January 6 cases, and his criminal conduct was a "proximate cause" of the victims' losses if not a "cause in fact," the Court has discretion to apportion restitution and hold the defendant responsible for his individual contribution to the victims' total losses. *See Paroline v. United States*, 572 U.S. 434, 458 (2014) (holding that in aggregate causation cases, the sentencing court "should order restitution in an amount that comports with the defendant's relative role in the causal process that underlies the victim's general losses"). *See also United States v. Monzel*, 930 F.3d 470, 476-77, 485 (D.C. Cir. 2019) (affirming $7,500 in restitution toward more than a $3 million total loss, against a defendant who possessed a single pornographic image of the child victim; the restitution amount was reasonable even though the "government was unable to offer anything more than 'speculation' as to [the defendant's] individual causal contribution to [the victim's] harm"; the sentencing court was not required to "show[] every step of its homework," or generate a "formulaic computation," but simply make a "reasoned judgment."); *cf.* 18 U.S.C. § 3664(h) ("If the court finds that more than 1 defendant has contributed to the loss of a victim, the court … may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.").

More specifically, the Court should require Samsel to pay $2,000 in restitution for his felony convictions. This amount fairly reflects Samsel's role in the offense and the damages

---

[31] Both statutes permit the sentencing court to decline to impose restitution where doing so will "complicat[e]" or "prolong[]" the sentencing process. *See* 18 U.S.C. §§ 3663(a)(1)(B)(ii), 3663A(c)(3)(B).

resulting from his conduct. Moreover, in cases where the parties have entered into a guilty plea agreement, $2,000 has consistently been the agreed upon amount of restitution and the amount of restitution imposed by judges of this Court where the defendant was not directly and personally involved in damaging property. Accordingly, such a restitution order avoids sentencing disparity.

## VII.  FINE

Samsel's convictions subject him to a maximum fine of $250,000 for each felony count and $5,000 for each misdemeanor count. *See* 18 U.S.C. § 3571(b). In determining whether to impose a fine, the sentencing court should consider a defendant's income, earning capacity, and financial resources. *See* 18 U.S.C. § 3572(a)(1); *See* U.S.S.G. § 5E1.2(d). The sentencing guidelines provide for a fine in all cases, except where a defendant establishes that he is unable to pay and is not likely to become able to pay any fine. U.S.S.G. § 5E1.2(a), (e) (2023). The burden is on the defendant to show present and prospective inability to pay a fine. *See United States v. Gewin*, 471 F.3d 197, 203 (D.C. Cir. 2006) (explaining that "it makes good sense to burden a defendant who has apparently concealed assets" to prove that "he has no such assets and thus cannot pay the fine"); *United States v. Lombardo*, 35 F.3d 526, 528 (11th Cir. 1994). "In assessing a defendant's income and earning capacity, the court properly considers whether a defendant can or has sought to 'capitalize' on a crime that 'intrigue[s]' the 'American public.'" *United States v. Seale*, 20 F.3d 1279, 1284–86 (3d Cir. 1994).

Here, Samsel has not shown an inability to pay, thus pursuant to the considerations outlined in U.S.S.G. § 5E1.2(d), the Court has authority to impose a fine. § 5E1.2(a), (e). The guidelines fine range here is $35,000 to $350,000 U.S.S.G. § 5E1.2(c).

A fine is appropriate in this case. In his pre-sentence interview, Samsel "denied having any income, bank accounts, cryptocurrency accounts,[32] vehicles, real estate property, and/or any assets of value." PSR ¶ 158. In reality, Samsel has fundraised aggressively off his notoriety stemming from his conduct on January 6. There are at least three active GiveSendGo pages connected to Samsel and Genco totaling more than $136,000.[33]

Samsel has used overt falsehoods to enrich himself through these pages. One of Samsel's most prevalent falsehoods is the staged photo of conditions at a federal pretrial detention center.[34] In a Gateway Pundit interview, in which Samsel solicited donations, Samsel stated that he was kept in that cell for "five, six months" and that during this period, "the judge was actually calling, trying to get in contact with me because I wasn't in a named cell."[35] He has misleadingly cast himself in a sympathetic light in articles soliciting donations—"It is public knowledge that I was not alone during the incident at the gate involving Ray Epps and Officer [C.E.]. I was part of a group of approximately 300 individuals, yet I was the only one who pulled Officer [C.E.] to

---

[32] Samsel in fact has stated his intention to start his own cryptocurrency, "Potestas Token," which he has promoted in Jan. 6 related news articles. *See, e.g.*, "J6er Ryan Samsel Launches 'The Effort': Empowering Change, Independence, and Financial Freedom," Gateway Pundit (June 29, 2024), available at: https://www.thegatewaypundit.com/2024/06/j6er-ryan-samsel-lauches-effort-empowering-change-independence/

[33] These pages include:
"Samsel Family," which currently has $85,795 in donations: https://www.givesendgo.com/campaign/grabwidget?urllink=G2EXA (last visited: Jan. 8, 2025).
"Medical and Legal Support," which currently has $42,982 in donations (with Genco listed as the recipient): https://www.givesendgo.com/RyanSamsel (last visited: Jan. 8, 2025).
"The Effort," which currently has $7,911 in donations (with Genco listed as the recipient): https://www.givesendgo.com/TheEffortLife (last visited: Jan. 8, 2025)

[34] E.g., https://www.givesendgo.com/RyanSamsel; https://www.givesendgo.com/TheEffortLife.

[35] https://www.actforamerica.org/node/63669 (last visited: Jan. 8, 2025).

safety."[36]—and has accused this Court of abuse to garner further attention and sympathy.[37]

These fundraising pages also mislead donors about the intended use of the funds. While the fundraising pages solicit donations to assist Samsel in paying for legal fees and medical expenses and debt, conversations between Samsel and Genco reveal an intention to use the funds for several other purposes, which include a hair transplant and cosmetic dental work in Turkey, a new barbershop, an apartment, steroids, and cryptocurrency ATMs.

Finally, while currently active fundraising pages tied to Samsel total $136,000, this is a conservative estimate not counting previously active pages that Samsel and Genco have since shut down,[38] fundraising done jointly for Genco and Samsel or solely for Genco,[39] or donations solicited in Bitcoin and Ethereum, which are difficult to track.[40] In recorded phone calls while Samsel has been in custody, Samsel and Genco have reported holdings of over $240,000. And while most of Samsel's and Genco's GiveSendGo campaigns are in Genco's name, Samsel's recorded conversations with Genco show clearly that Samsel exerts substantial control over the

---

[36]    https://www.thegatewaypundit.com/2024/04/j6-political-prisoner-ryan-samsel-finally-sees-doctor.

[37] E.g. https://www.thegatewaypundit.com/2023/12/j6-hostage-ryan-samsel-reveals-exactly-how-fbi/ ("When I finally was able to call into court, I told the judge, 'Your Honor, I'm in living a hole the size of a broom closet, and surgery is not scheduled for three months, get me the hell out of here! Can I please be allowed in general population?' She said, 'No' and kept in the hole.").

[38] E.g. https://www.givesendgo.com/THEEFFORT (last visited: Jan. 8, 2025). Interviews in which Samsel has solicited donations have linked to this page on multiple occasions with the text "PLEASE SUPPORT J6 POLITICAL HOSTAGE RYAN SAMSEL'S MEDICAL AND LEGAL BATTLE HERE." E.g., "https://www.thegatewaypundit.com/2024/04/ray-epps-exposed-never-before-released-fbi-interview.

[39] E.g. "Raechel Genco" GiveSendGo, which currently has $33,684 in donations: https://www.givesendgo.com/raechelgenco (last visited: Jan. 8, 2025).

[40] E.g. https://theeffort.life/ (last visited: Jan. 8, 2025).

funds, discussing his future expenditures with the funds[41] and admonishing Genco for spending the funds on what he sees as unneeded expenses.[42]

Samsel has been tireless in capitalizing on his notoriety stemming from his participation in January 6. It would be a grave injustice to permit Samsel to enrich himself not only from his conduct on January 6, but from his widespread lies about his conduct and what took place on January 6. A substantial fine is warranted in this case.

//

//

//

//

//

//

//

//

//

//

---

[41] For example, on an October 26, 2024 jail call, Samsel mentions using $30,000 for a new barbershop, $7,000 for hair transplant surgery, $2,000 for "teeth work," $3,500 for new clothes, and "a little bit" of steroids. *See* Gov. Exh. 1308.

[42] Samsel on a Nov. 2, 2024 call discussing $242,000 in savings: "Raechel, before you spend any money on anything, ask me. … You ask me permission … You don't make good decisions. When it comes to money, you ask me anything. I don't give a fuck, Raechel. You're blowing it on dumb shit." *See* Gov. Exh. 1309.

## VIII.  CONCLUSION

For the reasons set forth above, the government recommends that the Court impose a sentence of 240 months of incarceration, three years of supervised release, $2,000 restitution, a fine, and the mandatory assessment of $100 for each felony conviction and $10 for each class B misdemeanor conviction, which adds up to $520.

Respectfully submitted,

BRIDGET M. FITZPATRICK
ACTING UNITED STATES ATTORNEY
DC Bar Number is 474946

BY:    *s/ Alexandra F. Foster*
        Alexandra F. Foster, DC Bar No. 470096
        J. Hutton Marshall, DC Bar No. 1721890
        Kyle R. Mirabelli, NY Bar No. 5663166
        Assistant United States Attorneys
        U.S. Attorney's Office, District of Columbia
        Telephone No: (619) 546-6735
        Email Address: alexandra.foster@usdoj.gov